# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | | |
|---|---|---|
| **ALLEN WILLIFORD AND LYNDA WILLIFORD,** | ) ) ) | |
| | ) | **CASE NO. 8:23-cv-01731** |
| | ) | |
| | ) | **Formerly Case No: 21-CA-006219,** |
| | ) | **Thirteenth Judicial Circuit, Hillsborough** |
| *Plaintiffs,* | ) | **County, Florida** |
| | ) | |
| **VS.** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| **SYNGENTA CROP PROTECTION, LLC** | ) ) | |
| | ) | |
| *Defendant.* | ) | |

---

## AMENDED COMPLAINT

Pursuant to the Court's August 7, 2023 Order Granting Leave to File an Amended Complaint No Later Than August 21, 2023 to Cure the "Shotgun Pleading" defect, *See* Weiland v. Palm Beach County Sheriff's Office, 792 F.3d 1313, 1324 (11th Cir. 2015), Plaintiffs file this Amended Complaint. This Amended Complaint is identical to the Complaint filed in the Circuit Court of the County of Hillsborough, State of Florida, with the following exceptions:

1. The style of the case has been changed to reflect the Federal Court Case Number and Court Information.

1

2. References to Chevron U.S.A., Inc. as a Defendant have been omitted as that Defendant was dismissed by the State Court on April 11, 2022 without prejudice.

3. References to Council-Oxford, Inc. as a Defendant have been omitted as that Defendant was dismissed on July 18, 2023 with prejudice.

4. The verboten incorporation of previous allegations has been remedied.

5. Plaintiffs Count IV (Breach of Implied Warranty) has been omitted as that count was dismissed with prejudice by the State Court on January 5, 2022.

6. Plaintiffs Count VI (Punitive Damages), has been omitted as Plaintiffs punitive damages claims were dismissed, without prejudice, by the State Court.

Plaintiffs ALLEN WILLIFORD AND LYNDA WILLIFORD (hereinafter, collectively referred to as "Plaintiffs"), by and through counsel of The Miller Firm, LLC allege upon information and belief and complains of Defendant Syngenta Crop Protection, LLC ("SCPLLC") (together with their predecessors-in-interest, referred to collectively as the "Syngenta Defendants") and state as follows:

## STATEMENT OF THE CASE

1. Plaintiff ALLEN WILLIFORD suffers from Parkinson's disease caused by his exposure to the herbicide Paraquat;

2. Plaintiffs ALLEN WILLIFORD AND LYNDA WILLIFORD are Florida Residents and residents of Hillsborough County.

3. Defendant is a company that since 1964 has manufactured, distributed, licensed, marketed, and sold Paraquat for use in the United States, including Florida.

4.      Plaintiffs bring this action to recover damages for personal injuries resulting from the injured Plaintiff's exposures to Paraquat manufactured, distributed, and sold by Defendant.

5.      Defendant's tortious conduct, including its negligent acts and omissions in the research, testing, design, manufacture, marketing, and sale of Paraquat, caused Plaintiffs injuries. At all relevant times, Defendant knew or, in the exercise of reasonable care, should have known that Paraquat was a highly toxic substance that can cause severe neurological injuries and impairment, and should have taken steps in its research, manufacture, and sale of Paraquat to ensure that people would not be harmed by foreseeable uses of Paraquat.

## JURISDICTION AND VENUE

6.      At all times relevant hereto, Defendant was in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, labeling and packaging and was in the business of marketing, promoting, and/or advertising Paraquat products in the State of Florida and the County of Hillsborough.

7.      Pursuant to Florida Code § 47.011, venue is proper in the County of Hillsborough where the cause of action accrued.

## PARTIES

8.      At all times herein mentioned each and every of the Syngenta Defendants was the agent, servant, employee, joint venturer, alter ego, successor-in-interest, and predecessor-in-interest of each of the other, and each was acting within the course and scope of their agency, service, joint venture, alter ego relationship, employment, and corporate interrelationship.

9.      U.K. manufacturer Imperial Chemical Industries Ltd. a/k/a Imperial Chemical Industries PLC ("ICI") first introduced Paraquat to world markets in or about 1962 under the brand name GRAMOXONE®.

10.     In or about 1971, ICI created or acquired a wholly owned U.S. subsidiary organized under the laws of the State of Delaware, which was ultimately known as ICI Americas Inc. ("ICI Americas").

11.     Chevron Chemical Company was a corporation organized under the laws of the State of Delaware.

12.     Pursuant to distribution and licensing agreements with ICI and ICI Americas, Chevron Chemical Company had exclusive rights to distribute and sell Paraquat in the United States and did in fact manufacture, formulate, distribute, and sell Paraquat in the United States, including in Florida for use in Florida, from approximately 1964 until approximately 1986.

13.     Chevron U.S.A. Inc. is the successor-in-interest to Chevron Chemical Company.

14.     At all relevant times, Chevron Chemical Company acted as the agent of Chevron U.S.A. Inc. in selling and distributing Paraquat in the U.S. At all relevant times, Chevron Chemical Company was acting within the scope of its agency in selling and distributing Paraquat.

15.     From approximately 1964 through approximately 1986, pursuant to distribution and licensing agreements with Chevron Chemical Company, SCPLLC's predecessors-in-interest, ICI and ICI Americas, manufactured some or all of the Paraquat that Chevron Chemical Company distributed and sold in the United States, including in Florida for use in Florida.

16.     From approximately 1964 through approximately 1986, pursuant to distribution and licensing agreements between and among them, ICI, ICI Americas, Chevron Chemical Company acted in concert to register, manufacture, formulate, and distribute and sell (through Chevron Chemical Company) Paraquat for use in the U.S., including in Florida for use in Florida, and their respective successors-in-interest, SCPLLC and Chevron U.S.A. Inc.

17.     After 1986, SCPLLC and/or their predecessors-in-interest sold and distributed and continue to sell and distribute Paraquat in the United States, including in Florida for use in Florida.

18.     Thus, from approximately 1964 through the present, the Syngenta Defendants or their predecessors-in-interest have manufactured, formulated, distributed, and sold Paraquat for use in the U.S., including in Florida for use in Florida.

19.     As a result of mergers and corporate restructuring, SCPLLC is the successor-in-interest to ICI Americas, Inc.

20.      From approximately 1980 to present, Council-Oxford, Inc. pursuant to distribution agreements between and among them and manufacturer, Defendant acted in concert to distribute and sell Paraquat for use in the U.S., including in Florida for use in Florida.

21.     From approximately 1980 to present, Council-Oxford, Inc. pursuant to distribution agreements between and among them and manufacturer, Defendant acted in concert market and sell Paraquat to end users, including Plaintiff.

## PLAINTIFF'S EXPOSURE TO PARAQUAT

22.     At all relevant times, Plaintiff Allen Williford was a farmer/agricultural worker who was exposed to Paraquat in the 1960s, 1970s and 1980s in Florida (1) when it was mixed, loaded, applied, and/or cleaned; (2) as a result of spray drift (the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind); and/or (3) as a result of contact with sprayed plants.

23.     At all relevant times, it was reasonably foreseeable that when Paraquat was used in the intended or a reasonably foreseeable manner, users of Paraquat and persons nearby would be exposed to it.

24.     At all relevant times, it was reasonably foreseeable that Paraquat could enter the human body: (1) through absorption or penetration of the skin, mucous membranes, and other epithelial tissues (including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage were present); (2) through the olfactory bulb; (3) through respiration into the lungs; and (4) through ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways.

### PARAQUAT CAUSES PARKINSON'S DISEASE

25.     At all relevant times, it was reasonably foreseeable that Paraquat that entered a human body could ultimately enter the brain.

26.     At all relevant times, it was reasonably foreseeable that Paraquat that entered a human body could induce the misfolding of the alpha synuclein protein.

27.     Parkinson's disease is a progressive neurodegenerative disorder of the brain that affects primarily the motor system-the part of the central nervous system that controls movement.

28.     The characteristic symptoms of Parkinson's disease are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).

29.     Parkinson's disease's primary motor symptoms often result in "secondary" motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

30.     Non-motor symptoms-such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and

depression-are present in most cases of Parkinson's disease, often for years before any of the primary motor symptoms appear.

31.     There is currently no cure for Parkinson's disease; no treatment will stop or reverse its progression; and the treatments most commonly prescribed for its motor symptoms tend to become progressively less effective, and to increasingly cause unwelcome side effects, the longer they are used.

32.     One of the primary pathophysiological hallmarks of Parkinson's disease is the selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc").

33.     Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).

34.     The death of dopaminergic neurons in the SNpc decreases the production of dopamine. Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of Parkinson's disease.

35.     The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of Parkinson's disease.

36.     Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

37.     Scientists who study Parkinson's disease generally agree that oxidative stress is a major factor in-if not the precipitating cause of-the degeneration and death of dopaminergic neurons in the SNpc and the accumulation

of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of the disease.

38.    Paraquat is highly toxic to both plants and animals, creating oxidative stress that causes or contributes to cause the degeneration and death of plant or animal cells.

39.    Paraquat creates oxidative stress in the cells of plants and animals because of "redox properties" that are inherent in its chemical composition and structure: it is a strong oxidant, and it readily undergoes "redox cycling" in the presence of molecular oxygen, which is plentiful in living cells.

40.    The redox cycling of Paraquat in living cells interferes with cellular functions that are necessary to sustain life-with photosynthesis in plant cells, and with cellular respiration in animal cells. The redox cycling of Paraquat in living cells creates a "reactive oxygen species" known as superoxide radical, an extremely reactive molecule that can initiate a cascading series of chemical reactions that creates other reactive oxygen species that damage lipids, proteins, and nucleic acids, molecules that are essential components of the structures and functions of living cells. Because the redox cycling of Paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of Paraquat can trigger the production of countless molecules of destructive superoxide radical.

41.    Paraquat's redox properties have been known to science since at least the 1930s.

42.    It has been scientifically known since the 1960s that Paraquat (due to its redox properties) is toxic to the cells of plants and animals. The same redox properties that make Paraquat toxic to plant cells and other types of animal cells make it toxic to dopaminergic neurons in humans -that is, Paraquat is a strong oxidant that interferes with the function of, damages, and ultimately kills

dopaminergic neurons in the human brain by creating oxidative stress through redox cycling.

43.     Paraquat is one of only a handful of toxins that scientists use to produce animal models of Parkinson's disease, i.e., use in a laboratory to artificially produce the symptoms of Parkinson's disease in animals.

44.     Animal studies involving various routes of exposure have found that Paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons in the SNpc, other pathophysiology consistent with that seen in human Parkinson's disease, and motor deficits and behavioral changes consistent with those commonly seen in human Parkinson's disease.

45.     Hundreds of in vitro studies (experiments in a test tube, culture dish, or other controlled experimental environment) have found that Paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons (and many other types of animal cells).

46.     Epidemiological studies have found that exposure to Paraquat significantly increases the risk of contracting Parkinson's disease. A number of studies have found that the risk of Parkinson's disease is more than double in populations with occupational exposure to Paraquat compared to populations without such exposure.

47.     These convergent lines of evidence (toxicology, animal experiments, and epidemiology) demonstrate that Paraquat exposure generally can cause Parkinson's disease.

## PARAQUAT REGULATION

48.     The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq., which regulates the distribution, sale, and use of pesticides within the U.S., requires that pesticides be registered with the U.S. Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. 136a(a).

9

49.     The California Food & Agric. Code § D. 7, Ch. 2, which regulates the labeling, distribution, use, and application of pesticides within the State of California, requires that pesticides be registered with the California Department of Pesticide Regulation ("CDPR") before they are offered for sale in the State of California. Cal. Food & Agric. Code § 12811.

50.     Paraquat is a "restricted use pesticide" under federal law, see 40 C.F.R. § 152.175, which means it is "limited to use by or under the direct supervision of a certified applicator," and is a "restricted material" under California law, see Cal. Code Regs. tit. 3, § 6400(e), which means it cannot be sold, used, or possessed by any person in California without the proper licensing and permitting.

51.     As part of the pesticide registration process, the EPA requires, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

52.     As a general rule, FIFRA requires registrants, the chemical companies registered to sell the pesticides, to perform health and safety testing of pesticides. However, FIFRA does not require the EPA itself to perform health and safety testing of pesticides, and the EPA generally does not perform such testing.

53.     The EPA registers (or re-registers) a pesticide if it is persuaded, based largely on studies and data submitted by the registrant, that: (1) its composition is such as to warrant the proposed claims for it, 7 U.S.C. § 136a(c)(5)(A); (2) its labeling and other material required to be submitted comply with the requirements of FIFRA, 7 U.S.C. § 136a(c)(5)(B); (3) it will perform its intended function without unreasonable adverse effects on the environment, 7 U.S.C. § 36a(c)(5)(C); and (4) when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(D).

54.    FIFRA defines "unreasonable adverse effects on the environment" as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

55.    Under FIFRA, "[a]s long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]." 7 U.S.C. § 136a(f)(2). However, FIFRA further provides that "[i]n no event shall registration of an article be construed as a defense for the commission of any offense under [FIFRA]." 7 U.S.C. § 136a(f)(2).

56.    The distribution or sale of a pesticide that is misbranded is an offense under FIFRA, which provides in relevant part that "it shall be unlawful for any person in any State to distribute or sell to any person ... any pesticide which is ... misbranded." 7 U.S.C. § 136j(a)(1)(E). A pesticide is misbranded under FIFRA if, among other things: (1) its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients which is false or misleading in any particular, 7 U.S.C. § 136(q)(1)(A); (2) the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under section 136a(d) of this title, are adequate to protect health and the environment, 7 U.S.C. § 136(q)(1)(F); or (3) the label does not contain a warning or caution statement which may be necessary and if complied with, together with any requirements imposed under section 136a(d) of this title, is adequate to protect health and the environment," 7 U.S.C. § 136(q)(1)(G).

57.    As a result, a pesticide may be misbranded despite an EPA determination that it met FIFRA's registration criteria. In other words, notwithstanding its registration, a pesticide is misbranded if its label contains "false or misleading" statements, has inadequate instructions for use, or omits

warnings or cautionary statements necessary to protect human health. Similarly, a pesticide may be found to cause unreasonable adverse effects on humans when used according to the approved label despite a determination by the EPA that it would not.

58.     Plaintiff does not seek in this action to impose on Defendant any labeling or packaging requirement in addition to or different from those required under FIFRA. Any allegation in this Complaint that a Defendant breached a duty to provide adequate directions for the use of or warnings about Paraquat, breached a duty to provide adequate packaging for Paraquat, concealed, suppressed, or omitted to disclose any material fact about Paraquat, or engaged in any unfair or deceptive practice regarding Paraquat, is intended and should be construed to be consistent with that alleged breach, concealment, suppression, or omission, or unfair or deceptive practice having rendered the Paraquat "misbranded" under FIFRA. However, Plaintiff brings claims and seeks relief in this action only under state law, and does not bring any claims or seek any relief in this action under FIFRA.

### Acts of Syngenta Defendants

59.     SCPLLC is a limited liability company organized under the laws of the State of Delaware. It is a successor by merger or continuation of business to its corporate predecessors, including but not limited to ICI Americas. SCPLLC is registered with the State of Florida Secretary of State to do business in the State of Florida.

60.     SCPLLC or its corporate predecessors have sufficient minimum contacts with the State of Florida and have purposefully availed themselves of the privileges of conducting business in the State of Florida, in that they:

        a. secured and maintained the registration of Paraquat products and other pesticides with the CDPR to enable themselves and others to manufacture, distribute, sell, and use these products in the State of Florida;

b. marketed, licensed, advertised, distributed, sold, and delivered Paraquat and other pesticides to chemical companies, licensees, distributors, and dealers whom they expected to distribute and sell Paraquat and other pesticides in or for use in the State of Florida, including Chevron and "Syngenta Retailers," as well as to applicators and farmers in the State of Florida;

c. employed or utilized sales representatives to market and sell Paraquat and other pesticides in Florida;

61.    SCPLLC's contacts with the State of Florida are related to or gave rise to this controversy.

## DEFENDANT'S TORTIOUS CONDUCT RESULTED IN ALLEN WILLIFORD'S DEVELOPING PARKINSON'S DISEASE

62.    Plaintiff ALLEN WILLIFORD is a resident of Riverview, Florida.

63.    Plaintiff was exposed to Paraquat manufactured and sold by Defendant.

64.    Plaintiff Allen Williford worked as an agricultural worker in Florida in the 1970s and 1980s, where he personally sprayed, mixed, loaded, and/or cleaned Paraquat.

65.    During this time, Plaintiff was in close contact to the Paraquat that was designed, manufactured, and distributed by Defendant. During that time, Plaintiff would also mix, load, spray, and/or clean Paraquat.

66.    The Paraquat to which Plaintiff was exposed entered his body through absorption or penetration of the skin, mucous membranes, and other epithelial tissues (including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage are present); and/or 2) through the olfactory bulb; and/or 3) through respiration into the lungs; and/or 4) through ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways.

13

Once absorbed, the Paraquat entered his bloodstream, attacked his nervous system, and was substantial factor in causing him to suffer Parkinson's disease.

67.     Plaintiff was diagnosed with Parkinson's disease in or about 2021.

68.     Plaintiff had no reason to suspect the diagnosis was connected to his past Paraquat exposure.

69.     Although Plaintiff knew that the Paraquat to which he was exposed was acutely toxic, he had no reason to suspect that chronic, low-dose exposure to Paraquat could cause neurological diseases such as Parkinson's disease.

70.     Plaintiff was never told, either by a medical professional, by media, or by the Defendant, that chronic, low-dose exposure to Paraquat could cause him to suffer Parkinson's disease.

71.     Plaintiff did not discover this earlier because he had no reason to suspect that his working with Paraquat could cause him to suffer Parkinson's disease.

72.     Defendant's acts and omissions were a legal, proximate, and substantial factor in causing Plaintiff to suffer severe and permanent physical injuries, pain, mental anguish, and disability, and will continue to do so for the remainder of his life.

73.     By reason of these premises, it became necessary for Plaintiff to incur expenses from medical care and treatment, and related costs and expenses required in the care and treatment of said injuries. Plaintiff's damages in this respect are presently unascertained as said services are still continuing.

74.     By reason of these premises, it will be necessary for Plaintiff to incur future expenses for medical care and treatment, and related costs and expenses required for future care and treatment. Plaintiff's damages in this respect are presently unascertained as said services are still continuing. Plaintiff prays leave to insert elements of damages in this respect when the same are finally determined.

75.     By reason of these premises, Plaintiff has been at times unable to follow Plaintiff's regular employment, incurring special damages in a presently unascertained sum as said loss is still continuing. Plaintiff prays leave to insert elements of damages with regards to past wage loss, future wage loss, and lost earning capacity when the same are finally determined.

76.     By reason of these premises, Plaintiff has suffered general (non-economic) damages in a sum in excess of the jurisdictional minimum of this court.

77.     By reason of these premises, Plaintiff has suffered special (economic) damages in a sum in excess of the jurisdictional minimum of this court.

## CAUSES OF ACTION
## COUNT I - STRICT PRODUCTS LIABILITY - DESIGN DEFECT

78.     Defendant is liable to Plaintiffs under a products liability theory for marketing a defectively-designed product, as well as for failing to adequately warn of the risk of severe neurological injury caused by chronic, low-dose exposure to Paraquat.

79.     At all relevant times, the Syngenta Defendants, and their corporate predecessors designed, manufactured, distributed, and sold Paraquat for use in the State of Florida.

80.      At all relevant times and places, the Paraquat that the Syngenta Defendants, and their corporate predecessors designed, manufactured, distributed, and sold was used in the intended or a reasonably foreseeable manner.

81.     Plaintiff was exposed to Paraquat that the Syngenta Defendants, and their corporate predecessors designed, manufactured, distributed, and sold. As a result of that exposure, Paraquat entered Plaintiff's body causing Plaintiff to develop Parkinson's disease.

82.     The Paraquat that the Syngenta Defendants, and their corporate predecessors designed, manufactured, distributed, and sold did not perform as

safely as an ordinary consumer would have expected it to perform when used in the intended or a reasonably foreseeable manner, in that:

> a. as designed, manufactured, formulated and packaged Paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed (or areas near where it had been sprayed); and

> b. when inhaled, ingested, or absorbed into the body, it was likely to cause neurological damage that was both permanent and cumulative, and repeated low-dose exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

83.    Alternatively, the Syngenta Defendants, and their corporate predecessors' Paraquat products were defectively designed in that the risk of danger inherent in the challenged design outweighed the benefits of such design, considering, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.

84.    The design defects existed when the Paraquat left the Syngenta Defendants, and their corporate predecessors' possession and control.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## COUNT II - STRICT PRODUCTS LIABILITY  - FAILURE TO WARN

85.     Defendant is also liable to Plaintiffs under a products liability theory based on their failure to adequately warn of the risks of Paraquat.

86.     When the Syngenta Defendants, and their corporate predecessors manufactured and sold the Paraquat to which Plaintiff was exposed, it was known or knowable to, the Syngenta Defendants, and their corporate predecessors in light of scientific knowledge that was generally accepted in the scientific community that:

      a. Paraquat was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

      b. when inhaled, ingested, or absorbed into the body, it was likely cause latent neurological damage that was both permanent and cumulative, and that repeated, low-dose exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

87.     The risk of contracting Parkinson's disease from chronic, low-dose exposure to Paraquat presented a substantial danger to users of Paraquat when the product was used in a reasonably foreseeable manner.

88.     An ordinary consumer would not have recognized the potential risk of permanent, irreversible neurological damage, including the risk of contracting Parkinson's disease, from chronic, low-dose exposure to Paraquat.

89.     The Syngenta Defendants, and their corporate predecessors failed to warn of the potential risk of permanent, irreversible neurological damage from chronic, low-dose exposure to Paraquat, and failed to provide adequate instructions regarding avoidance of these risks.

90.     As a direct and proximate result of the Syngenta Defendants, and their corporate predecessors' marketing a defective product, Plaintiff suffered the injuries described in this Complaint.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## COUNT III - NEGLIGENCE

91. At all relevant times, the Syngenta Defendants, and their corporate predecessors designed, manufactured, distributed, and sold Paraquat for use in the State of Florida.

92. Plaintiff was exposed to Paraquat in the State of Florida that the Syngenta Defendants, and their corporate predecessors manufactured and sold.

93. The Paraquat to which Plaintiff was exposed was used in the intended or a reasonably foreseeable manner.

94. At all times relevant to this claim, in researching, designing, manufacturing, packaging, labeling, distributing, and selling Paraquat, the Syngenta Defendants, and their corporate predecessors owed a duty to exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable could be exposed to Paraquat, including Plaintiff.

95. When the Syngenta Defendants, and their corporate predecessors designed, manufactured, packaged, labeled, distributed, and sold the Paraquat to which Plaintiff was exposed, it was reasonably foreseeable that Paraquat:

> a. was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b. when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it has been sprayed or areas near where it has been sprayed, it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

96. In breach of the aforementioned duty to Plaintiff, the Syngenta Defendants, and their corporate predecessors negligently:

a. failed to design, manufacture, formulate, and package Paraquat to make it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

b. designed, manufactured, and formulated Paraquat such that it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause clinically significant neurodegenerative disease, including Parkinson's disease;

c. failed to conduct adequate research and testing to determine the extent to which exposure to Paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

d. failed to conduct adequate research and testing to determine the extent to which Paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which Paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying;

e. failed to conduct adequate research and testing to determine the extent to which Paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease;

f. failed to direct that Paraquat be used in a manner that would have made it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

g. failed to warn that Paraquat was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause clinically significant neurodegenerative disease, including Parkinson's disease.

97. The Syngenta Defendants, , and their corporate predecessors knew or should have known that users would not realize the dangers of exposure to Paraquat and negligently failed to take reasonable steps to prevent the foreseeable risk of harm from exposure to Paraquat.

98. As a direct and proximate result of the Syngenta Defendants, and their corporate predecessors' negligence, Plaintiff suffered the injuries described in this Complaint.

99. Additionally, in the course of designing, manufacturing, packaging, labeling, distributing, and selling Paraquat, the Syngenta Defendants, and their corporate predecessors violated laws, statutes, and regulations, including but not limited to: sections of Food & Agriculture Code, Division 7, Chapter 2 (Pesticides) and sections of Title 3, California Code of Regulations, Division 6 (Pesticides).

100. Plaintiff was a member of the class of persons that said laws, statutes, and regulations were intended to protect.

101. The Syngenta Defendants' violations of said laws, statutes, and regulations were also substantial factors in causing Plaintiffs injuries.

102. The injuries that resulted from the Syngenta Defendants' violations were the kind of occurrence the laws, statutes, and regulations were designed to protect.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## COUNT IV  - LOSS OF CONSORTIUM

106.  At all times since the diagnosis of Parkinson's Disease, Plaintiffs ALLEN WILLIFORD AND LYNDA WILLIFORD were, and are, legally married as husband and wife.

107.  As a direct and proximate result of the aforementioned conduct of the Defendant, and as a result of the injuries and damages, Plaintiffs have been deprived of the love, companionship, comfort, affection, society, solace or moral support, protection, loss of enjoyment of sexual relations, and loss of physical assistance in the operation and maintenance of the home, of their spouses and have thereby sustained, and will continue to sustain damages

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in   Plaintiffs' favor for compensatory damages, together with interest, costs herein incurred, attorney fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request this Court to enter judgment in Plaintiffs' favor and against the Defendant for:

    a.  actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

    b.  pre-judgment and post-judgment interest;

    c.  costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

    d.  any other relief the Court may deem just and proper.

Dated:  August 17, 2023        Respectfully submitted,

s/ Dennis Lopez
Dennis Lopez, Esq.
210 Pierce Street
Tampa, Florida 33602
Phone: 813-223-1977
Fax:      813-229-2439
Email: dlopez@lopezlawpa.com

*Counsel for Plaintiffs*

Tayjes Shah (to appear via pro hac vice)
**THE MILLER FIRM, LLC**
108 Railroad Avenue
Orange, Virginia 22960
Tel: (540) 672-4224
Fax: (540) 672-3055
Email: tshah@millerfirmllc.com

*Co-Counsel for Plaintiffs*

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all of the triable issues within this pleading.

Dated:  August 17, 2023          Respectfully submitted,

                                 s/ Dennis Lopez
                                 Dennis Lopez, Esq.
                                 210 Pierce Street
                                 Tampa, Florida 33602
                                 Phone: 813-223-1977
                                 Fax:      813-229-2439
                                 Email: dlopez@lopezlawpa.com

                                 *Counsel for Plaintiffs*

                                 Tayjes Shah (to appear via pro hac vice)
                                 **THE MIER FIRM, LLC**
                                 108 Railroad Avenue
                                 Orange, Virginia 22960
                                 Tel: (540) 672-4224
                                 Fax: (540) 672-3055
                                 Email: tshah@millerfirmllc.com

                                 *Co-Counsel for Plaintiffs*