# EXHIBIT A

# IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
## IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
### CIRCUIT CIVIL DIVISION

ALLEN WILLIFORD and
LYNDA WILLIFORD,

        Plaintiffs,

v.

                                 Case No.: 21-CA-006219

SYNGENTA CROP PROTECTION,
LLC, and COUNCIL-OXFORD, INC.,

        Defendants.

_____

## NOTICE OF FILING

    Defendant Syngenta Crop Protection, LLC, through undersigned counsel, hereby files the

following document attached as Exhibit "A" hereto:

1.    Transcript Excerpt from May 23, 2023 Hearing on Plaintiffs' Motion for Leave to
Amend Complaint to Assert Claims for Punitive Damages and Proffer in Support
(Court's Oral Ruling at pp. 164–67).

                        */s/ Joshua C. Webb*
                        Dennis P. Waggoner (FBN: 509426)
                        dennis.waggoner@hwhlaw.com
                        Joshua C. Webb (FBN: 051679)
                        josh.webb@hwhlaw.com
                        Fred C. Marshall, II (FBN: 119284)
                        kip.marshall@hwhlaw.com
                        HILL, WARD, HENDERSON, P.A.
                        101 East Kennedy Boulevard, Suite 3700
                        Tampa, FL 33602
                        Telephone: 813-221-3900
                        Facsimile: 813-221-2900

                        Ragan Naresh (pro hac vice)
                        ragan.naresh@kirkland.com
                        Don Hong (pro hac vice)
                        don.hong@kirkland.com
                        Seantyel Hardy (pro hac vice)
                        seantyel.hardy@kirkland.com

Grace Brier (pro hac vice)
grace.brier@kirkland.com
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave. N.W.
Washington, D.C. 20004
(202) 389-5000
(202) 389-5200

Bradley Weidenhammer (pro hac vice)
bradley.weidenhammer@kirkland.com
Britt Cramer (pro hac vice)
britt.cramer@kirkland.com
Zharna Shah (pro hac vice)
zharna.shah@kirkland.com
Cassandra Catalano (pro hac vice)
cassandra.catalano@kirkland.com
Thomas J. Leahy (pro hac vice)
thomas.leahy@kirkland.com
KIRKLAND & ELLIS LLP
300 N. La Salle St.
Chicago, IL 60654
(312) 862-4038

Zachary Holmstead (pro hac vice)
zachary.holmstead@kirkland.com
Paul Sampson (pro hac vice)
paul.sampson@kirkland.com
KIRKLAND & ELLIS LLP
60 E. S. Temple St. Suite 700
Salt Lake City, UT 84111
(801) 877-8201

*Counsel for Defendant Syngenta
Crop Protection, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that I filed a true and correct copy of the foregoing with the Court's e-filing

system on August 2, 2023, which will serve a copy upon all counsel of record via email.

 */s/ Joshua C. Webb*
Attorney

# EXHIBIT A

Page 1

1    IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
              IN AND FOR HILLSBOROUGH COUNTY
2                    CIRCUIT CIVIL DIVISION
3
     ALLEN WILLIFORD and          Case No.:  21-CA-006219
4    LYNDA WILLIFORD,             Division:  E
5         Plaintiffs,
6    v.
7    SYNGENTA CROP PROTECTION,
     LLC and COUNCIL-OXFORD, INC.,
8
          Defendants.
9
     _____/
10
                         HEARING
11
        HELD BEFORE THE HONORABLE ANNE-LEIGH GAYLORD MOE
12
13
     DATE:              May 23, 2023
14
     TIME:              1:41 p.m. to 5:10 p.m.
15
     PLACE:             George Edgecomb Courthouse
16                      800 East Twiggs Street
                        Courtroom 508
17                      Tampa, FL 33602
18   REPORTED BY:       ANN S. BEILSTEIN, RPR
                        Notary Public
19                      State of Florida at Large
20
21
22
23
24                   Pages 1 - 168
25

```
                                                       Page 2

 1   APPEARANCES:
 2        DENNIS A. LOPEZ, ESQUIRE
          Dennis A. Lopez, P.A.
 3        210 Pierce Street
          Tampa, FL 33602
 4        dlopez@lopezlawpa.com
               Counsel for Plaintiffs
 5
          BRIAN BRAKE, ESQUIRE
 6        The Miller Firm, LLC
          108 Railroad Avenue
 7        Orange, VA 22960
          bbrake@millerfirmllc.com
 8             Counsel for Plaintiff Pro Hac Vice
 9        RAGAN NARESH, ESQUIRE
          SEANTYEL HARDY, ESQUIRE
10        Kirkland & Ellis LLP
          1301 Pennsylvania Avenue, N.W.
11        Washington, D.C. 20004
          ragan.naresh@kirkland.com
12        seantyel.hardy@kirkland.com
               Counsel for Defendant, Syngenta Crop
13             Protection, LLC, Pro Hac Vice
14        JOSHUA C. WEBB, ESQUIRE
          Hill Ward Henderson
15        101 East Kennedy Blvd., Suite 3700
          Tampa, FL 33602
16        joshua.webb@hwhlaw.com
               Counsel for Defendant, Syngenta Crop
17             Protection, LLC
18        JOHN A. GUYTON, III, ESQUIRE
          Rywant Alvarez Jones Russo & Guyton
19        302 Knights Run Ave., Suite 1000
          Tampa, FL 33602
20        jguyton@rywantalvarez.com
               Counsel for Defendant, Council-Oxford, Inc.
21
     ALSO PRESENT:
22
          ALLEN WILLIFORD
23        LYNDA WILLIFORD
24
25
```

Page 3

1                         I N D E X

2                                                    PAGE

3   PROCEEDINGS.......................................   3

4   CERTIFICATE OF REPORTER.......................... 168

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 164

1    presentation that I gave you.  In the bottom left,

2    there's a specific citation to that.

3         THE COURT:  Okay.  I have considered the

4    statute which is Florida Statute 768.72.  I

5    considered the cases that you have cited,

6    considered the briefs, I've considered the exhibits

7    that you referenced, and I am prepared to make the

8    following findings.

9         The motion should be denied because Plaintiff

10   hasn't satisfied the burden of showing that the

11   conduct Syngenta engaged in rises to the level of

12   being outrageous in character, extreme in degree,

13   and equivalent to manslaughter.

14        I considered the fact that the Florida Supreme

15   Court has said that the type of evidence necessary

16   to uphold a punitive damages award must be of gross

17   and flagrant character, advancing reckless

18   disregard of human life for the safety of persons

19   expected to -- exposed to its dangerous effects, or

20   that there's an entire want of care which would

21   raise a presumption of a conscious indifference to

22   consequences, or which shows wantonness or

23   recklessness or a grossly careless disregard for

24   the safety and welfare of the public, or that

25   reckless indifference to the rights of others which

Page 165

1    is equivalent to an intentional violation.

2        So I've considered that standard which just

3    can't be met on the facts where you receive

4    information and then you act on that information by

5    continuing to investigate and the investigation

6    does not yield information.  When Syngenta did its

7    research, it did not yield information that

8    Syngenta -- that it would meet this very high

9    standard of being a gross and flagrant character of

10   evidence showing reckless disregard of human life.

11       So ultimately, what I have to do is look at

12   what did Syngenta know, when did they know it, and

13   ultimately, what did they do with the information

14   that they had.

15       I also have to look at the fact that we're

16   just talking about punitive damages in this

17   setting.  This is not a question of whether or not

18   Syngenta has any liability to the Willifords.  I'm

19   not deciding that issue.  I'm just deciding if we

20   get to, in essence, kind of the escalator, you

21   know, is whatever the conduct -- if there's

22   actionable conduct on the part of Syngenta, is it

23   the kind that you get on the escalator for, for

24   damages?

25       And the motion is denied.  I'm sorry.  The

Page 166

1    motion is, yes, denied.  It's without prejudice.

2    If there is something more, you can come back.  But

3    right now, what I saw was not the level of proof of

4    knowledge and complete disregard of the kind of

5    information that I could turn around and conclude

6    that the jury should be asked about punitive

7    damages at this stage.

8        Now, you talked about 7 million documents or

9    7 million pages or something like that, so maybe

10    you have something else.  And I also know that we

11    were under a lot of time pressure today.  And we

12    would be under time pressure in this kind of

13    hearing I think if we had been here for a full day.

14    This is the kind of case where things probably

15    could take as much time as you set aside for them.

16        But I just want to emphasize, it's a denial

17    without prejudice.  So if you have something more,

18    you're welcome to come back.  I really am just

19    purely looking at what the standard is.  And I'm

20    recognizing that this is not an adjudication of

21    Syngenta's liability to the Willifords.  It's

22    merely an adjudication of whether they can get on

23    the escalator in terms of damages with what they

24    have right now.  Okay?

25        MR. BRAKE:  Thank you, Your Honor.

Page 167

1          THE COURT:  All right.  Thank you.

2          Would you please prepare the Order?

3          MS. HARDY:  Yes, Your Honor.

4          COURT REPORTER:  Did you want to order the

5     transcript at this time?

6          MR. BRAKE:  Yes.  Normal turnaround will be

7     fine.

8          MR. NARESH:  Yes.

9          (The proceedings concluded at 5:10 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 168

1                    CERTIFICATE OF REPORTER
2
     STATE OF FLORIDA          )
3
     COUNTY OF HILLSBOROUGH  )
4
5
             I, Ann S. Beilstein, Registered Professional
6
     Reporter, certify that I was authorized to and did
7
     stenographically report the foregoing proceedings, and
8
     that the transcript is a true record of the proceedings.
9
             I further certify that I am not a relative,
10
     employee, attorney, or counsel of any of the parties,
11
     nor am I a relative or employee of any of the parties'
12
     attorneys or counsel connected with the action, nor am
13
     I financially interested in the action.
14
             Dated this 5th day of June, 2023.
15
16
17
18
     Ann S. Beilstein, RPR
19
20
21
22
23
24
25

# EXHIBIT B

## Fw: Williford - Removal

**David Dickens** <DDickens@millerfirmllc.com>

Thu 7/25/2024 11:13 AM

To:Jeffrey Travers <JTravers@millerfirmllc.com>

---

**From:** David Dickens
**Sent:** Monday, July 17, 2023 8:27 AM
**To:** 'Naresh, Ragan' <ragan.naresh@kirkland.com>
**Subject:** Williford - Removal

Ragan,

As we discussed on Friday, we expect to resolve plaintiffs' claims against Council Oxford this week at which time we'll be filing a notice of dismissal.

If Syngenta removes the case to federal court on the basis of diversity jurisdiction alone, Plaintiffs will not seek remand to state court for improper removal. If, however, Syngenta's removal contains any allegations of bad faith or fraudulent joinder, plaintiffs will, out of necessity, seek a remand to state court.

I'd appreciate you letting me know if Syngenta intends to file a notice of removal based on these representations as soon as possible. If so, we will forego the filing of our motion to amend the complaint to add a claim for punitive damages.

Plaintiffs, of course, will reserve their right to seek a remand from the MDL to the transferor (federal) court as appropriate. Plaintiffs also reserve their right to seek leave to amend their complaint in the MDL or federal court.

I'm available to discuss further this afternoon or tomorrow.

Regards,

David J. Dickens
The Miller Firm, LLC
108 Railroad Avenue
Orange, VA 22960
Tel: (540) 672-4224

# EXHIBIT C

**IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIRCUIT CIVIL DIVISION**

ALLEN WILLIFORD and
LYNDA WILLIFORD,

                    Plaintiff,

v.

SYNGENTA CROP PROTECTION,
LLC,  and
COUNCIL-OXFORD, INC.,

                  Defendants.

Case No.:  21-CA-006219

## PLAINTIFFS' DISCLOSURE OF EXPERT TESTIMONY

Plaintiffs, Allen Williford and Lynda Williford ("Plaintiffs"), through undersigned counsel and pursuant to the Court's Amended Differentiated Case Management Order,  submit this list of expert witnesses who may be called to offer opinion testimony on Plaintiffs' behalf at the trial of the above-captioned matter. Plaintiffs' disclosure of expert witnesses is subject to the following reservation of rights:

1.      The right to supplement or amend this witness list based upon any rulings of the Court or any other court decisions that affect the scope of evidence in this trial;

2.      The right to withdraw the designation of any expert prior to testimony, and positively aver that such previously designated expert will not be called as a witness at trial;

3.      The right to amend or supplement expert opinions based on additional discovery including updated medical records, deposition testimony, medical literature, or scientific studies;

4.      The right to supplement the references considered and/or relied upon by Plaintiffs' designated experts in order to address newly available information or literature;

1

5.      The right to elicit expert testimony at trial from any qualified person, including Plaintiffs' treating health care providers, as permitted under the applicable rules of evidence and procedure;

6.      Plaintiffs' expert witnesses, as identified below, may testify about their skill, knowledge, experience, training and education in their respective fields, the relevant medical and scientific literature; the techniques and methods in their field of practice; and the description and nature of their practice.   They may testify about their publications, presentations, research and all matters detailed in their respective curriculum vitae.  They may testify based on facts or data perceived by or made known to them at or before trial that have been properly disclosed under the applicable rules of evidence and procedure.  They may employ demonstrative and visual aids.

7.      Plaintiffs reserve the right to offer supplemental expert opinions based on updated or new information relative to the litigation.  Plaintiffs reserve the right for their expert witnesses to update the literature upon which the witnesses rely in support of their opinions.

8.      Plaintiffs incorporate all prior reports, if any, that have been disclosed in any other state or federal litigation.

9.      By identifying the expert witnesses named below, Plaintiffs do not intend to waive any objections to deposition testimony, exhibits, or other evidence or argument.  Plaintiffs reserve the right to call and elicit testimony from any and all of Defendants' current or former employees who have been disclosed as a witness and/or offered testimony and/or have been identified in discovery.

10.      Plaintiffs reserve the right to call and elicit testimony at trial from any and all of Defendants' retained or non-retained expert witnesses.

11.     All of the opinions listed are held to a reasonably degree of probability within that experts particular field.

## **RETAINED EXPERTS**

Plaintiffs designate the following retained experts who may be called to testify at trial.

1. **Dr. Richard Krolewski**
**Brigham and Women's Hospital**
**60 Fenwood Road, Boston, MA 02115**

**Testimony General and Specific**

Dr. Krolewski is a board-certified neurologist specializing in the treatment of patients with Parkinson's Disease, tremor, and other neurological disorders. Dr. Krolewski is an Associate Neurologist at Brigham and Women's Hospital in Boston, Massachusetts, and a member of the Movement Disorder Division in the Department of Neurology.  In addition to his clinical practice, Dr. Krolewski is an Instructor of Neurology at Harvard Medical School. During his residency and fellowship, Dr. Krolewski worked in the laboratory of Professor Lee Rubin at Harvard University's Stem Cell Institute modeling the effects of environmental toxicants and other biologically active compounds on the development of Parkinson's disease and developing methodologies to study the effect of pesticides on dopaminergic neurons.  This ongoing project, which he now leads in the lab of Dr. Vikram Khurana at Brigham and Women's Hospital, focuses on the effects of pesticides on different brain cell types derived from patients with Parkinson's Disease.

Dr. Krolewski is expected to offer opinions and testimony regarding general and specific causation.  His opinions are based on his education, training, and experience as a neurologist, his familiarity and review of relevant medical and scientific literature, relevant published and unpublished data, his review and analysis of Allen Williford's medical records, his in-person

examination of Mr. Williford, deposition transcripts, other discovery in this case, and such other materials upon which experts in his field typically rely on when forming opinions.

To the extent necessary for the jury to understand the substance of his opinions as applied to the facts of this case, Dr. Krolewski is expected to offer testimony regarding the general anatomy of the brain and central nervous system and background concepts, terms, and diagnoses in the field of neurology, including Parkinson's disease and tremor.

Dr. Krolewski is expected to discuss Mr. Williford's pertinent medical history as it relates to his neurological status generally, and more specifically, to Parkinson's disease. Dr. Krolewski is expected to testify that Mr. Williford's diagnosis of Parkinson's disease is correct, and that he continues to suffer from Parkinson's disease.

Plaintiffs anticipate that Dr. Krolewski will offer general causation testimony that Paraquat exposure is more likely than not a cause of Parkinson's disease based on his review of the totality of the evidence. Plaintiffs anticipate that Dr. Krolewski will provide testimony regarding the Bradford-Hill criteria and explain his application of the Bradford-Hill criteria to his opinion that Paraquat causes Parkinson's disease.

Dr. Krolewski is also expected to testify that Allen Williford's extensive duration and consistent, repeated exposure to Paraquat most likely produced/caused or contributed substantially to producing/causing his Parkinson's disease, and that but for the Paraquat exposure, Allen Williford most likely would not have developed Parkinson's disease when he did. Dr. Krolewski will testify as to the basis for his specific causation opinion, including his process for conducting a differential diagnosis analysis to rule in and rule out potential causes of Mr. Williford's neurological injuries. In performing the differential diagnosis and rendering his specific causation opinion, Dr. Krolewski is expected to offer testimony regarding the potential

risk factors and/or causes (if any) that contributed to Mr. Williford's Parkinson's disease.
Plaintiff anticipates that Dr. Krolewski will testify that based on the scientific and medical
literature, Mr. Williford's exposure to Paraquat contributed substantially to his Parkinson's
disease.

Plaintiffs anticipate that Dr. Krolewski will also describe Mr. Williford's disease process,
symptoms, course of treatment, and other related matters, including all documents related to such
issues. Dr. Krolewski will further testify that the epidemiological and scientific literature
supports a finding of causation for Mr. Williford.  Dr. Krolewski is also expected to testify about
Mr. Williford's prognosis, which is accurately reflected in the Life Care Plan prepared by Linda
Schwieger.

Plaintiffs anticipate that Dr. Krolewski will offer testimony about the following:

- Detailed descriptions of the central nervous system and anatomy of the brain
  in general;

- Detailed descriptions of Parkinson's disease, tremors, and other movement disorders;

- The role of cell biology and dopaminergic neurons in the development of Parkinson's
  disease;

- How the loss of dopaminergic neurons result in clinical manifestations of Parkinson's
  disease;

- Risk factors for the development of Parkinson's disease generally;

- The causal relationship between exposure to Paraquat and Parkinson's disease
  generally;

- A description of studies documenting an increased risk of neurotoxicity and
  Parkinson's disease when Paraquat exposure occurs in conjunction with Maneb
  exposure, including the significance and relevance to Mr. Williford.

- How environmental toxins such as Paraquat cause oxidative stress in human brain
  cells;

- The likely mechanism by which Paraquat kills dopaminergic neurons, resulting in the clinical manifestations of Parkinson's disease over time;

- The history and substance of epidemiological studies connecting Paraquat exposure and Parkinson's disease, including the importance and reliability of those studies;

- The dose-response relationship between Paraquat exposure and Parkinson's disease;

- An overview of Mr. Williford's neurologic history and medical history generally;

- Mr. Williford's medical records, including but not limited to their meaning and contents and the reliability of the conclusions contained therein;

- Mr. Williford's potential risk factors for Parkinson's disease;

- The basis for ruling out other causes of Mr. Williford's Parkinson's disease;

- The causal relationship between Mr. Williford's exposure to Paraquat and his Parkinson's disease;

- A differential diagnosis of Mr. Williford's Parkinson's disease;

- How Paraquat, substantially contributed to cause Mr. Williford's development of Parkinson's disease;

- Treatments for Parkinson's disease generally and, specifically for Mr. Williford;

- Progression of Parkinson's disease generally and specifically for Mr. Williford; and

- The treatment for Parkinson's disease, diagnosis, prognosis, and the effects of Parkinson's disease on the human body, including what occurred to Mr. Williford and what he anticipates will occur to Mr. Williford in the future.

Dr. Krolewski may also offer opinions, testimony, and comments in response to any and all disclosures, statements, and issues raised by Defendants and their experts who offer opinions regarding causation and/or other issues related to his areas of expertise. Plaintiffs reserve the right to amend or supplement this disclosure based upon the opinions of other experts, the production of additional medical records, materials, information, imaging and pathological testing which may arise during the course of discovery or at trial.

Dr. Krolewski spends less than 3% of his professional time serving as an expert in litigation. Of that time, he has devoted approximately 100% of his time to assisting Plaintiff's and 0% of his time assisting Defendants.

Dr. Krolewski is charging $550.00 per hour for his review of documents in this case. Dr. Krolewski charges $1,000.00 per hour for his deposition.

Dr. Krolewski has no prior trial or testimonial history.

He is available for a deposition on 5/1, 5/22, and 6/26.

A copy of Dr. Krolewski's curriculum vitae will be provided to counsel electronically.

**2. Beate Ritz, M.D., Ph.D.**
**650 Charles E. Young Dr. S.**
**Los Angeles, CA 90095**

**Testimony General**

Dr. Beate Ritz is a Professor of Epidemiology at the UCLA Fielding School of Public Health, and previously served as Vice Chair and Chair of the Epidemiology Department at UCLA for a decade. Dr. Ritz holds co-appointments in Environmental Health Sciences and Neurology at the UCLA School of Medicine (she is currently serving again as Vice Chair of the Epidemiology as director of the doctoral program in Epidemiology). Dr. Ritz's primary research interests are health effects from occupational and environmental exposures with a focus on pesticides and air pollution and chronic diseases including neurodevelopmental disorders, neurodegenerative diseases, cancers and reproductive outcomes. Over the past two decades, Dr. Ritz was a principal investigator of numerous Parkinson's disease, pesticides, and gene-environment epidemiology studies, including studies relating to Paraquat.

Plaintiffs anticipate that Dr. Ritz will offer general causation testimony that based on the totality of the evidence, Paraquat exposure is more likely than not a cause of Parkinson's disease. Dr. Ritz will base her testimony on her education, training, experience, epidemiological studies, peer-reviewed scientific and medical articles and studies, and all other relevant evidence in this case, and such other materials upon which experts in her field typically rely on when forming opinions.

Dr. Ritz previously provided a statement of her general causation opinions, including the facts and data she considered in forming her opinions, in *Hoffmann v. Syngenta Crop Protection, LLC*, et. al., No. 17-L-517 (Ill. Cir. Ct., 20th Jud. Cir.).  Accordingly, Plaintiffs' hereby incorporate, by reference, the following materials:

- Expert Reports of Dr. Ritz, including all supplements subparts and attachments thereto, produced in *Hoffmann v. Syngenta Crop Protection, LLC*, et al., No. 17-L-517 (Ill. Cir. Ct., 20th Jud. Cir.);

- All prior deposition testimony of Dr. Ritz in *Hoffmann v. Syngenta Crop Protection, LLC*, et al., No. 17-L-517 (Ill. Cir. Ct., 20th Jud. Cir.).

 In conjunction with the facts and opinions detailed by Dr. Ritz in her Expert Report in *Hoffmann*, Plaintiffs anticipate that Dr. Ritz may offer testimony about the following subjects:

- Epidemiology in general, including its importance in the field of medicine and the manner in which it can be used to establish a causal connection between an exposure and a particular disease or condition;

- The history and substance of epidemiological studies connecting Paraquat exposure with Parkinson's disease, including the importance and reliability of those studies;

- Parkinson's disease and pesticide epidemiology;

- Risk factors for development of Parkinson's disease;

- The loss of dopaminergic neurons in association with aging and how the loss of neurons from an environmental exposure can manifest in Parkinson's disease during a person's natural life span;

- The Bradford Hill criteria and its importance in epidemiology and causality assessments;

- A Bradford Hill causation analysis for Paraquat exposure and Parkinson's disease;

- The amount of increased risk for Parkinson's disease created by Paraquat exposure;

- The consistency of the increased risk for Parkinson's disease across epidemiological studies;

- The dose-response relationship between Paraquat exposure and Parkinson's disease;

- The biological mechanism whereby Paraquat exposure causes Parkinson's disease;

- The studies documenting the increased risk of neurotoxicity and Parkinson's disease when Paraquat exposure occurs in conjunction with Maneb exposure;

- The significance of internal Syngenta studies that support Paraquat causes Parkinson's disease that are not in the public domain.

Additionally, Dr. Ritz may comment upon any and all disclosures and statements of Defendants' experts who offer opinions regarding causation and/or other issues related to her areas of expertise. Plaintiffs reserve the right to supplement and/or modify this disclosure as additional discovery becomes available, to the extent that such additional evidence will in anyway modify or affect the testimony that Plaintiffs anticipate Dr. Ritz will provide. Plaintiffs reserve the right to supplement this disclosure based upon the opinions of other experts, the production of additional medical records, materials, information, imaging and pathological testing which may arise during the course of discovery or at trial.

Dr. Ritz spends less than 5% of her professional time serving as an expert in litigation. Of that time, she has devoted approximately 100% of her time assisting plaintiffs. Dr. Ritz is charging $700.00 per hour for her review of documents in this case and $1000.00 per hour for deposition testimony.

In the last four years, Dr. Ritz has provided testimony as an expert witness in the following cases: *Johnson v. Monsanto Company* (Super. Ct. County of San Francisco, CGC-16-550128); *Alva and Alberta Pilliod v. Monsanto Company* (Super. Ct. County of Alameda, RG17862702); *In Re Roundup Products Liability Litigation* (N.D. Cal., MDL 2741); Hardeman v. Monsanto Company (N.D. Cal., 3:16-cv-00525-VC); *Hoffman, et al. v. Syngenta Corp., et al.* (Illinois Twentieth Circuit Court, No. 17-L-517)

A copy of Dr. Ritz's curriculum vitae will be provided to counsel electronically.

Dr. Ritz is available for deposition in Los Angeles, California on the following dates: April 14, 2023; April 17, 2023; April 28, 2023.

A copy of Dr. Ritz's curriculum vitae will be provided to counsel electronically.

3. **Jason Richardson, Ph.D.**
   **Robert Stempel College of Public Health & Social Work**
   **AHC5, 11200 SW 8th St #500**
   **Miami, FL 33174**

**General Testimony**

Dr. Jason Richardson is a Professor of Environmental Health Sciences and Associate Dean for Research in the Robert School of Public Health and Social Work at Florida International University. Dr. Richardson is a Diplomat of the American Board of Toxicology and Fellow of the Academy of Toxicological Sciences (ATS). Dr. Richardson was a postdoctoral fellow at Emory University where his research focused on molecular neuroscience and mechanisms of neurotoxicity in neurodegenerative diseases. He spent 10 years at Rutgers Robert Wood Johnson Medical School and the Environmental and Occupational Health Sciences Institute, where he served as Deputy Director and Director of the Joint Graduate Program in Toxicology. He then moved to Northeast Ohio Medical University, where he founded the Center for Neurodegenerative Disease and Aging before moving to his present position in 2018. Over the

course of his career, Dr. Richardson has authored or co-authored over 115 peer-reviewed publications, including publications on the on the neurotoxicity of pesticides, environmental factors in Parkinson's disease, oxidative stress, and neurodegeneration. Over the past two decades, Dr. Richardson has been a principal investigator of numerous grants related to Parkinson's disease, pesticides, and gene-environment epidemiology studies, including studies relating to Paraquat.

Dr. Richardson is expected to offer opinions in the areas of environmental toxicology, animal toxicology, epidemiology and neurodegenerative diseases. Dr. Richardson will base his testimony on his education, training, experience, peer-reviewed articles and studies, Syngenta and Chevron's internal studies and data produced in this litigation, the testimony of corporate witnesses, other relevant evidence in this case, and such other materials upon which experts in his field typically rely on when forming opinions.

Plaintiffs anticipate that Dr. Richardson will offer the general causation testimony that Paraquat exposure is more likely than not a cause of Parkinson's disease. Specifically, Plaintiffs anticipate that Dr. Richardson will offer testimony about the following subjects:

- Toxicology in general, including its importance in the field of medicine and the manner in which it can be used to identify toxicants and establish a causal connection between an exposure and a particular disease or condition;

- Description of the central nervous system and anatomy of the brain in general;

- The history and substance of toxicology studies connecting Paraquat exposure with Parkinson's disease, including the importance and reliability of those studies;

- Parkinson's disease and pesticide toxicology;

- A weight of evidence causation analysis for Paraquat exposure and Parkinson's disease

- The ability of Paraquat to redox cycle in the human body and its significance to Paraquat's ability to kill neurons in the human brain;

11

- Toxicology studies and data demonstrating that Paraquat is a neurotoxicant;

- Relevant routes of human exposure to Paraquat;

- The significance of studies and autopsies finding Paraquat in the brain of humans and animals;

- A description of studies demonstrating that Paraquat can cross the blood brain barrier, including testimony relating to the significance of these findings and their relevance to his causation opinions;

- A description of studies finding that Paraquat can be absorbed into the blood stream and subsequently cycle to the brain, including testimony relating to the significance of these findings and their relevance to his causation opinions;

- A description of studies relating to Paraquat's ability to be absorbed via ingestion, dermal exposure, or inhalation, including testimony relating to the significance of these findings and their relevance to his causation opinions;

- A description of studies relating to the total absorption of Paraquat when used in combination with a surfactant, including testimony relating to the significance of increased absorption and toxicity when Paraquat is combined with a surfactant;

- The consistency of the increased risk for neuron death across Paraquat exposure and animal studies;

- The consistency of the conclusion that Paraquat is neurotoxic across Paraquat exposure and animal studies;

- The dose-response relationship between Paraquat exposure and neuron death;

- The biologic mechanism of action whereby Paraquat exposure causes neurotoxicity and Parkinson's disease;

- The findings of animal data relating to Paraquat neurotoxicity and the implications of animal data to humans;

- The loss of dopaminergic neurons in association with aging and how the loss of neurons from an environmental exposure can manifest in Parkinson's disease during a natural life span;

- The significance of the chemical similarity between Paraquat and MPTP;

- A description of studies documenting the increased risk of neurotoxicity and Parkinson's disease when Paraquat exposure occurs in conjunction with Maneb exposure;

- The significance of internal Syngenta studies that support Paraquat causes Parkinson's disease;;

- The significance of studies relating to the rates of absorption and clearance of Paraquat in the brain;

Additionally, Dr. Richardson may comment upon any and all disclosures and statements of Defendants' experts who offer opinions regarding causation and/or other issues related to his areas of expertise.

The foregoing description is based on the documents and evidence that are currently available. Plaintiffs reserve the right to supplement and/or modify this disclosure as additional discovery becomes available, to the extent that such additional evidence will in anyway modify or affect the testimony that Plaintiffs anticipate Dr. Richardson will provide. Plaintiffs reserve the right to supplement this disclosure based upon the opinions of other experts, the production of additional medical records, materials, information, imaging and pathological testing which may arise during the course of discovery or at trial. Dr. Richardson will testify to the basis for his opinions.

Dr. Richardson spends less than 5% of his professional time serving as professional consultant. With regard to litigation, he has only been an expert witness in one case, that was settled before trial, where he was retained on behalf of the plaintiff. Dr. Richardson is charging $800.00 per hour for his review of documents in this case. Dr. Richardson charges $1,000.00 per hour for his deposition. Dr. Richardson charges $10,000.00 per day for trial testimony. In the last four years, Dr. Richardson has not testified in any cases.

He is available for a deposition on 4/17, 5/1, and 5/8.

A copy of Dr. Richardson's curriculum vitae will be provided to counsel electronically.

4. **Kenneth Rudo, Ph.D.**
   **202 Lakeview Drive**
   **Summerville, SC 29485**

   **Testimony General and Specific**

Dr. Kenneth Rudo is an environmental toxicologist and founding member of Rudo Toxicological Consultants. Dr. Rudo served as the Environmental and Public Health Toxicologist for the State of North Carolina's Department of Health and Human Services from 1989 to 2017. In his role as toxicologist for the State of North Carolina, Dr. Rudo was responsible for performing human health risk assessments to establish potential links between exposure and adverse health impacts, evaluating human risk from exposure via ingestion, dermal exposure and/or inhalation to pesticides and other chemicals; and developing risk communications to warn the public of adverse impacts of chemical exposures.

Plaintiffs anticipate that Dr. Rudo will offer opinions and testimony in the areas of toxicology, exposure, dermal absorption, and human risk assessment. Dr. Rudo will base his testimony on his education, training, experience, peer-reviewed articles and studies, Syngenta and Chevron's internal studies and data produced in this litigation, the testimony of corporate witnesses, the deposition testimony of Mr. Williford, a telephone interview with Mr. Williford, other relevant evidence in this case, and such other materials upon which experts in his field typically rely on when forming opinions.

Plaintiffs anticipate that Dr. Rudo will offer general and specific testimony regarding the toxicological link between Parkinson's disease and Paraquat based on peer-reviewed published scientific literature and other scientific data relating to the toxicity of Paraquat, including Syngenta's own internal studies. Dr. Rudo will opine that there is, more likely than not, a

14

toxicological link between Paraquat exposure and Parkinson's disease. Dr. Rudo will explain that in his field of expertise, the term "toxicological link" means that: (1) there is a causal association, or causal link, between an exposure and an adverse health outcome; and (2)there is a plausible mechanism of action explaining how a toxic exposure produces/causes the particular adverse health outcome.

Having established a toxicological link between Paraquat exposure and Parkinson's disease generally, Dr. Rudo will further testify that Mr. Williford's total estimated exposure to Paraquat was sufficient to have resulted in the toxicological link to Parkinson's disease.  In offering his specific opinions described above, Dr. Rudo is expected to offer testimony regarding Allen Williford's total exposure to Paraquat, including a comparison of Plaintiff's exposure with the exposure data from applicators in studies on Paraquat and Parkinson's disease; and in biomonitoring studies.  Dr. Rudo's opinions are based on his analysis of Mr. Williford's paraquat exposure, peer-reviewed published scientific information related to paraquat toxicology, epidemiology, exposure and animal data, including an interpretation and methodology related to that data.

Specifically, Plaintiffs anticipate that Dr. Rudo may offer testimony about the following subjects:

- Toxicology in general, including its importance in the field of medicine and the manner in which it can be used in human risk assessments and to establish a toxicological link/epidemiological causation between an exposure and a particular disease or condition;

- The history and substance of toxicology studies in the peer-reviewed published scientific literature linking Paraquat exposure with Parkinson's disease, including the importance and reliability of those studies;

- Parkinson's disease and pesticide toxicology;

- A Bradford Hill analysis for Paraquat exposure and Parkinson's disease;

15

- Relevant routes of human exposure to Paraquat;

- Toxicology studies and/or findings that demonstrate Paraquat is a neurological toxin;

- The significance of studies and autopsies finding Paraquat in the brain of humans and animals;

- A description of studies demonstrating that Paraquat can cross the blood brain barrier, including testimony relating to the significance of these findings and their relevance to his opinions of a toxicological link between Paraquat exposure and Parkinson's disease;

- A description of studies finding that Paraquat can be absorbed into the blood stream and subsequently cycle to the brain, including testimony relating to the significance of these findings and their relevance to his opinions of a toxicological link between Paraquat exposure and Parkinson's disease;

- A description of studies relating to Paraquat's ability to be absorbed via ingestion, dermal exposure, or inhalation, including testimony relating to the significance of these findings and their relevance to his opinions of a toxicological link between Paraquat exposure and Parkinson's disease;

- A description of studies relating to the total absorption of Paraquat when used in combination with a surfactant, including testimony relating to the significance of increased absorption and toxicity when Paraquat is combined with a surfactant;

- The role of surfactants in increasing exposure and toxicity;

- The consistency of the increased risk for neuron death across studies related to Paraquat exposure;

- The consistency of the conclusion that Paraquat is neurotoxic across studies related to Paraquat exposure;

- The significance of studies related to the rates of absorption and clearance of Paraquat in the brain;

- The effect of wearing personal protective equipment on exposure levels;

- The effect of different spraying methods and equipment on exposure levels;

- Human exposure studies relating to Paraquat exposure and absorption;

- Mr. Williford's history of Paraquat use;

16

- Mr. Williford's use of non-ionic surfactants in combination with Paraquat;

- Mr. Williford's estimated total exposure to Paraquat prior to his diagnosis of Parkinson's disease;

- Whether Mr. Williford had sufficient exposure to Paraquat to have resulted in a toxicological link/epidemiological causation between his exposure to Paraquat and Parkinson's disease.

Additionally, Dr. Rudo may also offer opinions, testimony, and comments in response to any and all disclosures, statements, and issues raised by Defendants and their experts who offer opinions related to his areas of expertise. Plaintiffs reserve the right to supplement this disclosure based upon the opinions of other experts, the production of additional materials which may arise during the course of discovery or at trial.

Dr. Rudo currently spends 90% of his professional time serving as an expert in litigation, and 10% on pro bono work. Of that time, he has devoted approximately 100% of his time to assisting plaintiffs. Dr. Rudo is charging $425.00 per hour for his review of documents in this case and for deposition.

In the last four years, Dr. Rudo has testified in the following cases:

- Orange County Water District v. Unocal Corporation et.al., Case No. SACV 03-01742-CJC (ANx), January, 2019
- Suncoast Waterkeeper et.al., v. City of Gulfport, Florida, Civil Case No. 8:17-cv-00035-SCB-AEP, May 20, 2019
- Commonwealth of Pennsylvania v. Exxon Mobil Corporation et.al., Case no. 14-cv-06228, November, 2021
- Christine Moore v. Monsanto Company et.al., December 6, 2022 , Circuit Court for St. Louis County, Case No. 18SL-CC01214

A copy of Dr. Rudo's curriculum vitae will be provided to counsel electronically.

Dr. Rudo is available for deposition on May 2, May 3, or May 10.

**5. Linda K. Schwieger, RN, CNLCP®, CBIS**
   **Certified Nurse Life Care Planner**
   **Equitable Medical Legal Consulting LLC**
   **410 Sovereign Ct., Ste. 15**
   **Ballwin, MO  63011**

**Specific Testimony**

Linda Schwieger is a nurse, certified nurse life care planner, and certified brain injury specialist.  Ms. Schwieger will testify at the trial of this matter consistent with the Life Care Plan she prepared on behalf of Allen Williford, which is attached to this designation.  Ms. Schwieger will testify based upon her education, training and experience.  In preparation for her testimony, Nurse Schwieger has reviewed the pertinent medical records, consulted with Mr. Williford, spoken with Dr. Krolewski who has evaluated Mr. Williford's injuries, reviewed the materials listed in the LCP, and confirmed costs and/or necessity listed for each item.

As more fully detailed in the attached Life Care Plan, Nurse Schwieger will testify to matters relating to Mr. Williford's present and future needs for treatment of his Parkinson's disease and any related conditions as outlined by Dr. Krolewski, including physician specialist evaluations and assessments, diagnostics studies, emergency department evaluations and hospitalizations, procedures, medications, medical equipment and supplies, therapy evaluations and treatment sessions, home services, case management, home and vehicle accessibility and safety modifications.  Nurse Schwieger will review with the jury the timing and costs of these various treatments and needs.

In the event that other life care and rehabilitation needs arise between the date of this designation and the trial date, Nurse Schwieger reserves the right to amend and/or supplement her Life Care Plan. She also reserves the right to review any medical records generated between these

dates by Plaintiff's health care providers and suppliers. She also reserves the right to comment upon any Life Care/Rehabilitation Plan offered by the defendants in this case.

Ms. Schweiger's rates for consulting services in this case are attached.

Ms. Schweiger's testimonial history is attached. She estimates that her consulting rate entails 85% on behalf of Plaintiffs and 15% on behalf of Defendants.

She is available for a deposition on 5/16, 6/1, and 6/6.

A copy of Ms. Schweiger's curriculum vitae will be provided to counsel electronically.

6. **Alison Vredenburgh, Ph.D., CPE**
   **2588 El Camino Real**
   **F353 Carlsbad, CA  92008**

**Testimony General**

Dr. Vredenburgh was retained to perform a human factors and safety evaluation regarding Allen Williford's use of Paraquat. Dr. Vredenburgh obtained her Ph.D. (1998) in Industrial-Organizational Psychology from the California School of Professional Psychology, San Diego; M.S. (1996) Industrial-Organizational Psychology from the California School of Professional Psychology, San Diego; M.S. (1987) Systems Management Systems Technology emphasis from the University of Southern California; and a B.A., with Honors (1984) in Organizational Psychology from the University of California, Santa Barbara.

She is a Certified Professional Ergonomist (CPE) #237 (1993) and Board-Certified Disability Analyst and Fellow #5432-01 (2001).

Dr. Vredenburgh is the Founding Partner of Vredenburgh & Zackowitz, Inc. Carlsbad, CA (1998 – present). She consults with businesses and industry in areas including product warning design, injury prevention, machine guarding, job design, job and task analysis, program evaluation, training, risk management, Occupational Safety and Health Administration (OSHA), Americans

with Disabilities Act (ADA), Fair Housing Act (FHA), organizational development and assessment, and research instrument development and validation. She conducts and presents original research and serves as a forensic consultant for product liability, personal injury, FHA/ADA, and employment cases in the areas of human factors, safety, and industrial organizational psychology. She collects and reviews case material, inspects accident sites and equipment, and performs testing and evaluation. Issues include hazard management, communication, and warning effectiveness; product/equipment design; reasonableness of conduct; human error; adequacy of supervision and training; behavioral expectations; visibility, conspicuity, and lighting; perception/reaction times; falls from height; employee discrimination and harassment; and accessibility of housing and public areas. Since 1990, Dr. Vredenburgh has consulted on hundreds of cases and qualified as an expert in Municipal, Superior, and Federal District Courts.

Plaintiffs anticipate that Dr. Vredenburgh will testify on matters relating to human factors and warnings, including the adequacy of defendant's warnings on the use of Paraquat and risks associated with use of the product. Dr. Vredenburgh will base her testimony on her own training, education and experience, peer-reviewed articles and studies, corporate documents, a review of Paraquat labels and pamphlets, advertising materials, depositions, relevant standards, all other relevant evidence in this case, and such materials upon which experts in her field typically rely on when forming opinions.

She is expected to testify that Syngenta failed to effectively warn user of the exposure hazards presented by mixing and spraying Paraquat and provided inadequate and impractical instructions regarding the use of PPE.

Plaintiffs anticipate that Dr. Vredenburgh will offer testimony about the following subjects:

- The methodology for undertaking a human factors analysis regarding the adequacy of product warnings;

- The safety standard of care for producers of a product in general and Syngenta in particular to warn consumers of the known risks of Paraquat, including the risk of Parkinson's disease and/or neurotoxicity;

- How product design, warnings, and instructions influence consumer use and perceptions of hazards;

- A review of Paraquat warnings in the United States. Such opinions include labeling, and public disclosures related to safety.

- The adequacy of warnings in general and personal protective equipment in particular for use of Paraquat. Dr. Vredenburgh is expected to opine that the warnings were not effective for a number of reasons including but not limited to inappropriate location, content, (in particular no warning of long term effects such as neurotoxicity or Parkinson's disease), the high cost of compliance, "Anti-warnings," (such as advertising material showing product users not wearing PPE or downplaying the hazards of Paraquat), and the fact that it was not practicable to comply with the stated warnings in many circumstances, such as wearing PPE in hot weather and wearing PPE while cleaning spray nozzles.

- The expectations of an ordinary consumer based on the warnings provided.

- The effectiveness of Paraquat warnings to inform consumers of the risk of neurotoxicity and Parkinson's disease;

- Whether Paraquat labels were adequate to warn consumers of the risk of neurotoxicity and Parkinson's disease;

- The expectations and reasonable actions of an ordinary consumer based on the recommendations of personal protective equipment for use with Paraquat.

- The ability of manufacturers to provide stronger warnings related to the neurotoxicity or Paraquat and its risk of causing Parkinson's disease. Such ability of manufactures includes but is not limited to stronger warnings related to neurotoxicity and Parkinson's disease in the labeling, at trainings, and at the point of purchase.

- The ability of manufacturers to provide stronger warnings related to the use of personal protective equipment to minimize exposure via nasal, dermal, and oral exposure. Such ability of manufactures includes but is not limited to stronger warnings related to personal protective equipment in the labeling, at trainings, and at the point of purchase.

- The efficacy of warnings related to the use of personal protective equipment in hot climates where wearing personal protective equipment is not feasible.

- A manufacturer's safety responsibility to avoid selling pesticides in hot climates where safety measures such as the use of personal protective equipment cannot feasibly be implemented, as a barrier to hazard exposure.

- The need for effective safety management by manufacturers to reduce exposure through equipment design, such as closed loop systems.

- Syngenta's knowledge, based upon its own internal documents, that users were not wearing PPE including respirators consistently and otherwise not conforming to the label recommendations, e.g., worker's blowing out nozzles, touching nozzles without gloves, and getting Paraquat on their skin.

- Syngenta's knowledge that Paraquat is neurotoxic and enters the brain.

22

Dr. Vredenburgh may also offer opinions, testimony, and comments in response to any and all disclosures, statements, and issues raised by Defendants and their experts who offer opinions related to her areas of expertise.  Plaintiffs reserve the right to supplement this disclosure based upon the opinions of other experts, the production of additional materials which may arise during the course of discovery or at trial.

Dr. Vredenburgh has investigated over 1000 cases and is retained approximately evenly between plaintiff and defense cases.  Since the start of Covid, approximately 75% of her time has been in forensics.

Her rate is $450/hr for consulting services and for testimony, whether deposition or trial is $650/hour if not recorded and $750/hr if recorded.

Dr. Vredenburgh's testimonial history is attached.

She is available for a deposition on 6/6, 6/13, 6/20.

A copy of Dr. Vredenburgh's curriculum vitae will be provided to counsel electronically.

## **NON-RETAINED EXPERTS**

Plaintiffs designate the following non-retained expert witnesses:

### 1. **Plaintiffs' Treating Physicians**

In the event that treating doctors may be considered as expert witnesses, Plaintiffs reserve the right to call any and all of Allen Williford's treating physicians to testify and opine about the information contained in his medical records (their meaning and contents), and any other matters within their education, training and clinical experience, including but not limited to his history of Paraquat exposure and causation of Mr. Williford's injuries and illnesses. At this time it is not known if any of Mr. Williford's treating physicians will be called, but the following doctors are

disclosed. In addition, discovery may reveal that other treating physicians other than the ones listed here may be required at trial. If that occurs, Plaintiffs will supplement this expert disclosure.

Plaintiffs hereby disclose the following healthcare providers as persons who may be called to offer opinion and fact testimony at the trial of this matter:

- Dr. Stephen Aradi

  Dr. Aradi's deposition may be played/read into evidence at trial.

- Dr. Deborah Burke

  Dr. Burke's deposition may be played/read into evidence at trial.

- Dr. Theresa Zesiewicz

- Dr. Nathan Brinn

- Dr. Dana Ferrara

  Dr. Ferrara is expected to testify consistently with her medical records, including but not limited to her opinions about the effect upon Allen Williford of learning of his Parkinson's disease diagnosis including worsened depression and suicidal thoughts.

- Dr. Carlos Andres Sanchez Parra

  Dr. Sanchez Parra is expected to testify consistently with his medical records, including but not limited to his opinions about the effect upon Allen Williford of learning of his Parkinson's disease diagnosis including worsened depression and suicidal thoughts.

Plaintiffs further reserve the right to elicit factual and opinion testimony from any other healthcare providers that are identified in Allen Williford's medical records or Plaintiff Fact Sheets provided to counsel for Defendants and supplement their Designation of expert testimony prior to trial.

**2. Pesticide Industry Representatives and Employees**

 Deposition and/or trial testimony previously provided by the following former or current

employees of the pesticide defendants may be designated by Plaintiffs to be read to or played for

the jury. Plaintiffs are listing these former or current employees herein in an abundance of caution.

    Charles Breckenridge- Syngenta

    Richard Cavalli- Chevron

    Monty Dixon- Syngenta (individual and on behalf of Syngenta)

    Phillip Botham- Syngenta (individual and on behalf of Syngenta)

    Clive Campbell- Syngenta

    Tim Patterson- Chevron (individual and on behalf of Chevron)

    Sara McMillen- Chevron (individual and on behalf of Chevron)

    Jeffrey Podawiltz- Chevron

    Clark Ouzts- Syngenta

    Lewis Smith- Syngenta

    Robert Scott- Syngenta

    Kim Travis- Syngenta

    Andy Cook- Syngenta

    Richard Smeyne- Syngenta consultant


Dated: February 28, 2023                    Respectfully Submitted,
                                            s/ Dennis Lopez
                                            Dennis Lopez, Esq.
                                            210 Pierce Street
                                            Tampa, Florida 33602
                                            Phone: 813-223-1977
                                            Fax:    813-229-2439
                                            Email: dlopez@lopezlawpa.com

                                            Tayjes Shah, Esq.

Brian Brake, Esq.
The Miller Firm, LLC
108 Railroad Ave.
Orange, VA 22960
Phone: 540-672-4224
Fax: 540-672-3055
Email: tshah@millerfirmllc.com
Email. bbrake@millerfirmllc.com
Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2023, a true and correct copy of the foregoing

document was electronically transmitted to counsel to Defendants.

Date: 2/28/23

s/ Dennis Lopez
Dennis Lopez, Esq.
210 Pierce Street
Tampa, Florida 33602
Phone: 813-223-1977
Fax:      813-229-2439
Email: dlopez@lopezlawpa.com

Tayjes Shah, Esq.
Brian Brake, Esq.
The Miller Firm, LLC
108 Railroad Ave.
Orange, VA 22960
Phone: 540-672-4224
Fax: 540-672-3055
Email: tshah@millerfirmllc.com
Email. bbrake@millerfirmllc.com
Counsel for Plaintiffs

# EXHIBIT D

```
 1           IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL
                CIRCUIT IN AND FOR HILLSBOROUGH COUNTY
 2                        STATE OF FLORIDA
                          CIVIL DIVISION
 3

 4      ALLEN WILLIFORD AND LYNDA WILLIFORD,

 5               Plaintiffs,

 6      vs.                        Case No. 21-CA-006219

 7      SYNGENTA CROP PROTECTION, LLC, ET AL.,

 8               Defendants.
        * * * * * * * * * * * * * * * * * * * * * *
 9      In re:  Deposition of Deborah Burke, M.D.
                Taken December 22, 2022
10
        January 13, 2023
11
        Brian Brake, Esquire
12      The Miller Firm, LLC
        108 Railroad Avenue
13      Orange, Virginia 22960
        bbrake@millerfirmllc.com, jtravers@millerfirmllc.com
14
        Dear Mr. Brake:
15
                At the conclusion of Dr. Burke's deposition that
16      was taken on the 22nd of December, 2022, in the
        above-styled case has been transcribed.
17
                Per your request to read the transcript, please
18      forward on to Dr. Burke so that she may have a chance
        to make any corrections she wishes.  I suggest she
19      would do this within the next 30 days.

20              Please forward her signed errata sheet to my
        office and once it has been received it will be
21      forwarded to all the parties.

22      Thank you,

23      Jacqueline L. Barron
        Court Reporter
24
        cc: Seantyel Hardy, Esquire
25           John A. Guyton, III, Esquire
```

INTEGRA REPORTING GROUP, LLC
Tampa, FL   (813)259-4800

176

```
1              I HAVE READ THE FOREGOING TRANSCRIPT OF

2         DEPOSITION OR PROCEEDINGS AND EXCEPT FOR ANY

3         CORRECTIONS AND/OR AMENDMENTS APPENDED

4         HERETO, AND UNDER PENALTY OF PERJURY, I

5         HEREBY SUBSCRIBE TO THE TRANSCRIPT AS AN

6         ACCURATE RECORD OF THE TESTIMONY.

7

8

9

10

11         _____

12              SIGNATURE OF DEBORAH BURKE, M.D.

13

14

15

16

17

18    RETURN TO JACQUELINE L. BARRON, COURT REPORTER

19    CASE:  ALLEN AND LYNDA WILLIFORD, VS.

20    SYNGENTA CROP PROTECTION, LLC, ET AL.

21    DATE:  DECEMBER 22, 2022

22    WITNESS:  DEBORAH BURKE, M.D.

23

24

25
```

**1**

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL
CIRCUIT IN AND FOR HILLSBOROUGH COUNTY
STATE OF FLORIDA
CIVIL DIVISION

ALLEN WILLIFORD AND LYNDA WILLIFORD,

    Plaintiffs,

vs.        Case No. 21-CA-006219

SYNGENTA CROP PROTECTION, LLC,
CHEVERON U.S.A., AND
COUNCIL-OXFORD, INC.,

    Defendants.

*****************************************************

VIDEOTAPED DEPOSITION OF DEBORAH BURKE, M.D.

TAKEN:    PURSUANT TO NOTICE
        COUNSEL FOR PLAINTIFFS
DATE:    DECEMBER 22, 2022
TIME:    1:12 p.m. - 6 p.m.
LOCATION:    All parties appeared
        from remote locations

REPORTED BY:   JACQUELINE L. BARRON
        Integra Reporting Group
        Court Reporter
        Notary Public
        Commission No. GG 948301
        Expires: March 27, 2024
VIDEOGRAPHER:   Nick deHaas, Left Coast Video

**2**

APPEARANCES:
    BRIAN BRAKE, ESQUIRE
    JEFFREY TRAVERS, ESQUIRE - VIA ZOOM
    The Miller Firm, LLC
    108 Railroad Avenue
    Orange, Virginia 22960
    bbrake@millerfirmllc.com
    jtravers@millerfirmllc.com
    Attorneys for Plaintiffs
    SEANTYEL HARDY, ESQUIRE
    STACHIA REUWSAAT, ESQUIRE - VIA ZOOM
    Kirkland & Ellis, LLP
    1301 Pennsylvania Avenue, N.W.
    Washington, D.C. 20004
    seantyel.hardy@kirkland.com
    lhorton@kirkland.com
    Attorneys for Defendant
    Syngenta Crop Protection, LLC

    JOHN A. GUYTON, III, ESQUIRE - VIA ZOOM
    Rywant, Alvarez, Jones,
    Russo & Guyton, P.A.
    302 Knights Run Avenue
    Suite 1000
    Tampa, Florida 33602
    jguyton@rywantalvarez.com
    anewell@rywantalvarez.com
    Attorney for Defendant
    Council-Oxford, Inc.

**3**

I N D E X

            PAGE
DIRECT EXAMINATION BY MR. BRAKE   6
CROSS-EXAMINATION BY MS. HARDY   64
REDIRECT EXAMINATION BY MR. BRAKE   170
STIPULATION   172
CERTIFICATE OF OATH   173
CERTIFICATE OF REPORTER   174
ERRATA SHEETS   175
ERRATA LETTER   177

e

E X H I B I T S

Defendant's Exhibit Index   Page
Exhibit No. 1
(Curriculum Vitae)   6

Exhibit No. 2
(Dr. Burke's Records)   28
Exhibit No. 3
(How To Keep Good Clinical Records)   86

Exhibit No. 4
(Dr. Burke's Notes)   91

**4**

```
 1        THE VIDEOGRAPHER:  We are not on the
 2   record.  This begins media unit No. 1 to the
 3   videotaped deposition of Dr. Deborah Burke
 4   taken in the matter of Allen Williford and
 5   Lynda Williford versus Syngenta Crop
 6   Protection, LLC, Cheveron U.S.A., and
 7   Council-Oxford, Incorporated.  The case is
 8   filed in the Circuit Court in the Thirteenth
 9   Judicial Circuit in and for Hillsborough
10   County, State of Florida, Civil Division,
11   Case No. 21-CA-006219.
12        Today's date is December 22nd of 2022.
13   The time on the video monitor is
14   approximately 1:12 p.m.  This deposition is
15   being held at 101 East Kennedy Boulevard,
16   Suite 3700 in Tampa, Florida 33602.
17        My name is Nick deHaas, I'm the
18   videographer.  The court reporter is Jacqui
19   Barron.
20        Will counsel please state their
21   appearance for the record including who they
22   represent and what firm you're with,
23   beginning with counsel for the plaintiffs.
24        MR. BRAKE:  My name is Brian Brake of The
25   Miller Firm.  I represent Allen Williford and
```

5

1    Lynda Williford.  And we have --
2    Go ahead Jeffrey.
3        MR. TRAVERS:  Jeffrey Travers from The
4    Miller Firm on behalf of the plaintiffs.
5        MS. HARDY:  I am Seantyel Hardy of
6    Kirkland and Ellis on behalf of defendant
7    Syngenta.
8        MS. REUWSAAT:  Stachia Reuwsaat of
9    Kirkland and Ellis on behalf of Syngenta.
10        MR. GUYTON:  John Guyton for Council-
11    Oxford.
12        THE VIDEOGRAPHER:  If those are all the
13    appearances, will our court reporter please
14    swear in out witness and we can proceed.
15        THE REPORTER:  Would you raise your right
16    hand, please.
17        Do you swear or affirm that the testimony
18    you are about to give will be the truth, the
19    whole truth, and nothing but the truth?
20        THE WITNESS:  Yes.
21        THE REPORTER:  Thank you.
22            DEBORAH BURKE, M.D.,
23    the deponent herein, being duly sworn or affirmed
24    under oath, was examined and testified as follows:
25            DIRECT EXAMINATION

6

1    BY MR. BRAKE:
2    Q.  Dr. Burke, thank you for coming to beautiful
3    downtown Tampa today for your deposition, we
4    appreciate it, particularly given the holidays.
5        You've probably been deposed before and know that
6    if you need to take a break, just let us know.  I
7    want you to be comfortable.
8    A.  Thank you.
9    Q.  If you don't understand a question that I
10    ask, please let me know.  If you don't do that, I'm
11    going to assume that you've understood the question
12    and answering it to the best of your ability.  And
13    hopefully we'll be out of here in about a couple,
14    two, three hours then and get back to what you were
15    doing before you came.
16        So would you state your name for the record,
17    please.
18    A.  Deborah Burke.
19    Q.  And what is your profession?
20    A.  I'm a physician.
21    Q.  Are you a medical doctor?
22    A.  I am.
23        (WHEREUPON, the exhibit was marked.)
24    Q.  In front of you is a document marked Exhibit
25    No. 1.  Take a look at that and tell us if that's an

7

1    accurate copy of your CV?
2    A.  Yes, it was prepared for me by work
3    personnel.
4    Q.  Okay.
5    A.  That's where I got it.
6    Q.  So tell us some about yourself.  Where are you
7    licensed as a medical doctor?
8    A.  Florida.
9    Q.  And where did you first become licensed?
10    A.  Um.
11    Q.  And you can look at your CV if you need to.
12    A.  I think about 2000.
13    Q.  And do you specialize in some particular
14    area of medicine?
15    A.  Yes.  I'm a neurologist.
16    Q.  And are you board certified in neurology?
17    A.  I am.
18    Q.  What does it mean to be board certified in
19    neurology?
20    A.  It means that you have prepared to -- well,
21    you've done a residency in that area which prepares
22    you to take an exam that asserts that you know
23    neurology to some degree as expected by the standards
24    set by the board.
25    Q.  So within the field of neurology do you

8

1    subspecialize in the treatment of any types of
2    disorder or ailments?
3    A.  Formally, yes, movement disorders.
4    Q.  And what is a movement disorder?
5    A.  It's a disorder of movement, often, but not
6    always, degenerative, which where the pathology is
7    located in the brain as opposed to say if you have a
8    spinal cord injury and you can't move.  That is not a
9    movement disorder and that's the difference.
10    Q.  Would it be fair to say that you specialize
11    in movement disorders?
12    A.  Yes.
13    Q.  And is Parkinson's disease a movement
14    disorder?
15    A.  Yes, it is.
16    Q.  Let's take a look at your CV real quick.
17    Could you run down for us where you went to medical
18    school forward please and where you graduated?
19    A.  I went to Boston University School of
20    Medicine and graduated in 1996.  I did my internship
21    at the University of Florida, and residency at the
22    University of Florida which I finished in the year
23    2000.  And I did a fellowship in movement disorder at
24    the University of South Florida and finished in 2001.
25    Q.  Now we mentioned the fellowship before.  For

Pages 5 to 8

9

1  those who may not know what a fellowship in movement
2  disorder/Parkinson's disease is, tell us what that
3  means, to do a fellowship.
4      A.  Well, it means that in addition to doing
5  your residency and getting your board certification,
6  you get extra training.  I was trained for a year in
7  a movement disorder center supervised by an
8  experienced fellowship-trained movement disorder
9  specialist in treating movement disorders.
10     Q.  And that would include Parkinson's disease
11 as you mentioned before?
12     A.  Yes, it would.
13     Q.  And then I see here on Exhibit No. 1 as you
14 said before you're board certified in neurology in
15 2005?
16     A.  Uh-huh.
17     Q.  And you told us already you're licensed in
18 Florida as a medical doctor?
19     A.  Uh-huh.
20     Q.  Is that -- and please if you can say "yes"
21 or "no."
22     A.  Yes.  Sorry.  Yes.
23     Q.  Is your medical license current?
24     A.  Yes, it is.
25     Q.  And has it been current and active since you

10

1  first obtained your medical license?
2      A.  It has.
3      Q.  So there was a time period, if I understand
4  things correctly, where you worked for the University
5  of Southern Florida (sic); is that correct?
6      A.  Yes, yes.
7      Q.  And during the time period that you worked
8  for the University of Southern Florida, you had the
9  occasion to examine, diagnose, and treat Allen
10 Williford; is that correct?
11     A.  Yes.
12     Q.  And are you still -- I'm going to call it
13 USF, if that's okay.
14     A.  That's fine.
15     Q.  I think a lot of people do.  Are you still
16 at USF?
17     A.  No.
18     Q.  When did you leave USF?
19     A.  Last June.
20     Q.  And why did you leave USF?
21     A.  Well, first of all, I was always part-time
22 and I always had another part-time job.  And it's in
23 the resume.  I worked at -- most of the time I was at
24 USF I also worked in Sarasota at a place called the
25 Roskamp Institute.

11

1      Then I left the institute and I started working
2  for a company called Accel, which is clinical
3  research, and I was getting older and the office was
4  getting more and more hectic.  They had a lot of
5  people leave, a lot of just problems where -- they
6  got solved, you know, places go through things.
7      But the combination of -- also I have a daughter
8  who is just now 21, so -- and she was in and out of
9  my house and boyfriends.  A I felt like I don't need
10 to be going to work all day.  You know, I'm going to
11 lose her soon, you know, she's -- but she's still
12 with me.
13     My other job was paying me quite well.  The
14 university didn't pay as well.  And I just -- and I
15 think also I worked so hard at the university.  I
16 loved what I did.  I loved it more than anything
17 else, including the job that pays me more.  I loved
18 my patients.  And this is an area of illness where
19 you establish long-term relationships.
20     Q.  When did you start working at USF
21 approximately?
22     A.  Well, okay 2001 I did a fellowship, and
23 effectively you're working there, you're paid.
24     Q.  Right.
25     A.  Then I left and I came back in 2006 part-

12

1  time and I worked there until last spring.
2      Q.  The spring of this year?
3      A.  Yes.
4      Q.  2022.  So you were there from -- you were
5  there from 2006 to 2022, before that for about five
6  years?
7      A.  Correct.
8      Q.  And you mentioned -- I thought it was
9  interesting that you wrote down you loved your job --
10     A.  I do.
11     Q.  -- at USF.  What did you love about it?
12     A.  Well, I went to medical school late, as you
13 may be able to tell that from the dates.  And I went
14 because I wanted that kind of life.  I wanted those
15 relationships with patients.  I loved -- I loved
16 knowing things that I can offer.
17     And it's -- being a doctor is a good way to do
18 it.  I mean I could have been a nurse, but being a
19 doctor you have a little more power, more prestige,
20 and I liked that too.
21     But I just -- it's hard to really put into words.
22 I just really felt rewarded by seeing patients,
23 caring about them and feeling that they knew that and
24 that they would, you know, reflect that back to me,
25 that they really appreciated what I did for them.

13

1    Q.  So did you -- what I hear you say is you
2    really enjoy helping and getting to know your
3    patients?
4    A.  Yeah.
5    Q.  Is that right?
6    A.  Yeah.
7    Q.  That's great.  Were a lot of your patients,
8    during your tenure at USF, patients that had been
9    diagnosed with Parkinson's disease?
10    A.  I would say the majority, yeah.
11    Q.  I'm going to ask you maybe an unfair
12    question.  At the time that you were at USF,
13    approximately how many people do you think that you
14    diagnosed with Parkinson's disease?
15    A.  Well, that's tough.  Other people have asked
16    me.  A lot of times I'm asked that to qualify for
17    some position or something, how many.  I'd have to
18    say around 1,000.  I just -- you know.  And I'm just
19    using math, you know, how many years times how
20    many -- I worked about 20 hours a week, but they
21    weren't all patient hours.  You know, how many
22    patients did I see a week?  A large majority were
23    Parkinson's patients, but I would see them repeatedly
24    so they weren't being diagnosed every time.
25    Q.  Right.

14

1    A.  So I just sort of did some math and figured
2    "Well, probably, at least once a week, if not more,
3    times, you know, 50 weeks, times 15.  And that's not
4    counting, you know, my residency and fellowship.
5    Q.  It would be even more.  So you feel
6    comfortable saying that you've diagnosed at least
7    1,000 different people with Parkinson's disease; is
8    that right?
9    A.  That's right.  And I also did that at the
10    other job.  I was doing general neurology at the
11    other job.  So I also saw Parkinson's people.
12    Q.  The other job being?
13    A.  Roskamp.
14    Q.  Which is what?  I'm sorry.
15    A.  Roskamp is a neurology center in Sarasota.
16    It started as a basic science establishment, meaning
17    nobody was seeing any patients, they were all bench
18    researchers, mice, computers, basic scientists
19    trying -- and they were given a non-revocable fund
20    from a family called the Roskamps to find a cure for
21    Alzheimer's disease.  So they -- in the mean time, at
22    the very beginning of my career when I was working
23    part-time I adopted the baby that is now 21 and I was
24    single.
25    So I was doing, instead of like all out, you

15

1    know, own a practice, nights and weekends.  I tried
2    that and I was carrying a baby to the ER, you know.
3    So I started putting together these little gigs, if
4    you will, because you can do, you know, like clinical
5    research.  "Could you come once a week and be a
6    rater, and be here for three hours" or something.
7    And I stumbled into the Roskamp by doing that.
8    They had an outlet in Tampa.  And then they expanded
9    it to clinical trials.  That's how I got involved.
10    I'm not a basic scientist.
11    And then they -- they moved in a neurologist who
12    had a full-time practice.  And he moved his entire
13    full-time neurology -- Dr. Keegan, Dr. Andrew
14    Keegan -- practice into the Roskamp Institute.
15    They're very well known.  In fact they've been on NPR
16    recently as one of the sites where one of the new
17    Alzheimer's drugs, one of the better ones, was being
18    studied.  So there history is Alzheimer's.  And then
19    Parkinson's comes kind of naturally because they're
20    both central nervous system, neurodegenerative
21    diseases.
22    But Dr. Keegan moved his practice in and they
23    needed somebody -- he couldn't be the only general
24    neurologist.  So I began to do just regular -- and I
25    was in heaven, you know.  I wanted to take care of

16

1    patients.  I went to medical school to be a doctor to
2    treat patients, but I had this baby.  So I had these
3    jobs.  They didn't make me take call.
4    Q.  You needed some flexibility.
5    A.  Well, I needed not to take call.
6    Q.  Yeah, yeah.
7    A.  I could work all day, but I couldn't work
8    nights and weekends.  And I couldn't do it, you know,
9    somebody in the middle of the night, you don't even
10    plan, who's going to get a babysitter, you know?
11    Q.  So the goal of that organization was to find
12    a cure or a treatment for Alzheimer's?
13    A.  Well, that was their starting seed.  But as
14    they developed, they've developed into -- well, they
15    do a lot of dementia.  I saw a lot of dementia.  And
16    that can overlap Parkinson's, it can overlap
17    Alzheimer's.  But we just saw -- but the clinic, we
18    were the clinic part, we weren't the science research
19    part.
20    Q.  When you say "clinic part," that means
21    taking care or looking after patients part?
22    A.  Oh, yeah.  It's the Roskamp Neurology
23    Clinic.  Citizens in Sarasota looking for a
24    neurologist or their insurance -- there are a lot of
25    insurances, they go there to see one of us.  It's a

Pages 13 to 16

17

1    private -- it's a non-profit, it's a non-profit
2    organization.
3        Q.  Going back to USF for a second.  I
4    understand you saw patients at USF.  Did you have any
5    lecturing or teaching --
6        A.  Very little.
7        Q.  -- or academic responsibilities?
8        A.  Very little.  Because my arrangement when I
9    went back -- again, because of the baby -- I wanted
10   to see patients.  And the head of the department who
11   had trained me in the first place, you how, he liked
12   patients well enough, but he was really building a
13   big reputation, traveling.  He's renowned in terms of
14   the amount of publications, you know, because he was
15   spending all his time in the library, and he needed
16   somebody to see patients.  So I came on.  When I
17   first came as a contract and then they --
18       Q.  You're talking about USF now?
19       A.  Yeah.  And they gave me some title adjunct
20   professor, adjunct or something.  I did teach in the
21   office, the medical students would be -- or the
22   residents would come and they would shadow us, and
23   then they would come with me to see patients, and I
24   would explain to them what I was doing.
25       Q.  But I didn't teach in classrooms.  I didn't

18

1    publish.  I told them I was not going to do that.
2    Then you have to be in the library at night and on
3    the weekends.
4        Q.  Right, right.
5        A.  And they let me.  I paid a price.  You know,
6    I wasn't paid a whole heck of a lot.  I wasn't paid
7    badly considering what other people in the world
8    make, but --
9        Q.  Understood.
10       A.  -- it wasn't a lot and --
11       Q.  So it says on your resume that you were an
12   assistant professor of neurology, a clinician of
13   Parkinson's Disease and Movement Disorder Center
14   University of South Florida from 2006 through June of
15   2022; is that correct?
16       A.  That's true, yes.
17       Q.  We've got -- I mean, your resume is 11
18   pages, we could spend all day going through it, but
19   we're not going to.  What I'd like to talk about
20   though is -- so would it be fair to say you retired
21   from USF?
22       A.  Yes.  And that's what they call it.  They
23   gave me a retirement party and a plaque and --
24       Q.  And then looking at this it looks like --
25       A.  And also my retirement fund.

19

1        Q.  What?
2        A.  Well, they also -- you don't get retirement
3    like you do from the state where you get a check
4    every month.  They put money away --
5        Q.  I see.
6        A.  -- until I got that money.
7        Q.  From looking at your resume, it looks
8    like -- and you tell me if I'm wrong -- that what
9    you're currently doing is you're "principal
10   investigator, clinical researcher"; is that correct?
11       A.  That's correct.  That's the title, yes.
12       Q.  And is that what you started doing, more or
13   less, full-time after you retired from USF?
14       A.  No.  I had done it all along as part of -- I
15   wasn't always a principal investigator.  A lot of my
16   resume is, you know, you'll see subinvestigator or
17   rater.
18       Q.  Is that all you're doing now?
19       A.  Yes.
20       Q.  So tell us --
21       A.  Well, I also volunteer at a free clinic, but
22   that's not paid.
23       Q.  Understood.  You treat patients?
24       A.  Yes.
25       Q.  Right.  So what -- I'm looking here at all

20

1    these clinical research things you've done.  Tell us
2    first what does it mean to be a prin -- well, what's
3    clinical research first?  What does that mean?
4        A.  It's research where you're seeing human
5    beings instead of in the lab where you're seeing if
6    -- where you're working with rats, or computers, or,
7    you know, little vials of chemicals.  It's clinical,
8    it's in a clinic, where people come like for an
9    appointment and --
10       Q.  Okay.  And it looks like you're doing
11   clinical trials; is that correct?
12       A.  Yes.
13       Q.  What's a clinical trial?
14       A.  It's experimental to test a drug or a
15   procedure or a device.  Something that's new that
16   needs -- you need data to support the use of it and
17   the safety of it.
18       Q.  So don't let me put words in your mouth, but
19   is it an investigation to see if, for instance, Drug
20   A has a beneficial impact on treating a certain
21   disease?
22       A.  That is one thing it could be.
23       Q.  Okay.  All right.  And you're the principal
24   investigator for the clinical trial --
25       A.  Well, the way it works --

Pages 17 to 20

21

1    Q. -- is that correct?
2    A.  -- is I'm not the clinical -- the principal
3    investigator for the -- you don't have one for the
4    establishment much anymore.  You have your studies.
5        So say we have Alzheimer's studies, we have
6    Parkinson's studies -- well, we don't have
7    Parkinson's, we have Alzheimer's studies.  We have
8    multiple sclerosis studies, so we have a fibromyalgia
9    study.
10       Well, I am not the principal investigator for the
11   fibromyalgia study.
12   Q.  Right.
13   A.  And I am principal -- and my responsibility
14   is to oversee those studies.
15   Q.  Well, looking at your CV, your resume,
16   whatever you want to call it, it says you're the
17   principal investigator for some neurology clinic
18   trials and there are 76 of them; is that correct?
19   A.  Well, no.  No, not 76 that I'm the principal
20   investigator for now.
21   Q.  Well, I'm not talking about this moment.
22   I'm talking about in the history of you're doing it.
23   A.  That's what I was saying before.  Now I'm
24   the principal investigator for a large number.  When
25   I took the job I was given about 20 studies for which

22

1    I was the principal investigator.
2        But over time starting -- like practically right
3    after my fellowship I would have a role in -- you
4    know, they need all kinds of bodies.  And one thing
5    they needed a lot of is subinvestigators, a back up.
6    And you have to be there and you have to know the
7    protocol, but you're not the principal investigator.
8    Q.  Let's get away from the word "principal
9    investigator," but what I'm interested in is I'm
10   looking at page 2 of my CV, and you can look at it
11   too if you need to.  It's the principal investigator
12   clinical research experience.  And then it says
13   "neurology," and then says "count 76."  What's does
14   that mean?
15   A.  I think that the regulatory person who put
16   this together counted all the studies I did.  And I
17   don't know why it says -- maybe I was.  I mean, I --
18   but I don't think I was -- well, last couple years
19   I've been for 20.  So I've done these for a long
20   time.
21   Q.  So without going through all 76 of these,
22   I'll just read one and you tell me what this means.
23   A.  Where are you?
24   Q.  Right underneath neurology count 76 on page
25   2.

23

1    A.  Yeah.  That just means there's 76 things.
2    Q.  Let me read the first one and tell me what
3    this means to like a normal person.
4        "A randomized double blind, placebo controlled
5    group, clinical to examine the efficacy and safety of
6    early XXX treatment versus delayed XXX treatment in
7    patients with new onset Parkinson's disease."
8    A.  Okay.
9    Q.  So what briefly --
10   A.  The X's are no longer used.  They used to do
11   it to protect the sponsor's product.  But the fact is
12   the products are always searchable.
13   Q.  Right.
14   A.  You can always find it.  They're not
15   secrets.  But back in the day, the people that put
16   together the resumes for -- they're to send to
17   pharmaceutical companies.  I mean, this one was to
18   say who I was and the pharmaceutical companies
19   recognize why the X's are there.
20       So basically what that means besides the X's is
21   that, okay, it's double-blind.  That means that both
22   the provider and the patient are blinded.  Because
23   it's placebo controlled it means that there is an
24   experimental drug and then there's a comparison.
25   Sometimes it's what you might informally call "sugar

24

1    pills," it's just neutral.  Many times though it's an
2    alternative treatment.  Sometimes it's just a
3    medicine for symptom relief.
4        But we're blinded in that those -- whatever it is
5    that the placebo group is assigned to is designed to
6    look exactly like the drug.  They're not -- they're
7    told it could be a placebo, but they don't know if
8    it's a placebo.  And there's a very, very elaborate
9    consent process.  It's probably more regulated
10   than -- anything else in the rest of medicine.
11       So there's an elaborate consent process where
12   they're told they may get a placebo.  And the point
13   is to test the results against people on placebo.
14   Because data has shown that people who are in a study
15   and think they're getting treated improve even if
16   they're not getting treated.  You all know it, I mean
17   the placebo effect.
18       So they -- you have to find the difference
19   statistically between the actual drug and the
20   placebo.  You can't just say, "Well they're better."
21   Well, maybe they're better because you're making them
22   feel good, you know, or, they're paying better
23   attention to their health.  But now you've tried to
24   equal the playing field by you have a bunch of people
25   saying, "You may even get side effects," and yet you

INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813)259-4800

25

1  find out you're not getting the drug.
2      Q.  So is the idea that you give one subset
3  of the patients not a real pill, like a sugar pill --
4      A.  Yeah.
5      Q.  -- and you give another set of --
6      A.  It might be an active pill.
7      Q.  Pardon me?
8      A.  It may be a real medicine.
9      Q.  But it's not the one you're studying.
10     A.  But it's not the one you're studying, right.
11     Q.  We'll call it the "placebo medicine."  And
12  then you get group B, the thing you're trying to
13  figure out if it works, whatever that is, that drug,
14  and then you see who got better and who didn't and
15  report, right?
16     A.  Also the bad things that happen.
17     Q.  Right.  And then based upon that I imagine
18  companies and other agencies determine whether or not
19  a drug can be approved for use to treat a particular
20  condition?
21     A.  Well, the FDA.
22     Q.  And what's the name of the company or the
23  research group that you're currently working with to
24  do theses studies?
25     A.  Accel, A-c-c-e-l, Clinical Research Studies.

26

1      Q.  And is that over in St. Petersburg?
2      A.  They have a site in St. Petersburg.  They
3  have multiple sites.  I think their headquarters is
4  in DeLand.
5      Q.  Right.  So when I look through here, I see
6  that -- I think, and you tell me if I'm wrong, all of
7  the clinical investigative projects that you've been
8  involved in under neurology deal with testing
9  different drugs or methods to treat Parkinson's; is
10  that right?
11     A.  No.
12     Q.  Okay.
13     A.  A lot of them are treating multiple
14  sclerosis.
15     Q.  Well, if we look under just neurology,
16  though, everything I see says Parkinson's,
17  Parkinson's, Parkinson's.
18     A.  Well, then they may have -- part of this was
19  made by the staff at USF that I transferred over to
20  Accel.  And in -- at USF everything was Parkinson's.
21  But at Accel we don't do Parkinson's.
22     Q.  So just give us a rough idea of how many
23  clinical -- we'll call them "clinical trials."
24     A.  Oh, no.
25     Q.  Give us a rough idea -- you can count on

27

1  your resume if you want to -- you have been involved
2  in where you are the investigator who is trying to
3  determine whether a particular drug is going to be a
4  good drug to help people with Parkinson's disease?
5      A.  I have no idea.  I don't know.  30.  I mean,
6  I don't really know.
7      Q.  And during the course of your practice of
8  medicine at the different places you've been, would
9  you routinely read the neurology journals and
10  movement disorder journals that would come out?
11     A.  Yeah.  Not page to page, every one, but
12  sure.
13     Q.  You would get them and consider them.
14     A.  All right.  So I'm going to ask you some
15  questions about the treatment that you've rendered to
16  Allen Williford at USF.
17     A.  Okay.
18     Q.  And if I ask you a question that involves
19  you giving us an opinion, I'm going to ask that you
20  only tell us that opinion if you hold it to what we
21  in the law call a reasonable degree of medical
22  probability, which means 51 percent.
23     A.  Okay.
24     Q.  Does that sound fair?
25     A.  Uh-huh.

28

1          (WHEREUPON, the exhibit was marked.)
2      Q.  All right.  So have you had an opportunity
3  to review the notes that you made while you treated
4  Allen Williford at USF?
5      A.  Yes.
6      Q.  And was the first visit that you had with
7  Allen Williford on July 19th, 2021?  And if you want
8  to look at the document that I have for you it's page
9  28 at the bottom.  You can feel free to take the
10  paperclip off if you want.
11     A.  Page 28.  Yes.
12     Q.  And I don't know if you want to take off
13  that paperclip to make it easier for you or go to
14  yours?
15     A.  I think I'd like to go to mine.
16     Q.  Take your time.  If it takes a while to get
17  to it, that's perfectly fine.  July 19th, 2021.
18     A.  Okay.  I have it.
19     Q.  Was that the first time that you saw Allen
20  Williford?
21     A.  Yes.
22     Q.  And I know if you go to right before
23  medication changes -- it's page 31 for those with the
24  marked copy -- there's a paragraph 5 that says,
25  "I spent 60 minutes of clinical activities and that

Pages 25 to 28

29

1    included review of previous."
2        A.  Uh-huh.
3        Q.  So either before, during, or after you saw
4    Allen on July 19th, 2021, you would have looked at
5    his previous neurology notes; is that right?
6        A.  Yes.
7        Q.  And let's go then back to the first page of
8    the document I gave you.  I have a record showing
9    that Allen saw a Dr. Stephen Aradi on April 21st,
10   2021.  Do you see that?
11       A.  Sure.
12       Q.  Would that have been something you reviewed
13   before you saw Allen?
14       A.  Yes.
15       Q.  I have just a couple of questions for you.
16   Well, first off, why do you do that?
17   Why do you want to see what another doctor has
18   done before you see a patient?
19       A.  It's valuable information.  You don't want
20   to reinvent the wheel.
21       Q.  And did you see that when Dr. Aradi had
22   noted that when he saw Allen, that he had diagnosed
23   him with Parkinson's disease?
24       A.  Yes.
25       Q.  And here's a question I have for you.

30

1    There's a -- on the second page on my document, it's
2    No. 4, there's a question, "Regular exposure to
3    pesticides or solvents."
4        A.  Can you tell where you are here?
5        Q.  Yes, ma'am.
6        A.  I got it.
7        Q.  Yeah.  So it says, "Regular exposure to
8    pesticides or solvents.  Has been a farmer with
9    substantial pesticide exposure all his life."
10   Do you see that?
11       A.  Uh-huh.
12       Q.  So my question is, why would a neurologist
13   ask a question like that?
14           MS. HARDY:  Objection to form.
15           MR. BRAKE:  What's wrong with it?
16           MS. HARDY:  It calls for speculation.
17       Q.  Do you know why neurologists ask patients if
18   they have regular exposure to pesticides or solvents?
19       A.  Well, because we're taught -- we're to
20   understand that they're associated with Parkinson's,
21   the development of Parkinson's disease.
22       Q.  So then let's go to your note.  Tell us --
23   if you would go back to that, the 7/19/2021, your
24   first visit.
25       A.  Uh-huh.

31

1        Q.  Go ahead and summarize for us what he told
2    you and what his symptoms were?
3        A.  Well, at the time he told me that his
4    symptoms, as it says, began in 2019 with a tremor in
5    his left hand and he had some in his left leg.
6        Then there was some other issues.  Things that he
7    later saw neurosurgery for.
8        I also noted that he had something called
9    micrographia.  Parkinson's patients tend to write --
10   their handwriting becomes really tiny.  And he
11   reported some cognitive changes.  It doesn't say it
12   right here.  His wife was also instrumental in
13   discussing that with me.
14       So lower down it's -- now there's a couple of
15   paragraphs that were part of that review of other
16   doctors when he saw surgeons because he had some
17   other issues.
18       And so then there was a summary that we, you
19   know, kind of use.  So he had a tremor that was not
20   relieved with alcohol.  There's another kind of
21   tremor called essential tremor that tends to improve
22   with alcohol.  So this was not -- that's just a piece
23   of information.
24       Slowness, that's classic bradykinesia.  Hyposmia,
25   they tend to lose their smell.  REM behavior disorder

32

1    means people act out their dreams.
2        Q.  If I may interrupt you, just so we're clear
3    here.  Tell us -- I think this is what you're doing,
4    but tell us the history or symptoms that you observed
5    that were consistent with Parkinson's disease.  I
6    think that's what you're doing.
7        A.  Well, some of it.  I mean, I didn't observe
8    him acting out his dreams.
9        Q.  Right.  Well, you observed or by history.
10       A.  But they tell you that.
11       Q.  Right.
12       A.  And they talked about the cognitive changes.
13   So really that's in my physical exam.  I saw the
14   tremor.  I felt increased tone, rigidity.  He had a
15   flexed posture.  A shorter stride.  He walked slowly
16   with a hunch posture.  He didn't sling his arms and
17   that's almost at a def -- well, that's a classic, you
18   know, physical exam for a Parkinson's patient.
19       And then the other things like micrographia, you
20   know, there's more history.  I don't actually
21   remember if I asked him to write, but...
22       Q.  Let me back you up to the first page of your
23   note.  You say that when he saw Dr. Aradi, Dr. Aradi
24   noted hypomimia?  And that's the -- as I understand
25   it, that's when you limit -- the expressions in your

33

1    face are limited; is that right?
2        A.  Yeah.  We say it "hypomimia."
3        Q.  Hypomimia?  Okay.  I've got to go to medical
4    school.
5        A.  And basically it means that, you know,
6    movement isn't just your arms and legs, you also have
7    expression in your face and it's movement.  And they
8    stop -- they decrease that.  So there's a kind of
9    blankness.  And their eyes -- eye movement and
10   blinking tend to decrease.  So, you know, it --
11   depending on the degree, sometimes people just look
12   like they're giving you the dead stare and they're
13   not aware of it and that's not what their intention
14   is.
15       Q.  Is that a sign or Parkin -- can that be a
16   sign of Parkinson's disease?
17       A.  Oh, yeah.
18       Q.  You note the same line, "left greater than
19   right bilateral rest tremor."  Is that consistent
20   with Parkinson's disease.
21       A.  Yes.  Parkinson's tremor tends to be what we
22   call at rest as opposed to an action tremor.  It
23   tends to be asymmetric, meaning more on one side than
24   the other.
25       Q.  Then you right down "RBD."  What's that?

34

1        A.  That's the acting out of dreams.  REM
2    behavior disorder.  REM sleep behavior disorder.  I
3    mean they'll kick and punch.
4        Q.  In the middle of the night?
5        A.  Yeah.
6        Q.  And then you call it RBD.  And he reported
7    that or someone did, correct?
8        A.  Well, usually I ask.  They don't always note
9    it.  Sometimes if they report it, it's because they
10   have some experience with knowing what the symptoms
11   are.
12       Q.  Is that a sign of Parkinson's disease?
13       A.  Yes.
14       Q.  Can you -- you probably --
15       A.  It isn't only, but --
16       Q.  No.  I understand it can be.  You probably
17   have known for a long time, but tell us briefly why?
18   How does that work?  What from --
19       A.  Well, it's just statistically true or it's
20   been shown statistically that that's a phenomena that
21   not only is associated with Parkinson's, but often
22   starts decades before you even develop the
23   Parkinson's and is now kind of considered a prodromal
24   of Parkinson's.
25       Q.  And you noted he had hyposmia?

35

1        A.  That's decreased smell, hyposmia.
2        A.  And then micrographia --
3        A.  Small handwriting.
4        Q.  -- which is small handwriting?
5        A.  Yeah, you got it.
6        Q.  Those are all signs of Parkinson's disease?
7        A.  Right.
8        Q.  So I don't think I've asked you, probably
9    something I should have before, tell us in layman's
10   terms, what is Parkinson's disease?
11       A.  It's a neurodegenerative disease that
12   attacks a part of the brain called the basal ganglia.
13   It's caused by proteins alpha-synuclein, you know,
14   that misfolds.  In other words, the body is making a
15   protein that somewhere along the line the protein is
16   damaged and it becomes junk and it just becomes
17   something to get in the way of activity.
18       So it's deposited in that area of the brain and
19   that area of the brain has a large responsibility for
20   movement.  So that's Parkinson's.  I mean, that's
21   what's behind Parkinson's disease and as a result,
22   you know, people -- it isn't that people are similar
23   to someone who's got like a gunshot wound in the neck
24   and they're paralyzed from here down.  It's sort of
25   diffused and they lose the ability not to move, but

36

1    to control movement.
2        So I'll tell my patients, "Your nerves are fine,
3    your muscles are fine, your bones are fine.
4    Everything is fine from here down, but the computer
5    that runs it all, like you think of that as your
6    tools, is damaged."
7        Q.  And what exactly in the brain is damaged?
8        A.  The basal ganglia.  The part of the brain.
9    It's a nucleus in the brain.
10       Q.  The cells in that part of the brain that are
11   damaged?
12       A.  Yeah.
13       Q.  Do those cells produce anything that is
14   helpful for movement?
15       A.  Dopamine.  Yes.
16       Q.  And what happens if you don't have enough
17   dopamine?
18       A.  Well, that's the transmitter, that's the
19   neurochemical that is used to communicate.  We have
20   neurochemicals in the brain, serotonin, dopamine,
21   adrenalin, which are also in other parts of our body,
22   where parts of you communicate with other parts of
23   you and tell other parts of you what to do.
24       So dopamine is one of those communicators.  It's
25   like electricity or something, you know, going from

37

1    one place to another carrying a signal. But it
2    damages the source of dopamine because that's where
3    it's produced -- one of the places that's produced.
4        Q.   So tell me if I've got this right. The
5    cells in the brain that produce dopamine which have
6    an affect on movement, those cells somehow get
7    damaged --
8        A.   Right.
9        Q.   -- and that's Parkinson's disease?
10       A.   Yes.
11       Q.   Okay.
12       A.   Well it's Parkinson's disease unless it's
13   something else that damaged them like a stroke, but
14   it's very rare.
15       Q.   I understand. So based upon your
16   questioning -- and I've seen you question Allen about
17   his history, what things going on with him; am I
18   right?
19       A.   Right.
20       Q.   Based upon that you did a physical
21   examination, right?
22       A.   Uh-huh.
23       Q.   And then you -- I guess that's pretty much
24   it then, the history and physical. Did you opine as
25   to whether or not Allen had Parkinson's disease when

38

1    you saw him the first visit?
2        A.   I believe I did. I have to look to see
3    which part of my opinionating was the first visit.
4        Q.   Yeah. I'm looking at --
5        A.   Because of the physical exam -- well, also
6    what he said with Dr. Aradi, but mainly the exam. I
7    mean, he had the classic symptoms of Parkinson's and
8    he had the history. You know, what he himself or
9    what he and his wife told me was consistent. Some
10   cognitive issues and then the REM behavior disorder.
11       Q.   It was the tremor and all the other things
12   we talked about --
13       A.   Right, exactly.
14       Q.   -- that led you to conclude when you saw him
15   on your first visit, July 19th, 2021, that Allen
16   Williford in fact did at that time have Parkinson's
17   disease?
18       A.   Oh, yeah.
19       Q.   Were you pretty confident about that
20   diagnosis?
21       A.   Yes. You know, I was allowing for other
22   possibilities, but yes. And there are what they call
23   atypical Parkinson's. And every once in a while --
24   well, there are medications that can cause symptoms
25   of Parkinson's.

39

1        Q.   Okay.
2        A.   So, you know, what I was looking at was a
3    Parkinson's type of thing and clearly. But I know
4    later on I went to get an additional test and I
5    commented somewhat about this because I read these.
6    And I always do this, you know, about the possibility
7    of, you know, just doing due diligence, making sure
8    that I'm covering all the basis.
9        Q.   Making sure it's Parkinson's, right?
10       A.   Yes.
11       Q.   Do you have any independent recollection of
12   Allen Williford today?
13       A.   I do a little bit, but not a lot.
14       Q.   You're relying primarily on the notes you
15   made at the time you treated him?
16       A.   Yeah, I didn't see him very often.
17       Q.   Okay. So then did you order any tests to
18   confirm your diagnosis of Parkinson's disease for
19   Allen?
20       A.   Yes, a DaTscan.
21       Q.   And it's DaTscan?
22       A.   Yes, it stands for dopamine transporter scan
23   DaTscan.
24       Q.   And if you could just very briefly tell us
25   what that is and what you can learn from it.

40

1        A.   It's an imaging technique where a substance
2    that under certain -- you know, with certain kinds of
3    scanning, a DaTscan or a PET scan will light up when
4    it attaches to certain targets. It's designed to
5    attach to certain targets. For example, some
6    substances will attach to a cancer, et cetera.
7        So you can -- you know, the radiology department,
8    they give people an IV with a substance and they put
9    them in a scanner and they look for what lights up.
10   And now in this kind of scan lighting up is good. In
11   other words, cancer lighting up is not good. But in
12   this scan what you want to light up is dopamine and
13   dopamine transporters. You want to see dopamine
14   activity, that's a healthy brain.
15       Q.   So can you tell then from a DaTscan whether
16   it's very likely or unlikely that someone has
17   Parkinson's disease?
18       A.   Usually. I mean, you know, like with
19   anything there are sometimes --
20       Q.   Lets talk about Allen. We'll get to the
21   note, but with Allen --
22       A.   Allen was very clear that there was a
23   problem.
24       Q.   Based upon your clinical observations --
25       A.   He was very abnormal.

Pages 37 to 40

41

1    Q. -- his history and this fancy DaTscan was
2  done, right?
3    A. Yes, all of it together. But even the
4  DaTscan alone, we knew there was something wrong.
5    Q. And that something wrong was what?
6    A. Well probably Parkinson's. But basically he
7  did not have -- he was very deficient in dopamine
8  activity.
9    Q. So when you -- I'm sorry, I didn't mean to
10  cut you off.
11    A. Well, usually that's sort of by definition
12  Parkinson's. I mean, -- there are, like I said,
13  atypical Parkinson's.
14    Q. Is it true -- is it accurate to say that
15  after you saw the results of the DaTscan, that
16  confirmed your diagnosis of Parkinson's disease of
17  Allen?
18    A. Oh, yes. Yes.
19    Q. I wasn't clear on your first visit that you
20  had with Allen on July 19th, 2021. Did you prescribe
21  any medication to help him with the symptoms?
22    A. Well, I could find it. But down the road I
23  know I did prescribe carbidopa/levodopa. Yeah, that
24  was after I got the results of the DaTscan.
25    Q. So when you first saw him you didn't start

42

1  him on levodopa, correct?
2    A. No. He had already been given it by
3  Dr. Aradi and he said it made him feel foggy or -- he
4  stopped it.
5    Q. Okay. So if you would turn now please to
6  the next time that you saw Allen, which is September
7  2nd, 2021, and it's page 34 for those people I've
8  sent the records to.
9    And, Doctor, you can use the notes that you
10  brought with you if you'd like.
11    A. September 2nd?
12    Q. Yes, ma'am.
13    A. Yes, I'm there.
14    Q. So this is your second visit with Allen,
15  correct?
16    A. Uh-huh.
17    Q. And can you say yes for the record?
18    A. Yes.
19    Q. So tell us at this point in time you got the
20  results back from the DaTscan; is that right?
21    A. Yes.
22    Q. And what were the results from the DaTscan?
23    A. Well, I'll read it. "Activity is absent in
24  and putamen of both hemispheres and confined to the
25  caudate nuclei. Activity is slightly asymmetric but

43

1  forms two roughly circular or oval foci more
2  prominent on the left. This impression is" -- this
3  was dictated by the radiologist -- "The impression is
4  abnormal scan. Type II."
5    Q. And then what does he say below that?
6    A. "This result is consistent" -- this is what
7  I say. Well I think the radiologist does too.
8    "This result is consistent with a dopamine
9  deficiency syndrome."
10    Q. And I think you've already answered this.
11  But based upon that study and what you've seen
12  before, now you're confident in your diagnosis of
13  Parkinson's disease, correct?
14    A. Completely, yes.
15    Q. Do you -- I'm assuming that you communicate
16  this diagnosis to the patient once -- especially once
17  it's confirmed like this; is that right?
18    A. Yes.
19    Q. Do you have any -- and if you don't that's
20  fine. Do you have any recollection of what the
21  reaction of Allen or his wife Lynda was when you told
22  him he had -- now, you confirmed he has Parkinson's
23  disease?
24    A. I don't think he was --
25    MS. HARDY: Objection to form.

44

1    THE WITNESS: Pardon?
2    Q. She objected to the form of the question.
3  You can answer it.
4    A. Oh, okay. He wasn't happy with it. I mean,
5  I think he was -- you know, people try -- you know,
6  they hope it's not right, you know. And that's not
7  unusual.
8    Q. But while we're talking about that, do you
9  -- let me ask you this.
10    What is -- is there a cure for Parkinson's
11  disease?
12    A. Not at -- no.
13    Q. Will Parkinson's disease continue to
14  progress --
15    A. Yes.
16    Q. -- no matter what you do --
17    A. Yes.
18    Q. -- to try to slow it?
19    A. Yes.
20    Q. And then when it progresses, what does that
21  mean for a person's ability to function, or with the
22  way their body works? What happens?
23    A. Well, classically they get stiffer, slower.
24  It gets hard to get up out of a chair. It gets hard
25  to walk. They walk with these tiny little steps at

Pages 41 to 44

45

1    best. They may lose contr -- they may have trouble
2    speaking. They may have trouble swallowing. They
3    may lose control of their bladder. They develop --
4    they can develop what they call autonomic symptoms
5    where their blood pressure becomes deranged. And
6    they can develop dementia. Almost all of them have
7    some cognitive changes, but not all of them go on to
8    qualify as demented. They may have severe loss of
9    balance and begin to fall. Even from the beginning
10   they have some GI problems.
11    Q. When you say "GI problems," problems with
12  going to the bathroom?
13    A. Yeah, constipation classically. They
14  have -- the digestive system becomes slow.
15    Q. And all of this is because of damage that's
16  been done to the brain?
17    A. Yeah.
18    Q. So then at the very end stage of Parkinson's
19  disease, I mean is a patient like immobile?
20    A. They can be. Now, sometimes the -- up to a
21  point you can replace dopamine with levodopa. And to
22  the extent that it keeps working and it doesn't keep
23  working for most people without end, I mean they --
24  when the dopamine is working they're much more --
25  they're much better functioning.

46

1    Although some of the symptoms don't respond to
2  dopamine. The cardiac -- the blood pressure
3  symptoms. In fact that makes it -- the levodopa
4  makes it worse. The bladder issues, the GI issues,
5  they don't tend to respond. The dementia, maybe a
6  little. It's the core triad; the stiffness,
7  slowness, tremor that, you know, tend to respond to
8  the levodopa, so they can maybe walk, move around.
9    Q. So levodopa can slow it down but not stop
10  it; is that right?
11    A. Well, there's debate as to whether it even
12  slows it down.
13    Q. Oh.
14    A. I mean, it does indirectly because if you're
15  really active, it seems that activity, physical
16  activity may slow it down. People who are physically
17  active do tend to do much better for a long time. So
18  if you've got a medicine that allows you to be
19  physically active, you're going to do better.
20    But whether -- studies to see if the -- you know,
21  when they do the placebo, or some comparison, you
22  know, clinical trials have not demonstrated an actual
23  slowing of the progression of the disease by
24  levodopa. It's symptom treatment.
25    Q. Well, let me make sure I understand. Is

47

1  levodopa the most effective medication that we --
2  I'll say, you as doctors today know to try to help
3  people with Parkinson's disease?
4    A. I think so, yes.
5    Q. And then if I heard you correctly, it may
6  slow -- it may treat the symptoms but debatable
7  whether it actually does anything to prevent the
8  progression?
9    A. Correct.
10    Q. So then did you recommend that Allen start
11  levodopa?
12    A. Yes.
13    Q. So let's go to your next visit with Allen,
14  which is page 42 at the bottom, and it's dated April
15  7, 2022. And let me know when you get there, please.
16    A. April 7th?
17    Q. Yes, ma'am. The one I have has the start of
18  note at the bottom of the page.
19    A. I'll look over here. Okay.
20    Q. While I'm thinking of it, since you are no
21  longer employed at USF, did you have access to Allen
22  Williford's records?
23    A. No.
24    Q. Did I provide you the records --
25    A. Yes.

48

1    Q. -- for you to review before today?
2    A. Yes.
3    Q. And did I explain to you how to get to the
4  deposition and that we were going to be going through
5  questions about your treatment before today?
6    A. Yes.
7    Q. Do you feel I helped you prepare for your
8  deposition today?
9    A. Yes.
10    Q. Okay. So then tell me when you've gotten to
11  the note of April 7, 2022, please.
12    A. Well, I found it in the big stack. I know I
13  saw -- it's the same. I would prefer to use my own.
14    Q. We can even take a little break if you want
15  to find it.
16    A. I'll look at yours. When I look at yours I
17  know I've looked at it. So this is 42?
18    Q. Yes, ma'am.
19    A. I've got it, 4/7.
20    Q. So this note reflects that you, for the
21  third time now, saw Allen on April 7th, 2022?
22    A. Yes, it does.
23    Q. Tell us what happened at that visit.
24    A. Well, he reported some benefit from
25  levodopa. The phrase he does not get the muscle

INTEGRA REPORTING GROUP, LLC
Tampa, FL (813)259-4800

49

1  jitters.  He talks about there are times where he'll
2  get cold quicker, which I'm not sure what this is.
3  Then he gets tremor.  People do tend to sometimes get
4  kind of out of the box because that's when their
5  levodopa wears off.
6     So he did enjoy himself with his grandkids.  He
7  seemed to be -- something was helping him because he
8  was -- he skied.  But that happens, people with
9  levodopa sometimes -- you know, they'll have
10  experiences like being in a nursing home and they'll
11  be told -- and they won't be able to get up and move
12  when somebody wants them to, and they'll be told, "I
13  know you can walk.  I saw you doing it yesterday."
14     Q.  Uh-huh.  And they do it then?
15     A.  No, they can't.
16     Q.  Oh, I see.
17     A.  That's the point, is that the medicine, when
18  it's working, can be almost miraculous and the
19  difference, so...
20     Q.  And based upon what Allen described to you
21  and your exam on April 7th, 2022, did it look to you
22  as though levodopa was benefiting Allen?
23     A.  Yes, it did.
24     Q.  Let's go to your assessment for that visit,
25  please.  Was it just a follow-up visit --

50

1     A.  Uh-huh.
2     Q.  -- to kind of check out how the levodopa was
3  going?  Is that what the check-up was for?
4     A.  Well, I follow almost all of them every
5  three or four months because something always
6  happens.  And -- I mean, it's a multi-system disease.
7  And levodopa is not the only intervention, it's just
8  the most classic one.
9     So we try to keep up with it as they change.  I
10  mean, even just levodopa is dosed in a tremendous
11  variety of ways.  It's not a medicine like most
12  medicines where you take this much every so often.
13     Q.  So your treatment for Allen is to ask him to
14  continue taking levodopa?
15     A.  Yes.
16     Q.  And exercise just as much as he can?
17     A.  Uh-huh, exactly.
18     Q.  Are those the two main things to help him
19  with his Parkinson's disease?
20     A.  Yes.  That we address there, yes.
21     Q.  Okay.  We go to assessment for that visit,
22  the same one we've been talking about, the April 7th.
23  Your diagnosis is what, if you can just read that?
24     A.  Parkinson's disease.
25     Q.  And you describe some of the symptoms there?

51

1     A.  Well, those are the classic --
2     Q.  Okay.
3     A.  -- the triad or sometimes it's four.  You
4  know, that you'll see in textbooks.  What is the
5  classic triad for Parkinson's?  Slowness, stiffness,
6  tremor.
7     Q.  And tell us what your plan was as of that
8  visit.
9     A.  Well, we again review -- you know, I always
10  spent time encouraging what we called "healthy
11  living," that was primarily exercise.  But there are
12  all types, so it takes more time than you would think
13  because you're addressing a number of motor problems
14  and you're teaching them a number of physical
15  activities.  He was having some dependence on
16  benzodiazepines, which you'll see scattered -- you
17  know, comments scattered throughout my records.
18     He didn't demonstrate the behaviors of an addict.
19  I mean, he wasn't also drug seeking or a problem, but
20  he just had trouble letting go of it, you know.  And
21  it's kind of not that good for you.  But he was
22  working, you know, to stop that.  We changed --
23  decreased his sertraline, which is a serotonin
24  medicine for depression.
25     Q.  Is that the Zoloft?

52

1     A.  Yes, it is.  And gave him another one,
2  budeprion, because those drugs can cause erectile
3  dysfunction, so he didn't like that so we took him
4  off and put him on something else.  And that was it.
5     Q.  So at this point in time you're requesting
6  that Allen take the levodopa three times a day?
7     A.  Yes.
8     Q.  So let's go to your next, and I believe your
9  last appointment with Allen on June 9th, 2022 and let
10  me know when you are there.
11     A.  I'm there.
12     Q.  All right.  Tell us how he's doing and what
13  you observed on June 9th, 2022, the last time you saw
14  Allen.
15     A.  Well, he seemed somewhat stabilized.  His
16  medicine was lasting four to six hours.  So --
17     Q.  Let me interrupt you, I'm sorry.  The
18  medicine being the levodopa?
19     A.  Yes.  Sinemet is carbidopa/levodopa.
20     Q.  Same thing, different name?
21     A.  Well, it's got two medicines,
22  carbidopa/levodopa --
23     Q.  I see.
24     A.  -- as opposed to just levodopa.
25     Q.  Okay.  So that's when he's taking both?

53

1    A.  Right.  He's taking Sinemet.
2    Q.  Sorry to interrupt you.
3    A.  That's all right.  So now he's taking it
4  more often.  He'll take it every four to six hours.
5  He doesn't notice particular times where it's not
6  working.  Some people, they produce a schedule,
7  they'll take the medicine, they know it's going to
8  wear off in three and a half hours.
9    If they don't take their medicine until four
10  hours, they'll wear off and they can identify it.
11    He had, you know, a vaguer kind of situation and
12  so there was no concrete specific times where he
13  could say, "Well, my medicine always seems to wear
14  off at this time," which can be good, it could be
15  that it's not wearing off.
16    He didn't have any dyskinesia, which is an
17  excessive movement that sometimes the medicine
18  causes.  And he didn't have dystonia which is muscle
19  spasming causing distorted posturing which sometimes
20  happens.
21    Then we went back to the cognitive changes.  His
22  wife was concerned.  Am I -- is that what you asked
23  me about?
24    Q.  Yes, ma'am.  Basically, what happened when
25  you had a follow-up visit on June 9th, 2022?

54

1    A.  And she was describing that he was
2  indecisive.  It's -- there's a kind of cognitive
3  change which is a little different than Alzheimer's,
4  for example.  Where it's not so much memory as
5  trouble planning, organizing, focusing.  So it's not
6  unusual for people with Parkinson's to start on
7  something, go do something else, forget they started
8  and not return to it.  And that was the kind of --
9  from talking to him and her, that was the behavior
10  that he was exhibiting.
11    Q.  And that can be a symptom of Parkinson's
12  disease?
13    A.  Yeah.  It's called impairment of executive
14  function as opposed to just memory.  Where you
15  organize, plan and --
16    Q.  Lynda Williford was worried about that.
17    A.  Yeah.
18        MS. HARDY:  Objection to form.
19    Q.  Did she tell you she was worried about that?
20    A.  She --
21        MS. HARDY:  Objection to form.
22    Q.  Yeah.  Just ignore --
23    A.  Oh, okay.  I'm sorry.
24    Q.  Unless someone tells you not to answer, just
25  let us do our little lawyer thing.

55

1    A.  Okay.
2    Q.  Did -- so let's make sure my question is
3  clear for you.
4    Did Allen Williford's wife Lynda express concern
5  to you --
6    A.  Yes.
7    Q.  -- about the cognitive changes that you were
8  just describing that are caused by Parkinson's
9  disease?
10    A.  Yes.
11        MS. HARDY:  Objection to form.
12    A.  She described it as indecisiveness.
13    Q.  And you told us that you -- what she
14  described to you, starting a task --
15    A.  Yes.
16    Q.  -- and then not going back to it, is
17  something that is associated with Parkinson's?
18    A.  Yes, yes.
19    Q.  So let's talk a second about some of the
20  causes of Parkinson's disease.  You note here midway
21  through -- and we're on page 51 -- that says,
22  "Extensive exposure to paraquat."  Did I read that
23  correctly?
24    A.  Yes.
25    Q.  I did read that correctly.  Is that

56

1  something that Allen Williford told you during your
2  visit on June 9th, 2022?
3    A.  Yes.
4    Q.  Assuming that Allen did in fact have
5  "extensive exposure to paraquat," then in your
6  opinion, is paraquat a likely cause of the
7  Parkinson's disease that you diagnosed?
8        MS. HARDY:  Objection, form.
9    A.  Yes, it is a likely cause.
10        MR. GUYTON:  Objection.
11    Q.  Can you tell us, were there any other things
12  that jumped out at you besides paraquat as a likely
13  cause of his Parkinson's disease?
14        MR. GUYTON:  Object to the form of the
15  question.
16    You may, of course, answer.
17    Q.  Let me make it easier.  Was there a family
18  history of Parkinson's disease?
19    A.  No.
20    Q.  Were there any other things that you noted
21  either by history or examination that pointed as a
22  likely cause --
23    A.  No.
24    Q.  -- of his Parkinson's disease other than
25  what he reported to you as an "extensive exposure to

Pages 53 to 56

INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813)259-4800

57

1  paraquat"?
2       MS. HARDY:  Objection, form.
3       A.  No.
4       MR. GUYTON:  Object to the form.  You
5  may, of course, answer.
6       MR. BRAKE:  Objection what, John?
7       MR. GUYTON:  Object to the form of the
8  question.
9       You may, of course, answer.
10      Q.  Okay.  Are you familiar with a drug MPTP?
11      A.  Yes.
12      Q.  Tell us what is MPTP?
13      A.  Well, I mean technically it's -- I mean, the
14  chemical is 1,4 methyl-phenyl, 1,2,3
15  tetrahydropyridine.  I mean, it's just a chemical.
16      Q.  Right.  But what is it?
17      A.  Well, it metabolizes to something called MPP
18  in the brain which causes Parkinson's.  It was also
19  used recreationally, that's how they discovered it
20  because it also -- when it's -- is metabolizes it
21  creates a high.  So people were taking it as a sort
22  of designer drug and then developing Parkinson's.
23      Q.  Is MPTP also used to induce Parkinson's
24  disease in laboratory rats?
25      A.  Yes.

58

1       Q.  Is it your opinion that MPTP is a cause of
2  Parkinson's disease?
3       A.  Yes.
4       Q.  Do you know if there's any similarity
5  between the chemical structure of MPTP and paraquat?
6       A.  From what I've read they're very -- the
7  molecules are similar, not identical but similar.
8       Q.  Back to the question about the paraquat and
9  the Parkinson's disease.  You've told us that it's
10  your opinion that paraquat was a likely cause of
11  Allen's Parkinson's disease.  Did you form that
12  opinion at the time that you saw him on June 9th,
13  2022?
14      MR. GUYTON:  Objection to the form.
15      You may, of course, answer.
16      A.  Yes.  Yes.  I mean, I always -- I'm taking
17  his word for it, but he used it.
18      Q.  Right.  Assuming that's true, but that's
19  something you thought of at that time --
20      A.  Yes.
21      Q.  -- not just today --
22      A.  No.
23      Q.  -- right?
24      A.  Oh, no.  No, uh-huh.
25      Q.  And then what was your plan then for Allen

59

1  at your last visit on June 9th, 2022?  What are you
2  going to do to try to get him maintained?
3       A.  I think I'm missing the next page.
4       Q.  It's page 52 for the ones that are numbered.
5       A.  Okay.  I mean, I'm guessing.  Of course I
6  would continue carbidopa/levodopa.  I would continue
7  the encouragement to do the physical activity.
8       "Continue carbidopa/levodopa.  Continue the
9  Buspar."  He had a psychiatrist by then, so I
10  deferred to their decision-making.  I sort of tried
11  to educate them a little bit about the kind of
12  cognitive changes that Parkinson's presents.
13  Encouraged, you know, supported him in his efforts
14  not to use too many benzodiazepines.  And continued
15  to advocate, lecture about exercise.
16      I mean, cognitive activity, social activity,
17  physical activity all help Parkinson's people, and so
18  I always -- at least when I have time, kind of
19  reinforce that and discuss it.
20      Q.  So the plan is to continue the medication,
21  levodopa, and exercise?
22      A.  Uh-huh.
23      Q.  And that was the last time you saw him?
24      A.  Yes.
25      Q.  Do you recall having a discussion with Allen

60

1  about his prognosis?
2       Did he ever, that you recall, ask you like "what
3  does my future hold for me?"
4       A.  You know, I do in a way, but it's hard
5  because I always have those discussions.
6       Q.  So your habits and routine practice --
7       A.  Absolutely.
8       Q.  -- is after you diagnose someone with
9  Parkinson's disease to tell them what may -- is
10  likely to come?
11      A.  Well, they always ask.
12      Q.  What do you say?
13      A.  Well, I have to start with that it is not
14  entirely predictable.  There's a vast range of
15  severity.  But I do tell them that there's -- that
16  they will progress.  That things will get worse.
17      I try to be a little optimistic and encourage
18  them to use the medication.  It's easier with people
19  when they have a really good dramatic response to it.
20  But that -- I discourage them from anticipating every
21  single possible symptoms.  I say, "Just because you
22  see people do this, doesn't necessarily mean you'll
23  get that symptom," because that's true, not everybody
24  gets everything.
25      Depending on where they are sometimes I

INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813)259-4800

61

```
1   prepare -- you know, talk about do they want to have
2   a certain -- do they have lawyers, do they have
3   end-life plans.
4        Q.  Uh-huh.
5        A.  They -- one of the things they have to plan
6   for is not being able to care for themselves, so --
7   you know.  And you try and be careful with that
8   because not everybody -- I mean, older people may die
9   before that ever happens.  This isn't around the
10  corner.  And we have those kind of discussions.
11       Q.  I mean, you probably --
12       A.  But we also try to tell them that as they
13  are -- you know, that it could be years they may --
14  you know, the guy went skiing, you know.  They need
15  to keep living life.  That this was not ALS, it's not
16  cancer.  You know, there's more variety in terms of a
17  possible outcome.  I mean, how serious the outcome
18  will be.
19       Q.  I'm sure that news is probably not very
20  welcome.
21       A.  They already know.
22       Q.  Yeah.  Let me back up one question and I
23  think I'll be finished, but I'm sure Seantyel will
24  have some questions for you.
25       We talked about before how when Allen first saw
```

62

```
1   Dr. Aradi, and then just now about you talking to
2   Allen about paraquat and pesticides.  Why do doctors,
3   and why do you at USF and you specifically, inquire
4   about potential causes of Parkinson's?
5        A.  Well, there's a variety of reasons.  The
6   first is to kind of make sure it is Parkinson's.  I
7   mean, if somebody, for example, has been on an
8   antipsychotic drug, then you may not have Parkinson's
9   for example.
10       So you're trying to find all the variables.
11  Why -- do you have a family history of Parkinson's?
12  You know, then it helps you make the diagnosis.
13       We're not at a point where we treat people
14  differently.  It's not because they got -- you know,
15  they have a family history that we would treat them
16  differently than if they were exposed to a toxin that
17  causes Parkinson's.  Sometimes there's benefits.
18  Like if they're a veteran and they were sprayed with
19  Agent Orange, they may not realize that when they are, by
20  the VA, pretty automatically, it seems to have
21  service-connected disability even if it's 30 years
22  later.
23       So -- and then there's clinical trials.  And
24  there's just -- sometimes just hist -- just
25  accumulation of knowledge and understanding what
```

63

```
1   you're dealing with.
2        But in a clinical trial, you know, a sponsor may
3   be a pharmaceutical.  Who's ever coming up with the
4   intervention and say, "We want to do a trial.  We
5   want to do a trial on people who were exposed to
6   something."  Or they're looking for a gene.  "Oh, we
7   want to ask about GeneJuice."
8        So, you know, you have all this in the records
9   that they come from something or were exposed to
10  something that may have led to this situation and
11  then you could say "Oh, we need you for a clinical
12  trial."
13       Q.  And would another reason be so that if
14  someone is continuing to expose them --
15       A.  Oh, certainly, yeah.
16       MS. HARDY:  Objection to form.
17       A.  Well, yeah.  I mean, if it's something they
18  can stop, you want them to stop it, yeah.
19       Q.  So the record is clear and so we have a
20  clear answer to the question I'm going to ask it
21  again.
22       A.  Okay.
23       Q.  Would another reason to want to know
24  potential causes of Parkinson's disease be that if
25  someone is snorting MT -- or MPTP, right?
```

64

```
1        A.  Yeah.
2        Q.  If they stop doing that that's messing with
3   your brain, right?
4        A.  Right.  Yeah.
5        MS. HARDY:  Objection to form.
6        MR. BRAKE:  I think those are all the
7   questions I have.  I personally need to take
8   a quick break if that's okay with everyone
9   here.
10       THE WITNESS:  I would like to.
11       MR. BRAKE:  Thank you.
12       THE VIDEOGRAPHER:  We're off the video
13  record at 2:23 p.m.
14       (WHEREUPON, a brief recess was taken.)
15       THE VIDEOGRAPHER:  This is the beginning
16  of media unit No. 2.  We're on the video
17  record at 2:38 p.m.
18            CROSS-EXAMINATION
19  BY MS. HARDY:
20       Q.  All right.  Hello, again, Dr. Burke.
21       A.  Hello.
22       Q.  To remind you, my name is Seantyle Hardy and
23  I represent defendant Syngenta in this action and I'm
24  going to ask you a few questions today.
25       If you could start by stating and spelling your
```

Pages 61 to 64

65

1    full name for the record.
2        A.   Deborah, D-e-b-o-r-a-h, A., Burke,
3    B-u-r-k-e.
4        Q.   Great.  What is your current address?
5        A.   4503 33rd Avenue North, St. Petersburg,
6    Florida 33704.  That's my legal address.
7        Q.   And what is your e-mail address?
8        A.   Brkdbrh@yahoo.com is one of them.  And
9    accelclinical -- dburke@accelclinical.com is my other
10   one.
11       Q.   Are you represented by counsel today?
12       A.   No.
13       Q.   During my questioning you may hear Mr. Brake
14   make objections like I did earlier --
15       A.   Okay.
16       Q.   -- unless you are instructed not to answer,
17   you may ignore that objection and go ahead and answer
18   the question.  Do you understand?
19       A.   I do.
20       Q.   Okay.  And then Ms. Barron is taking down
21   everything that we say.  So it is important that you
22   and I do not speak over each other.  Is that okay?
23       A.   Yes.
24       Q.   And so I will try to wait for you to answer
25   the full question before I ask the next question.

66

1    And if you could wait for me to ask the full question
2    before you answer the question.  Is that okay?
3        A.   Yes, that's fine.
4        Q.   And I'll try to ask clearer questions today,
5    but if at any time you don't understand one of the
6    questions that I've asked, please let me know.
7        A.   Okay.
8        Q.   And if you begin to answer the question and
9    then answer the question, I will assume that you
10   understand the question.  Is that fair?
11       A.   Un-huh.
12       Q.   Great.  Now, your only role in this case was
13   -- was that in the process of evaluating
14   Mr. Williford as his doctor?
15       A.   Yes.
16       Q.   So were you ever hired by Mr. Williford's
17   attorneys to do anything else in this case?
18       A.   No.  You mean other than what I'm doing
19   right now?
20       Q.   Were you hired to do what you're doing right
21   now?
22       A.   I am paid to do it.  I was subpoenaed so I
23   would have to do it whether I was paid or not, but I
24   am paid.
25       Q.   And who is paying you?

67

1        A.   I assume his lawyer firm.
2        Q.   And how much are you being paid?
3        A.   $400 an hour.
4        Q.   Okay.  Prior to being subpoenaed, were you
5    contacted by Mr. Williford's attorneys?
6        A.   Well, they tried but I -- they couldn't
7    contact me.  They were trying to contact me at the
8    university.
9        Q.   Once you were subpoenaed how many times did
10   you speak to Mr. Williford's attorneys?
11       A.   Probably, I'd say three.
12       Q.   And what format was those conversations?
13       A.   Telephone, e-mail, a text or two.
14       Q.   And can you recall which attorneys you've
15   spoken to?
16       A.   This is the only one.
17       Q.   And outside of Mr. Williford's appointments
18   have you spoken Mr. Allen Williford?
19       A.   No.
20       Q.   Did Mr. Brake provide you with any
21   documents?
22       A.   Yes.
23       Q.   And what documents?
24       A.   The clinic visit that we've been referring
25   to.  Dr. Aradi's clinic visit report and several of

68

1    mine.  Four of mine.
2        Q.   And when you say these clinical visits, are
3    you referring to the clinical notes?
4        A.   Yes.
5        Q.   Other than the clinical notes that you went
6    through earlier today with Mr. Brake, did he provide
7    you with any other documents?
8        A.   No.
9        Q.   And other than the -- strike that.
10       Your curriculum vitae that you went through
11   earlier with Mr. Brake, did you prepare that?
12       A.   No.
13       Q.   Who prepared that?
14       A.   Well, it's an ongoing document.  The office
15   manager at USF -- there was more than one -- they
16   would add studies as I did them.  And then when I
17   started -- and then the same would happen at Roskamp,
18   an officer manager -- and I don't even remember them
19   all -- would add to the resumes because they used
20   them -- you know, my CV when they wanted to get to
21   clinical studies, and also just for licensing and
22   everything.
23       And then at Accel, they began to add studies as I
24   do them.  They maintain the CV.
25       Q.   So just to clarify, this CV was started by

69

1  the office manager at USF; is that correct?
2      A.  Yes, I think that was who initiated it.  I
3  may have initiated it years ago but then they'll also
4  cut stuff out.  Like I had a CV that I made out.  I
5  was, you know, on staff at several hospitals in
6  St. Pete, and I was trying to work in that context,
7  and I made my own CV.  And I used that when I first
8  got some of these other jobs, but then other people
9  will do it for me, so that's what happens.
10      Q.  So this CV that was initiated by either you
11  or the office manager at USF it is now being
12  maintained by someone at Accel?
13      A.  Yes.
14      Q.  Okay.  And did you provide this CV to
15  Mr. Brake?
16      A.  Yes, I did.
17      Q.  Did you bring any documents with you today?
18      A.  The clinic -- these reports, these clinic
19  documents that we've been working with.  He brought
20  the CV -- I e-mailed him the CV.
21      Q.  Do your clinical notes that you brought
22  today include any notes that weren't included in
23  Mr. Brake's copy of the notes?
24      A.  No, no.
25      Q.  Other than your clinical notes did you bring

70

1  anything with you today?
2      A.  I brought a computer.
3          MR. BRAKE:  You mean documents, right?
4          MS. HARDY:  Yes.
5      Q.  Other than --
6      A.  No other documents, no.
7      Q.  All right.  Dr. Burke, when were you first
8  licensed to practice medicine?
9      A.  I believe it was 1996.  I'm going backwards
10  to I think it's when I graduated from medical school
11  that you first -- you get your MD and then you can
12  practice, and then you can do an internship and then
13  board certification type stuff comes later.
14      Q.  So how long have you been practicing?
15      A.  Well, I started working I mean as a resident
16  since 1996 and then I finished in 2001 and I've been
17  practicing ever since.
18      Q.  So you've been practicing for over 20 years?
19      A.  Yes.
20      Q.  And you've been practicing neurology for
21  over 20 years?
22      A.  Yes.
23      Q.  Do you specialize in Parkinson's disease?
24      A.  Movement disorders, particularly
25  Parkinson's.

71

1      Q.  Can you describe what other movement
2  disorders that you work with aside from Parkinson's?
3      A.  More active syndromes were essential tremor,
4  restless leg syndrome.  I was -- I worked for a while
5  at Huntington's chorea.  A lot of patients present
6  with non-specific movement problems, dystonia for
7  example.  All of a sudden they're doing some
8  posturing muscle spasm that they can't control.  It's
9  called dystonia, it's a movement disorder.  They'll
10  present with tremors that aren't necessarily any of
11  the above.  They'll present with movement that is a
12  side effect of some treatment or medication they got.
13  I have to think about it.  That's the bulk of it.
14  That's the bulk of it.
15      Q.  So your specialty in movement disorders
16  covers all of the disorders you just mentioned and
17  Parkinson's disease; is that correct?
18      A.  Yes.  But I haven't done Huntington's chorea
19  for a long time because there's another specialist at
20  USF that does that.
21      Q.  Are you an active professor in any medical
22  schools?
23      A.  No.
24      Q.  Earlier when we discussed, or when you and
25  Mr. Brake discussed your CV, you stated that you

72

1  didn't teach at USF although assistant professor is
2  listed on your CV.  Can you explain that?
3      A.  No, I really can't.  Because when I had
4  first started working, I worked as a contractor and I
5  was called -- I forget, it was some general name they
6  used for it.
7          Then they started calling me -- but nobody
8  discussed it with me.  Nobody changed the terms of my
9  employment.  All of a sudden they were calling me an
10  adjunct professor, and then they were calling me
11  assistant professor.  And I don't -- I don't -- I
12  mean, that was something that happened between
13  administrative -- central administrative office and
14  our office manager.  It didn't change my pay, it
15  didn't change anything.  It was just -- I don't know
16  -- in fact after I left I began to wonder exactly --
17  you know, because I never -- I assumed I never had
18  benefits, for example.  But then I think I did have
19  some.
20      Q.  So is it fair to say that you were given
21  this title, but you were not acting as a professor?
22      A.  I wasn't acting as a teacher of students.
23  Well, when the medical students came, yes, I was
24  teaching.
25      Q.  And what -- when you say you were teaching,

Pages 69 to 72

73

1       was this teaching in practice, like during practice
2       and --
3           A.   Uh-huh.
4           Q.   Does that include shadowing?
5           A.   Yes.
6           Q.   And sometimes I would -- like if I had I
7       DaTscan disc, an image, and I bring it up on the
8       computer and look at it, or I'd explain it to them.
9       I explained results of tests to them.  I talked to
10      them about, you know, what Parkinson's was, why we
11      treat it the way we do, or if it was another movement
12      disorder.  So I would teach them.
13          Q.   Other than what you've just described, have
14      you ever taught courses?
15          A.   No.
16          Q.   Okay.  Other than what you described, have
17      you ever taught courses on Parkinson's disease?
18          A.   No.
19          Q.   Have you ever taught any courses on movement
20      disorders?
21          A.   No.
22          Q.   How many patients have you treated with
23      Parkinson's disease?
24          A.   Thousands.
25          Q.   And when you say "thousands," does this

74

1       include patients that you treated during your
2       residency?
3           A.   I don't think so.  I didn't treat that many
4       during -- residency was general neurology.  Only that
5       one year of fellowship was specific to movement
6       disorders.
7           Q.   Earlier you testified that you've diagnosed
8       about 1,000 people --
9           A.   That was an example.
10          Q.   -- with Parkinson's disease --
11          A.   I think so.
12          Q.   -- is that correct?
13          A.   Yeah.
14          Q.   And so have you treated more people than you
15      you've diagnosed with Parkinson's disease?
16          A.   Yeah, I guess I have.
17          Q.   And how does that come about, treatment when
18      you aren't the diagnosing physician?
19          A.   They'll be referred -- they come from a
20      primary care doctor who sees the tremor refer's them.
21      They'll self-refer.  Someone's -- you know, they'll
22      either -- maybe they'll diagnose themselves and then
23      I'm really diagnosing them.  But they're referred
24      from other places, the VA.  I worked for the VA for a
25      while as a contractor.

75

1           Yeah, most of them referrals, sometimes from
2       within the university, and then they just -- where
3       the movement disorders are, then you Google it and we
4       come up, and they'll make an appointment.
5           Q.   So earlier when you were estimating that
6       you've diagnosed nearly 1,000 people with Parkinson's
7       disease, were you not counting people that you've
8       treated but not personally diagnosed?
9           A.   No.
10          Q.   Can you explain?
11          A.   Well, they come diagnosed.  So I'm not
12      diagnosing them.  I may be affirming the diagnosis.
13      So it depends on how they come.  I mean, if they come
14      with a full diagnosis from a comp -- well described
15      by a competent provider, particularly if they come
16      with a DaTscan.  It's a gray area I guess whether I
17      would be diagnosing them because I would be -- you
18      know, sometimes they're sent to me as a specialist to
19      confirm the diagnosis.
20          So I am looking at them trying to be sure they
21      have -- you know, diagnosing them.  But a lot of them
22      suspected they had Parkinson's, or someone suspected
23      they might.  But, you know, they could have been
24      taking a med -- they had a tremor, so they might have
25      been taking a medicine that caused tremor.  There's

76

1       all kinds of -- there's all kinds of different
2       tremor.  So they would be referred to me possibly as
3       having a movement disorder.  That's how they would
4       come.
5           Q.   So does your 1,000 guesstimate include
6       confirmed diagnoses or --
7           A.   I think it might.  But by confirmed it might
8       be they themselves Googled their symptoms.
9           But I think when I was trying to estimate, I was
10      trying to remember how many times -- I was trying to
11      remember myself sitting with a patient and saying to
12      them, "Yes, you have Parkinson's," and it being that
13      kind of visit.  And where, you know, like
14      Mr. Williford -- I mean, Dr. Aradi diagnosed him.  I
15      mean, he saw him first and put a label on it.  But
16      most of them didn't come that diagnosed.  I mean,
17      they didn't come from another movement disorder
18      specialist within the university with such a detailed
19      confirmation.
20          I mean, I got the DaTscan.  I confirmed the
21      symptoms.  I saw them myself.  But usually it was
22      more of a gray area.  It wasn't like a complete
23      surprise.
24          I mean, if you find a lump and you go to the
25      doctor and they say, "Yes it's cancer," maybe you

INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813)259-4800

77

```
 1    already thought that.  Maybe your primary care
 2    thought that, but you don't know until somebody
 3    diagnosis it.
 4        Q.  So in coming up with this figure, would you
 5    have counted Mr. Williford in this or no?
 6        A.  Probably not.  But see when you say "count,"
 7    I didn't really count.  I just was thinking, well, I
 8    probably -- probably once a week, sometimes it was
 9    twice or three times a week, sometimes nobody.  But
10    it was very steady and very frequent that I would see
11    somebody.  And they had not -- they had not been
12    con -- given a confirmed diagnosis of Parkinson's and
13    I told them that it was.  It was Parkinson's.  Some
14    of them would be completely shocked.
15        But people don't end up with a specialist usually
16    out of the blue, they come for a diagnosis where
17    other people may suspect what they have.
18        Q.  So is that a no, that in your process of
19    calculating about 1,000 people you would not have
20    considered Mr. Williford in one of those?
21        A.  I don't think so.  I mean, I confirmed it.
22    I mean, what else can I say?
23        Q.  Have you conducted clinical research on
24    Parkinson's disease?
25        A.  I've been part of it, yes.
```

78

```
 1        Q.  And is this in your work at Accel?
 2        A.  No.  The reason being that it was a conflict
 3    of interest.  The office I started in was in Tampa
 4    and I could -- I was at one point assigned a study
 5    that turned out to be the same study at USF.  Now
 6    there's nothing illegal about that, but too many of
 7    the same -- you know.
 8        I wasn't told I couldn't, but the head of the
 9    department where I worked was not happy, so I agreed
10    not to do Parkinson's research at Accel.
11        Q.  Where have you done clinical research on
12    Parkinson's disease?
13        A.  Mostly USF.  I did some at Roskamp.  And
14    there the university wasn't too concerned because it
15    was Sarasota, it was pretty far away.  So we weren't
16    competing for the same population of patients.
17        Q.  And what did your clinical research at USF
18    and Roskamp on Parkinson's disease involve?
19        A.  Usually it -- well, patients would come and
20    there would be a series of evaluations that we would
21    do.  They'd be tracked.  Like there's, for example, a
22    rating scale called the UPDRS.  It's an extensive
23    scale where you evaluate the status of a patient and
24    you come up with numbers, and that way they're
25    tracking how the disease progresses as best they can
```

79

```
 1    in your subjects.  They call it -- you know.  And
 2    that's where they get their data.
 3        And that's just an example.  Another thing might
 4    be somebody else comes to me and says, "You know,
 5    Dr. Burke, they're reporting a headache.  Do you
 6    think it's a side effect of the drug?"  So that would
 7    be my role, like if I was the investigator or
 8    subinvestigator.  That's often the role.  You're sort
 9    of overseeing the medical aspect of the study.
10        Q.  How many studies specific to Parkinson's
11    disease have you involved in?
12        A.  I don't know.  I don't even -- I think I
13    answered that earlier and I don't even remember what
14    I said.  20, 30.  I don't know.
15        Q.  So you think it was no more than 30, is that
16    a fair estimate?
17        A.  Oh, no, I don't think so.  Uh-uh.
18        Q.  Are you a member of the International
19    Parkinson's Disease and Movement Disorder Society?
20        A.  Not now, no.
21        Q.  Have you ever been?
22        A.  I don't think so.  I was a member of the
23    Parkinson's study group which is one of the sort of
24    overseeing groups, but I don't -- no, I don't think I
25    ever -- I tended not to join a lot of the -- I joined
```

80

```
 1    the American Academy of Neurology.  And for a while I
 2    was in one of the research sort of people that
 3    oversee research and say, "Well, now we're going to
 4    make it a standard that doctors use this kind of
 5    prescribing."
 6        You know, they came up with the standards for
 7    doctors treating Parkinson's disease.  The
 8    Parkinson's Study Group.
 9        Q.  Are you a member of the American
10    Neurological Association?
11        A.  The American -- the academy of neurology or
12    the -- I don't think -- not the American neurology
13    association.  I am a member of the American Academy
14    of Neurology.  And I think there's actually both and
15    I think there really is an ANA, but I'm not sure.
16        But the stan -- the flagship organization that
17    publishes what we call the green -- it used to be the
18    green journal, it's now a different color, but it was
19    the sort of thing that ever -- it's the journal you
20    follow and they provide CMEs and they get involved in
21    some politics, and -- I mean, they're the group and
22    so I've always belonged to them.
23        Q.  Are you a member of the International
24    Society of Motor Disturbances (sic)?
25        A.  No.
```

Pages 77 to 80

81

1      Q.  Do you serve on the board of any medical
2  societies?
3      A.  No.
4      Q.  Do you serve on the board of any research
5  groups?
6      A.  No.
7      Q.  Do you serve on --
8      A.  Purposefully I don't.
9      Q.  Do you serve on the board of any
10  foundations?
11      A.  No.
12      Q.  Do you edit any peer-reviewed journals?
13      A.  No.
14      Q.  Do you write for any peer-reviewed journals.
15      A.  I -- mostly no.  There's Medscape when it
16  was first started, I was published as the -- I was
17  the person that wrote the Essential Tremor document.
18  In other words, if you Google and got Medscape and
19  wanted to know all about essential tremor, that's my
20  document.
21      Q.  And when was this?
22      A.  As a fellow.  It was actually a little bit
23  later.  It was a little bit later.  I did a lot of
24  the work while I was a fellow, but it was refined and
25  I did -- got more research and it was very extensive,

82

1  but -- and I would get patients because they would
2  find it online, you know, then they would track me
3  down.
4      Q.  Other than this publication and Medscape,
5  have you been published in any peer-reviewed
6  journals?
7      A.  No.
8      Q.  And this Medscape publication was published
9  in a peer-reviewed journal, correct?
10      A.  No.  It was published online.  It was part
11  of Medscape.  It used to be called E -- it was called
12  eMedicine.  And it was supposed to be -- it was like
13  a textbook online.  And then it also -- then it went
14  more popular, so people --
15      Q.  Was your writing on The essential Tremor
16  peer reviewed?
17      A.  Yes, I believe it was.
18      Q.  Have you published any non-peer reviewed
19  writings?
20      A.  No.
21      Q.  Have you ever served as an expert in any
22  litigation before?
23      A.  Yes.
24      Q.  How many times?
25      A.  Well, the definition of "expert" is -- I

83

1  don't know.  Two maybe.  There may be more over the
2  years.
3      Q.  How many times have you testified in a
4  trial?
5      A.  Never.  And I avoid it.
6      Q.  So the two that you referred to, what were
7  those two?
8      A.  One -- I'm trying to remember.  It was more
9  than two and I don't remember them.  I remember one
10  was a patient with a different kind of movement
11  disorder, it wasn't Parkinson's, who had been told by
12  I think a nurse practitioner that it was what they
13  call functional.  And he was -- I had also called it
14  functional, which kind of means that it doesn't fit a
15  known disease.
16      You know, it's kind of stigmatized.  It's like,
17  "Oh, someone's pretending."  But sometimes they're
18  not pretending, it's just they have a set of symptoms
19  that don't match anything.  And he was suing the
20  primary person that diagnosed him and then they had
21  me -- because I had seen him -- do what I'm doing
22  now.
23      Q.  So there you gave a deposition?
24      A.  Yes.
25      Q.  But you didn't testify at a trial?

84

1      A.  No, I have never testified at a trial.  Oh,
2  there was one, an auto accident or something.  I
3  remember something came up and I said -- I did do one
4  with an auto accident, something had come up.
5      Q.  Did you testify at the trial in the auto
6  accident?
7      A.  You mean in person in court?
8      Q.  Uh-huh.
9      A.  I've never been in court.
10      Q.  Okay.
11      A.  Except on a jury.
12      Q.  So other than the functional movement
13  disorder and the auto accident, did you serve as an
14  expert in any other case?
15      A.  I have.  I remember, but I can't -- I
16  just -- I remember doing it, but I can't remember
17  what it was about.
18      Q.  Okay.  Was it related to your work as a
19  neurologist?
20      A.  Oh, yeah, it was through USF.  And I
21  remember it because I -- you know, this is the first
22  time I've kind of done this on my own.  Usually some
23  office manager is negotiating with the lawyers, the
24  timing, the schedule, and I remember that I hadn't --
25  you know, asking for payment, and I remember that

Pages 81 to 84

85

1    happening. I know that's happened a couple of times
2    earlier in my career, but I just don't remember what
3    it was. I'm sorry.
4        Q. The ones that you recall, were they all in
5    Florida?
6        A. Oh, yeah.
7        Q. And were you always hired on behalf of the
8    plaintiff in those cases?
9        A. Yes. They were patients.
10       Q. And you sat for depositions in all of those
11   cases?
12       A. Yes.
13       Q. Do you know the outcome of those cases?
14       A. No, I don't.
15       Q. Can you recall how many times you've sat for
16   a deposition?
17       A. Well, I said twice that I distinctly
18   remember. My guesstimate would be four times.
19       Q. And, Doctor, you believe that it's important
20   to keep good clinical records, correct?
21       A. If you can, yes.
22       Q. And one facet of your medical training was
23   learning how to take good clinical records?
24       A. Well, there was -- there were sort of
25   templates. Templates isn't the right word. It

86

1    wasn't filled in or anything. There were things that
2    you said first and things you said second and you
3    presented a case and it was sort of parallel when you
4    wrote a case. You know, "this is a 35-year-old male
5    that presents with," you name what they were
6    presented with. I mean, there was kind of a formula
7    that we would use.
8        Q. And you learned this as part of your medical
9    training?
10       A. Yes. Now, at the Parkinson's disease we had
11   a template that didn't necessarily follow all that.
12       MS. HARDY: Will you hand that to the
13   court reporter for marking.
14       THE REPORTER: Do you want to keep this
15   consecutive, right?
16       MS. HARDY: Hum?
17       THE REPORTER: Consecutive markings?
18       MS. HARDY: Yes.
19       (WHEREUPON, the exhibit was marked.)
20       Q. All right. You've been handed what's been
21   marked as Exhibit 3 and it says "How to keep good
22   clinical records."
23       I'm going to direct you to page 2. Well, it will
24   say page 372 down at the bottom left and you see it
25   says, "table 1, good clinical records." Do you see

87

1    that?
2        A. I do.
3        Q. Now, can you review that table and I'll give
4    you a moment to review it.
5        A. It sounds like textbook, yeah.
6        Q. Okay. So keeping good clinical records has
7    all of these advantages on the left, correct?
8        A. Correct.
9        Q. So it aids in sharing of information and
10   cross-medical disciplines, correct?
11       A. Hopefully, yes.
12       Q. And it helps with coordination and
13   continuity of care?
14       A. Uh-huh.
15       Q. It helps improve decision making for patient
16   management?
17       A. Yes.
18       Q. It improves availability of data?
19       A. For risk assessment, yes.
20       Q. Okay. And it provides informative evidence
21   in a court of law; is that right?
22       A. Yes.
23       Q. So keeping poor clinical records has all of
24   the disadvantages on the right; is that right?
25       A. Correct.

88

1        Q. Do you agree that if you learned anything
2    relevant information about a patient you need to put
3    it in the medical record; is that right?
4        A. I'm thinking at other times that you choose
5    not to put something in a record.
6        Q. What are those times?
7        A. Well, they're not -- I'm not saying they're
8    automatic or they always happen, but there might be
9    something that would stigmatize the patient.
10       Q. And what might that be?
11       A. Maybe they would confirm excess alcohol use,
12   for example. Usually you would, almost always. But
13   I think there are times that clinicians -- and I'm
14   speaking generally -- might make a decision not to
15   put something in.
16       Q. So generally there are times that you would
17   not put relevant information in a medical record?
18       A. Speaking abstractly, yeah. I'm not
19   recalling spec -- it didn't really happen in ways
20   that I specifically remember. I just -- there are
21   times when I'm reading records and I'm thinking
22   something isn't there.
23       Q. Do you as a practitioner include all
24   relevant information in a medical record in your
25   practice?

89

1    A. I try.

2    Q. And what are the times where you can recall

3  not putting relevant information in a patient's

4  medical record?

5    A. I don't remember consciously, purposefully

6  not putting something in. But you're under a lot of

7  time pressure. You can just not be as thorough as

8  you might at some point think you wish you were

9  or could have been. You may simply miss something,

10  make a mistake.

11    Q. So would you agree that it's important for

12  medical records to be accurate?

13    A. Oh, certainly and thorough, yes.

14    Q. Do you agree that medical records must be

15  comprehensive?

16    A. Are you we doing Alcoa here? Yes.

17    Q. Everything that you know about the patient,

18  do you try to include this in your medical records?

19    A. If it's relevant.

20    Q. And your opinions of the patient as it

21  relates to their diagnosis, do you include these in

22  their medical records?

23    A. My opinions? You mean like if I like them

24  or --

25    Q. As it relates to their diagnosis?

90

1    A. My opinions. I guess so. I mean, that's

2  what the assessment is about, what I think is

3  happening.

4    Q. So your assessment of the patient's medical

5  condition is always going to be included in your

6  medical notes; is that correct?

7    A. Yes.

8    Q. We'll turn now to your medical notes of your

9  visits with Mr. Williford. And we can use the

10  version that you have which I believe it's Exhibit 2.

11    A. I'm sorry?

12    Q. Then we can use the version that you have

13  that Mr. Brake gave you which I believe is Exhibit 2.

14    THE WITNESS: Okay. Well, this is 2.

15  This is the one he gave me.

16    THE REPORTER: It's the same thing.

17  Right.

18    THE WITNESS: This is one he gave me.

19  They're about the same thing, but this is

20  Exhibit 2.

21    Q. Is the one that he gave you different from

22  the one that's marked?

23    A. I would assume not. This one looks fatter.

24  I mean, this is what I've been reading. I referred

25  to this once while we were talking because I just

91

1  couldn't find the page, this is what I've been using.

2    MS. HARDY: Okay. Let's have what you've

3  been using marked as Exhibit 4. We're going

4  to have the original marked as Exhibit 4.

5    (WHEREUPON, the exhibit was marked.)

6    Q. We are going to turn to -- it's page 28 on

7  the Bates stamps and this should be in exhibit --

8    A. That's this?

9    Q. Yeah. We can turn using that one which is

10  Exhibit 2. Turn to page 28. And on the bottom right

11  it will say page 145 of 150.

12    A. Yes.

13    Q. Are these your notes from your first

14  appointment with Mr. Williford?

15    A. Was that my first? 7th -- was July. Let me

16  just double-check, I think that was. My first was

17  April. I believe so. Maybe that was Dr. Aradi's. I

18  mean that might -- I'm sorry, that was Dr. Aradi's

19  was April. So you're correct, it was September -- I

20  mean, July.

21    Q. July. Okay. So are these notes shown on

22  page Bates stamp ending in 28 of Exhibit 2, this was

23  your first appointment with Mr. Williford, correct?

24    A. Yes.

25    Q. You treated Mr. Williford for just over one

92

1  year; is that correct?

2    A. Well, let's see. He saw Dr. Aradi in April.

3  I saw him the first time in July of '21 and then the

4  last time I saw him was as late as July 2022. Let me

5  look there. June -- is that the last, June? I'd say

6  approximately. Yeah, I'd say approximately.

7    Q. So it's about one year --

8    A. Yeah, about one year.

9    Q. -- that you treated Mr. Williford?

10    A. Correct.

11    Q. Do you independently recollect your

12  appointments with Mr. Williford at all?

13    A. Not much. No, I don't.

14    Q. So most of your memory is coming from your

15  medical records?

16    A. Well, when I read it, it's familiar, and

17  some of it then I remember, but just independently,

18  no.

19    Q. Based on your understanding why was

20  Mr. Williford referred to you?

21    A. Well, I don't know. I think it was probably

22  -- Dr. Aradi was very busy doing a lot of things

23  besides Parkinson's, so for some reason they

24  transferred him to me. I don't know why he went to

25  Dr. Aradi in the first place.

93

1    Q.  Do you typically get patients transferred to
2  you from Dr. Aradi?
3    A.  No, because he was relatively new.  Very
4  often from Dr. Hauser who's the head of the
5  department.
6    Q.  When you first saw Mr. Williford, did you do
7  a full workup as you would with a new patient?
8    A.  A new Parkinson's or movement disorder
9  patient, yes.
10    Q.  And what did that involve?
11    A.  Well, you look at them generally.  You check
12  their mental status.  You might ask them, "What is
13  the date?  Where are you?  What's your name?"  Just
14  you listen to them speak.  And then we have a
15  template, that's sort of what I'm looking at, and I
16  follow it.
17    And you look at -- we look at the cranial nerves,
18  sensation.  Then we start with the motor and I watch
19  their eyes move.  I look at the expression on their
20  face.  I take their limbs and move them to see if
21  they're stiff.  I have them sit in a certain relaxed
22  postures to see if a tremor comes out.  I'll have
23  them do various movements.
24    I'll have them walk.  They -- I might ask them to
25  do heal/toe or something to see if they have balance.

94

1  We do things like finger to nose to see if they have
2  coordination.  And that -- it sort of follows a
3  pattern that's in the exam.
4    Q.  Did you have Mr. Williford fill out a
5  questionnaire?
6    A.  We do on intake.  I don't personally hand it
7  to them.  That's part of the intake.  Yes, there's a
8  questionnaire.
9    Q.  And what does that questionnaire --
10    A.  It's not here by the way.
11    Q.  And what does it involve?  What's on the
12  questionnaire?
13    A.  They ask them family -- they have some very
14  specific questions about family history, you know.
15  Do they have tremor?  Have they ever been diagnosed
16  with dementia or Alzheimer's, siblings.  Any kind of
17  family history.  If they've been exposed -- if they
18  worked on a farm.  If they drank well water.  Their
19  occupation.  I'm trying to remember everything.
20    Well, of course, then there's the medical history
21  we ask, like you do at any doctor's office.  They
22  give you this form and ask you to fill out everything
23  that's ever been wrong with you, asks you to fill out
24  your medications, you know, if you have any
25  allergies, that kind of thing.

95

1    Q.  You mentioned work on a farm and well water,
2  are there other things of this nature on that
3  questionnaire other than working on a farm and
4  exposure to well water?
5    A.  I'm trying to remember because I haven't
6  seen one of these forms in several months.  Is there
7  something -- I mean, is there anything else at all on
8  the form that I'm not remembering?  Probably.  But
9  I'm not what sure what you're asking me.
10    Q.  Do you review this form when you are
11  diagnosing your patient?
12    A.  I usually look at it when they come in, yes.
13    Q.  And are there things that you consider risk
14  factors for Parkinson's disease on this form?
15    A.  Drinking well water from a farm is why it's
16  there, yeah.
17    Q.  Are there other things such as that that you
18  consider risk factors --
19    A.  Family history.
20    Q.  -- that you recall on this form?
21    A.  Family history, medications.  I think those
22  are the main things.  There is a whole section of
23  symptoms where it goes through different -- like any
24  doctor, you know, there's a list.  Do you have
25  asthma?  Do you have this?  Do you have that?

96

1  Sometimes if they have -- oh, if you've ever taken
2  antipsychotic medications.  There's some question --
3  I think that's asked, but it's not asked in those
4  terms.  It's asked more like if you take -- there's a
5  category of medicines for psychological issues, or do
6  you have any.  And some of that is just part of the
7  history, but we are also attuned to see if they've
8  ever been given what are called basically dopamine
9  blockers.
10    Q.  So other than exposure to dopamine blockers,
11  have you taken dopamine blockers, working on a farm,
12  drinking well water, do you recall any other things
13  that you can consider risk factors --
14    A.  Smoking.
15    Q.  -- for Parkinson's disease on this form?
16    A.  Well, smoking is I think asked.  It's not a
17  risk factor, it's protective.
18    Q.  Anything else that you can recall?
19    A.  Not that I can recall, no.
20    Q.  And who developed this form?
21    A.  Well, I don't know.  I think it evolves.
22  Well, I know it evolves.  Usually there's templates.
23  I mean, it was there when I got there.  And sometimes
24  it would change over time because we would realize we
25  needed certain types of information that we weren't

97

1 collecting and it would be updated, usually by an
2 office manager. It would be reviewed by Dr. Hauser
3 or whoever was the lead.
4     Q. Have you ever prompted changes to this form?
5     A. I don't think so, uh-uh. If I wanted to
6 know something I could always ask it.
7     Q. In your first appointment with Mr. Williford
8 you noted that his symptoms began in 2019 with a
9 tremor in his left hand and sometimes his leg; is
10 that correct?
11     A. That's what I -- yes, that's what I
12 reported, and usually that was based on what the
13 patient told me.
14     Q. Do you know Dr. Aradi personally?
15     A. At work, yes. Not extensively because he
16 was relatively new. And he wasn't -- he was only in
17 our office. I mean, first he was around when I was.
18 I was only there a couple days a week and he was only
19 there like one day a week. So we both worked -- he
20 worked at other places. He worked at another
21 movement disorder at USF.
22     But, yeah, I got to -- I liked him. I had a lot
23 of respect for him. I really enjoyed him. I knew
24 him well enough to appreciate him, but we didn't have
25 a long, established relationship.

98

1     Q. Did you know him prior to him starting at
2 USF?
3     A. No. He had just -- he was very young. He
4 had just completed his fellowship.
5     Q. Did you have patients come to you for a
6 second opinion after being treated by Dr. Aradi?
7     A. No. Not that I'm aware of. But they might
8 be transferred to me simply because of scheduling.
9     Q. Other than you, Dr. Aradi, and Dr. Hauser,
10 were there other movement disorder doctors in your
11 group?
12     A. Not doctors, no.
13     Q. What was Dr. Hauser's role?
14     A. He was the head of the group. Now, when I
15 was trained, when I did the fellowship with that
16 group, it was a bigger group.
17     Q. You knew that Mr. Williford's symptoms
18 included a tremor at your first visit, correct?
19     A. Yes.
20     Q. And a REM sleep behavior disorder; is that
21 correct?
22     A. Uh-huh.
23     Q. And light-headedness upon standing, correct?
24     A. Correct.
25     Q. Micrographia?

99

1     A. Uh-huh, yes.
2     Q. He denied excessive daytime sleepiness; is
3 that correct?
4     A. Yes. There were a couple of those things
5 that went -- you know, you'd ask him one day and
6 they'd say yes, and then you'd ask them another day
7 and they'd tell you something else and say no.
8     Q. But at his appointment with you, the first
9 time he denied excessive daytime sleepiness?
10     A. Right.
11     Q. He denied insomnia; is that correct?
12     A. If that's what -- yes. I don't -- I can't
13 say that I personally remember that, but I saw that I
14 put -- that that's what's in the record, yes.
15     Q. And do you trust that that's correct given
16 that it's in your records?
17     A. At the time it was correct. At the time it
18 would have been what he told me.
19     Q. So as of his first appointment with you he
20 denied impulse control disorders and constipation,
21 correct?
22     A. Well, something about he -- his -- he had
23 more trouble with bowel movements than he had, that
24 they were slower. I don't remember what visit that
25 was. I remember reading that, but otherwise, yes.

100

1     Q. At his first visit with you on July 19th,
2 2021 he denied constipation; is that correct?
3     A. Okay. Yes.
4     Q. And at that visit with you he denied impulse
5 control disorders --
6     A. Yes.
7     Q. -- is that correct?
8     A. Uh-huh.
9     Q. So during Mr. Williford's first visit with
10 you he had the opportunity to share any information
11 that he thought might be relevant to your diagnosis
12 of Parkinson's disease, correct?
13     A. Correct. Don't forget that somebody brings
14 him in the room before I'm in there and they fill out
15 some of the -- they ask some of those questions.
16     Q. And so these notes are comprehensive; is
17 that correct?
18     A. I don't know what -- yes. I mean, we don't
19 leave something out on purpose if that's what you
20 mean.
21     Q. Well what I -- I'll clarify.
22     When you say that someone else fills some of this
23 out, these notes aren't only things that you've
24 placed in there, but this includes things that the --
25     A. It's their --

Pages 97 to 100

101

1    Q. -- nurse --

2    A. Yes, yes.

3    Q. -- might have put in here; is that correct?

4    A. I mean, I can't speak for what he's -- he

5    might walk in to say something to the front desk lady

6    that doesn't get recorded. But, yes, in their role

7    of taking them back to the office and asking them

8    specific questions, yes, that would be recorded.

9    Q. So the medical practitioners that saw him

10   that day, you and others would have recorded

11   everything in this chart; is that correct?

12   A. Correct. Remember I'm answering for other

13   people. I wasn't there. So if they ask the patient

14   a question and the patient answered a certain way, I

15   mean, I don't know if they -- you know, I'm not --

16   now I might confirm it. The patient might tell me

17   something different. It happens a lot.

18   Q. Understood. But if it's in this medical

19   record, Dr. Burke, is there any reason to not trust

20   that it is true?

21   A. It's true that that's what the patient said.

22   Q. Okay. And did you have any reason to not

23   trust, that you can recall, Mr. Williford's and

24   Mrs. Williford's description of his symptoms?

25   A. No, I don't. I did not trust them.

102

1    MR. BRAKE: Did you say you didn't not

2    trust them? What did you just say?

3    THE WITNESS: I wasn't suspicious of

4    them.

5    Q. On the questionnaire that we discussed a bit

6    earlier, can you recall whether head trauma, or a

7    history of head trauma was on that questionnaire?

8    A. Well, it was on the questionnaire, yes. And

9    I'm trying to remember if I saw anything. I don't

10   remember if I -- I don't remember it with regard to

11   him. But it was on that questionnaire. Yes, you are

12   correct.

13   Q. And a history of pesticide use, is that on

14   the questionnaire?

15   A. Yes. Under where they talk about the well

16   water and the farming.

17   Q. And a family history, that's on the

18   questionnaire?

19   A. Yes.

20   Q. Are there specific questions about genetic

21   history outside of family history?

22   A. Not that I remember. I mean, do you mean

23   like, they ask about well do you have such -- do you

24   have part one gene disorder? I do not remember that

25   being on the form that I was given, no.

103

1    Q. Does the questionnaire ask about any other

2    toxin exposure that you can recall?

3    A. Just the part about medications. I can't --

4    no, I don't recall a specific other question.

5    MR. BRAKE: When you --

6    Q. And --

7    MR. BRAKE: I'm sorry to interrupt you.

8    When you get to a good point -- it doesn't

9    have to be right this second -- I'm going to

10   need a break again.

11   MS. HARDY: Okay.

12   Q. And you cannot remember which specific boxes

13   Mr. Williford checked; is that correct?

14   A. I remember dementia, Father; Alzheimer's,

15   Mother; Grandfather tremor. I think that's right.

16   That's my recollection, whether it was -- I'd have to

17   look to see if I'm right. I don't -- I don't

18   remember -- and it's not completely off the top of my

19   head that that's in here. That's in the records that

20   I have in front of me.

21   I don't have in front of me the part where we --

22   the actual copy of where we asked some other

23   questions. Like I don't remember seeing in here

24   where -- I remember it stating that he said. I'm

25   just trying to think if I saw that page. Yeah, I

104

1    don't see it in here, the page that we're discussing.

2    Q. Do you -- does USF retain that

3    questionnaire?

4    A. Oh, yeah, yeah. It gets complicated

5    because, you know, they have to upload it out of the

6    paper copies. But, yeah, they do.

7    Q. So you can't individually recollect which

8    boxes Mr. Williford checked?

9    A. Not on that -- not that part of that sheet,

10   no, I don't recall.

11   Q. Okay. How long did his first appointment

12   with you take?

13   A. I have no idea, but they're usually long.

14   That was -- I mean, I spent a lot of time with

15   patients. So I would say at least an hour. Very --

16   I almost never saw a patient for the first time and

17   it take less than an hour, usually more.

18   Q. And is this hour sufficient to generally

19   make a diagnosis of Parkinson's disease?

20   A. Well, no, because if you ordered tests or

21   other records, you don't -- I mean, like this I got a

22   DaTscan and that -- that's when I -- well it

23   confirmed the diagnosis.

24   But, yeah, in the case of the symptoms being

25   consistent with Parkinson's, you don't even need

INTEGRA REPORTING GROUP, LLC
Tampa, FL   (813)259-4800

105

1  always an hour if it's classic Parkinson's.
2     Q.  So this hour was sufficient to make a
3  diagnosis of Parkinson's disease?
4     A.  I think so.
5     Q.  And then you planned to confirm with a
6  DaTscan?
7     A.  Yeah.  And sometimes you get a -- like if
8  you want to eliminate something you get an MRI or
9  something like that.  I checked his neurosurgery
10  notes, for example, to see because was there anything
11  there that might have caused symptoms.
12     Q.  And what were you looking for there?
13     A.  Well, I wasn't looking for anything.  I went
14  into the electronic records for any records at all.
15  I mean, you know, if he had seen dermatology, I would
16  have seen those, but when -- you know, I think it's
17  documented he had some foot pain and ligament pulls
18  and things that can affect gait, and so those would
19  be something that I would be interested in, and I
20  pulled them in my records.
21     Q.  If you can turn to Exhibit 2, the Bates page
22  ending in 30.  And that's page 147 of 150.
23     A.  Yes.
24     Q.  Down at the bottom where you write your
25  plan, you include the DaTscan and then you indicated

106

1  on the second paragraph under plan, "A lack of
2  response to levodopa would indicate a much more
3  difficult path for this Allen.  We want to have
4  convincing evidence that we are not on the wrong
5  track if we persist in addressing this as idiopathic
6  Parkinson's disease."
7     Can you explain what you mean by that?
8     A.  Well, when people don't respond to levodopa,
9  it's just sort of indicated that you take extra care
10  making a diagnosis, but many don't.  Many that turn
11  out to have a positive DaTscan that have Parkinson's,
12  they don't respond.
13     Q.  So at this first appointment Mr. Williford
14  had described that he had not improved when taking
15  levodopa?
16     A.  Not exactly.  He said he got -- it had side
17  effects he didn't like.  And he didn't describe any
18  dramatic improvement.  Now keep in mind that some of
19  the complaints, like cognitive problems, levodopa
20  doesn't treat it.  You don't expect there to be
21  improvement.
22     Tremor is highly unpredictable in its response to
23  levodopa.  Tremor very often, its gait, the rigidity,
24  and slowness that you really expect to respond.
25  Sometimes tremor goes away like a miracle, and

107

1  sometimes it doesn't touch it, and it will touch
2  other symptoms.
3     Q.  So at your first appointment with
4  Mr. Williford was it your understanding that he had
5  not positively responded to the levodopa?
6     A.  Yes, it was.
7     Q.  And does that make you cautious about
8  confirming the diagnosis at this time without a
9  DaTscan?
10     A.  I think it was -- what do you call it -- an
11  overabundance of caution.  I think I was pretty
12  convinced, but I --- yes, you address anything that
13  isn't perfectly in place, so...
14     And it's a clin -- mostly it's a clinical
15  diagnosis.
16     Q.  In this first appointment with Mr. Williford
17  you didn't note any specific causes of Parkinson's
18  disease; is that correct?
19     A.  Not in this document, no, I didn't.
20     Q.  Did you note them anywhere other than in
21  this document?
22     A.  Well, there would have been a cover sheet
23  and it would have been there if he checked off yes to
24  being exposed to pesticides.  I didn't usually do
25  that.  I didn't usually give an opinion about

108

1  something like that, because it wouldn't change his
2  treatment.  And it -- yeah.
3     Q.  So --
4     A.  Like he had a family history of Parkinson's,
5  I might not say well probably -- his Parkinson's is
6  probably genetic.  I might not concretely articulate
7  that.
8     Q.  So this record that we have does not include
9  the cover sheet that might include a cause of
10  Parkinson's disease?
11     A.  Right, because -- it's also complicated
12  because we think in terms of multiple factors.  In
13  other words, there's no one thing that we know for
14  sure -- well -- is the cause.
15     Q.  The cover sheet you mentioned, is this that
16  questionnaire that we've been talking about?
17     A.  That's part it, yes.  Yeah.
18     Q.  And what else is in this cover sheet?
19     A.  Well, they ask him if he's ever had any
20  surgeries.  I mean, I can't recall the whole thing,
21  I'm sorry.
22     Q.  So you --
23     A.  I just don't remember, no.  That's all.
24     Q.  So this cover sheet is the document that
25  they fill out in preparing for their appointment; is

Pages 105 to 108

109

1  that correct?
2      A.  Correct.
3      Q.  And this is the document that you said has
4  to be manually uploaded?
5      A.  Well they all do, yeah.  Well, wait a
6  minute.  Yeah, that has to be manually.  Actually,
7  some of this data we have to -- we can enter
8  directly.  Like when I'm talking to a patient, I can
9  type in a lot of this.  But not -- I don't think
10  those -- those they -- see they fill them out at home
11  and bring it on a piece of paper.
12      Q.  You don't personally -- or was it your
13  testimony that you don't typically discuss your
14  opinion as to what was the cause of a patient's
15  Parkinson's disease with the patient?
16      A.  I -- not -- well, not typically because you
17  don't -- we don't talk -- speak in terms of knowing
18  the cause.  It just isn't -- now let's say, for
19  example, a patient had taken -- even then -- like if
20  they had taken say dope -- an anti-psychotic, a
21  dopamine blocker, that -- and they have some
22  Parkinson's symptoms, I don't assume cause and effect
23  because they can have both.
24      I mean, that drug -- they may have been
25  developing Parkinson's anyway and that drug brought

110

1  out -- you know caused symptoms that made people
2  look.
3      So it's like smoking tobacco.  You know, we say
4  it causes lung cancer, but not everybody that smokes
5  gets lung cancer, and there are people that get lung
6  cancer that didn't smoke.
7      So I don't know in a record, like did somebody
8  say, "Oh, they have lung cancer."  They might say
9  they smoked for 25 years, but did they say "this lung
10  cancer was caused by them smoking"?  You don't
11  usually see that, at least I don't.
12      Q.  So that's not something that you
13  typically --
14      A.  No.
15      Q.  -- discuss with your patients and put in
16  their record?
17      A.  Well, I will tell them that if -- that
18  pesticides have a strong association with Parkinson's
19  and we know some things about it being a factor in
20  developing Parkinson's.  But I don't say, "Oh, your
21  Parkinson's was caused by this."  I don't say that.
22      Q.  Do you tell patients to stop using
23  pesticides?
24      A.  Well, almost always they already have.  A
25  lot of times, like when we talk about the well water,

111

1  they were children.
2      Now, in this case he was a farmer himself as an
3  adult.  But very seldom do I see somebody who is
4  actively using pesticides.  I mean, by the time I see
5  them they're older.
6      It's like the veterans, they were sprayed with
7  Agent Orange when they were 20 and they're in my
8  office when they're 50.  So do I tell them -- now the
9  VA has come to the conclusion that they will say
10  they're service connected because of the Agent
11  Orange, but nobody knows whether that person would
12  have developed Parkinson's anyway.  We don't know.
13      MR. BRAKE:  I'm going to need to take
14  that break soon.
15      Q.  So is there any risk factor that you
16  specifically tell a patient to stop doing if you see
17  a patient --
18      A.  Well, if they were using -- I mean, if they
19  were still -- let's say they worked in a pesticide
20  business, and there's -- then I would.  Whether I
21  thought it caused it or not, I would say pesticides
22  are bad for Parkinson's, you know.
23      MS. HARDY:  We can go ahead and take that
24  break.
25      MR. BRAKE:  Thank you.

112

1      THE VIDEOGRAPHER:  We're off the video
2  record at 3:48 p.m.
3      (WHEREUPON, a brief recess was taken.)
4      THE VIDEOGRAPHER:  This is the beginning
5  of media unit No. 3.  We're on the record at
6  3:55 p.m.
7      Q.  All right.  Dr. Burke, we're going to be
8  discussing your second appointment with
9  Mr. Williford.  It looks like that was September 2nd,
10  2021 and it starts on Bates number -- or page 34.
11      A.  Okay.
12      Q.  Now, you saw Mr. Williford for the second
13  time on September 2nd, 2021?
14      A.  I did.
15      Q.  And this was after the DaTscan had been
16  taken?
17      A.  Yes.
18      Q.  During this appointment you noted that
19  Mr. Williford was able to rise from a chair without
20  difficulty; is that correct?
21      A.  Yes.
22      Q.  And his posture was normal?
23      A.  I'm looking for my physical exam here.  Yes.
24      Q.  He was an alert and oriented person to -- or
25  oriented to person, place, and time; is that correct?

INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813)259-4800

---

113

1    A.  Yes.
2    Q.  His language was normal?
3    A.  Yes.
4    Q.  His strides were slightly shortened?
5    A.  Correct.
6    Q.  His arm swing on the right was mildly
7    reduced?
8    A.  Correct.
9    Q.  And his arm swing on the left was severely
10   reduced?
11   A.  Yes.
12   Q.  And at this appointment you confirmed -- or
13   fully confirmed the diagnosis of Parkinson's disease?
14   A.  Yes.
15   Q.  And you were able to do this with the help
16   of the DaTscan; is that correct?
17   A.  It was confirmatory, yes.
18   Q.  At this appointment had he improved on -- or
19   had he improved with the help of the levodopa?
20   A.  I don't specifically say.  I mean, in
21   physical exams some things are better than on other
22   exams, but that doesn't mean their overall -- that
23   means they're doing well that day.  The medicine is
24   working that day.
25   Q.  So here on page 34, the Bates stamp 34, you

---

114

1    note that the -- "It was not clear if he is
2    benefiting from the medication which he
3    discontinued."
4    So at this second appointment had you not
5    restarted him on the levodopa yet?
6    A.  I seem to remember that I did the first
7    visit, but I don't honestly remember.  Let's see.
8    No.  The earlier visit says, "recommendations
9    plan" -- oh, this is Dr. Aradi's.  Sorry.
10   So we're looking -- let me get this straight.
11   We're looking at September.
12   Q.  Yes.  September 2nd, 2021.
13   A.  And so --
14   Q.  And this is your second appointment.
15   A.  So my first opinion -- so this was July.
16   Yeah, it doesn't look like I started him in July.
17   Q.  So it was after you had the DaTscan and the
18   second appointment that you started him back on the
19   levodopa?
20   A.  Apparently so, correct?
21   Q.  And do you know or have any recollection of
22   why that would have been?
23   A.  Because we desperately try to make sure that
24   they're not going to respond to levodopa before we
25   give up on it because it's most of what we have.  So,

---

115

1    you know, you don't -- I mean, I think part of the --
2    part of the disc -- he didn't really want to accept
3    that he had Parkinson's.  There was -- probably
4    had levodopa at home if he wanted to start it.  There
5    was no particular reason for me to push it at the
6    first visit when it was very clear.
7    I mean, when everything was done and I was saying
8    to him -- I would say to him, "Look this is only
9    half.  We need to really see if it's going to help
10   you."  I don't know why I did that the second time
11   instead of the first.  I really don't know.
12   Q.  Do you recall whether you changed his dosing
13   when you restarted him on levodopa after this -- or
14   after this second appointment?
15   A.  I don't remember specifically.  They change
16   their dosing all the time actually, yeah.  I don't.
17   I remember seeing three times a day and then he was
18   taking it every four to six hours.
19   Q.  And are you familiar with this brain fog
20   that he described as being a symptom?
21   A.  A side effect of levodopa can be sleepiness
22   is usually what the word we use.  So when somebody
23   says "brain fog" -- I mean, that was his term.  It's
24   getting to be used more and more.  You know, sort of
25   a lay term in medicine.  Patients on chemotherapy

---

116

1    will say they have brain fog.  But I don't know that
2    it has a medical definition.
3    Q.  And would you -- do you recall adjusting his
4    dosing based on his description of the side effect?
5    A.  No, I don't.  I don't remember that.  I
6    might have done it, but I don't remember it.
7    Q.  In your experience would you have adjusted
8    the dosing based on a patient of yours describing
9    that they're having brain fog on levodopa?
10   A.  It would depend on their response to the
11   levodopa.  In other words, if somebody has a choice
12   of being able to get up out of a chair and walk and
13   have brain fog, or not have brain fog and not be able
14   to get up out of a chair and walk, you base your
15   decision on that.
16   And see, levodopa is not a medicine with exact
17   dosing.  It's not like an antibiotic.  It doesn't
18   have anywhere near exact dosing.  When we start them
19   -- if I started him from scratch on levodopa, I would
20   have him take a pill and cut sometimes in half, and
21   take a half once a day, period, for like a week, then
22   take two because it can make people nauseated.  If
23   you stay on it for a while, you get over that.  And
24   then the second week they might take a whole pill
25   once a day.

---

Pages 113 to 116

117

1      I might have -- usually we titrate them up over
2   six weeks. Not every doctor does that. They come in
3   and they go, "Oh, I quit that medicine because it
4   made me sick." "Well, it made you sick because the
5   doctor put you on it three times a day from the
6   get-go, so start this way."
7      And because it's -- it's really a symptom
8   medicine. If a little works, you use a little. If
9   more works, you use more. If it works every two
10  hours, they take it every two hours. There are
11  people that literally take levodopa every hour. And
12  they sometimes will manipulate it themselves. And if
13  they have an understanding of it, it's not that
14  unusual, you know.
15     I mean, people -- there's -- it's not that toxic
16  if you don't make a dramatic change. It doesn't fail
17  to work if you're not take -- you know, if one day
18  you skip it, you might have symptoms, but it's still
19  going to work the next day.
20     Q.  Can I direct you to page 7 of the same
21  document, which is Dr. Aradi's note. So go -- if you
22  went back toward the beginning.
23     A.  Page 7. No, page 7 of this large document?
24     Q.  Of Exhibit 2, yeah. And do you see this
25  encounter date in the top right, does it say

118

1   "4/22/21"?
2      A.  Yes, it does.
3      Q.  And then down at the bottom does it say,
4   "Electronically signed by Stephen Aradi, M.D."?
5      A.  Uh-huh.
6      Q.  So under recommendations plan do you see
7   where it says "trial of carbidopa/levodopa at 25
8   milligrams, 100 milligrams up to one tab TID."
9      What does that mean?
10     A.  Three times a day.
11     Q.  So when you previously described weaning a
12  patient on to this medication, is that what was done
13  here?
14     A.  No. That's not what I would have done.
15     Q.  Okay.
16     A.  Now, there's nothing dangerous about it.
17     Q.  So when he was started on the levodopa
18  medication by Dr. Aradi, Mr. Williford was started on
19  the medication at three times a day?
20     A.  If I go by this record, yes.
21     Q.  And you have no reason to believe that this
22  was what he was prescribed by Dr. Aradi, correct?
23     A.  I have no reason to --
24     Q.  To believe that this is not what he was
25  prescribed by Dr. Aradi?

119

1      A.  No, I don't have any reason to think that,
2   no.
3      Q.  What did you prescribe when you restarted
4   Mr. Williford on levodopa?
5      A.  I don't remember.
6      Q.  And does it appear anywhere in your notes
7   from this second appointment?
8      A.  Now, I'm looking at Dr. Aradi's note, so
9   back to where?
10     Q.  If you could turn back to -- well, page 35
11  has your review of symptoms and physical exam, page
12  36 has your plan.
13     A.  Okay. "Retry levodopa."
14     Q.  Do you have -- is your prescription for him
15  here in this note?
16     A.  Yeah, it just says "retry levodopa."
17     Q.  Okay. And you can't recall --
18     A.  And I discussed side effects with him, you
19  know. See, a lot of times once patients are familiar
20  with the medication. I mean, they're not going to
21  take six of them if they haven't. You know, they
22  take one and see how it works.
23     Q.  And so in your experience with a patient
24  like Mr. Williford who had been previously prescribed
25  levodopa at three times a day and that's not what you

120

1   would have done, would you have restarted him at
2   three times a day or would you have started him on a
3   lower dosage?
4      A.  This is where you're getting into
5   documentation. I probably talked with him in the
6   same way I sort of explained here that it's --
7   there's not an exact dose. That he can take a pill,
8   see if it makes him sleepy. If it makes him sleepy,
9   take half a pill. If -- he has to decide if it's
10  working for him and they go by that. I don't -- you
11  know. And probably I didn't document the whole
12  conversation.
13     Q.  All right. Dr. Burke, we're going to turn
14  to your third appointment of Mr. Williford and that
15  was on page 42.
16     A.  So that's 4/7/22?
17     Q.  Yes.
18     A.  Okay.
19     Q.  Under history of present illness you noted
20  that he was not experiencing motor fluctuation; is
21  that correct?
22     A.  I'm looking.
23     Q.  It's on the next page.
24     A.  Yes.
25     Q.  That's correct?

INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813)259-4800

121

1      A.  Correct.
2      Q.  Does that mean that he has improved with the
3  medication?
4      A.  Not necessarily.  It means that he's not
5  having episodes where the medicine is working and
6  then not working.  Where either wearing off and
7  sometimes it's predictable, it will last two and a
8  half hours.  You don't know that until they've
9  started to take it.  And then you can document,
10  "Okay, after two and a half hours, regularly,
11  distinctly he has a recurrence of specific
12  Parkinson's symptoms, he's off."  That's what we mean
13  by motor fluctuations.
14      Q.  And you noted that he did not get muscle
15  jitters as much as he does with not taking it?
16      A.  Well, those were -- that was his words.
17  Yes, I just quoted what he said.
18      Q.  Okay.  And so was that something that you
19  considered in changing or not changing his
20  prescription moving forward?
21      A.  If -- I mean, the bottom line is if a
22  patient feels better on levodopa, they take the
23  levodopa.  If they say something like "muscle
24  jitter," which to me is not a specific description of
25  a Parkinson's symptom, it doesn't matter because it's

122

1  just their way of saying how the Parkinson's makes
2  them feel.
3      It's -- yeah, I mean, I wouldn't -- I would say,
4  "Okay, you're better on it."  In a way that seems
5  relevant, of course.  Let them be.  People figure it
6  out because they -- it's a little bit like managing
7  pain but not quite, because you don't have to be as
8  careful with levodopa as with some pain medicine.
9  You know, but if your headache medicine wears off in
10  four hours, you take it every four hours and people
11  learn that petty quick.
12      Q.  Here you noted that "the arm swing on the
13  left was only moderately reduced."  Was that
14  something that you considered an improvement?
15      A.  No.  I mean, it comes -- these symptoms come
16  and go.  He might have -- he might have felt better
17  that day.  So I mean it's -- it's better to have an
18  arm swing than not, but it doesn't mean that his
19  overall status has improved.
20      Q.  Do you consider that to have been an
21  improvement due to medication?
22      A.  There's no way to know.  Yes, that is one of
23  the things that levodopa does and it's -- you just --
24  yeah, that's why you document it, and it may very
25  well be because of the levodopa.  But sometimes

123

1  people are just -- these -- like if people get
2  nervous their tremors get worse.  It doesn't matter
3  if they're on levodopa or not, their tremors get
4  worse.
5      But you don't say "they're worse," or "the
6  medicine is not working."  If somebody's tired their
7  symptoms come out more.  So one -- so you're taking
8  one slice of a big picture and saying "well, is he
9  better?  Is he worse?"  It's sort of -- if every time
10  he takes it he walks better and it's distinct, then
11  you know the medicine is helping.
12      Q.  So do you consider --
13      A.  But it's just not one exam.
14      Q.  So do you consider an increase in an arm
15  swing an improvement on the medication?
16      A.  It's an improvement in gait, yeah.  I mean,
17  when you swing your arms when you walk, you are
18  walking better than if you don't.
19      Q.  So if Mr. Williford was swinging his arms
20  more at this appointment than at previous
21  appointments, you would have considered that an
22  improvement?
23      A.  For that one symptom, yes.
24      Q.  Okay.  I'm now going to direct you to his
25  fourth appointment with you, which starts on page 51,

124

1  and this was on June 9th, 2022.  Do you see that?
2      A.  I do.
3      Q.  At this point you noted "Patient is not
4  experiencing motor fluctuation again."  Is that
5  correct?
6      A.  Correct.
7      Q.  He was not experiencing dyskinesia during
8  the day, correct?
9      A.  Correct.
10      Q.  He did not have dystonia, correct?
11      A.  Correct.
12      Q.  He had some breakthrough tremors, correct?
13      A.  Correct.
14      Q.  And here you noted for the first time that
15  he had a family history of Alzheimer's.
16      A.  Okay.  That was documented probably in that
17  sheet, and for some reason I decided to put it in
18  here.
19      Q.  Okay.  So for the first time in your
20  documentation you noted that he had a family history
21  of Alzheimer's; is that correct?
22      A.  For the first time I documented it in the
23  clinic report, yes.  It doesn't mean I didn't see the
24  -- I saw whatever was in that page the first time I
25  saw him.  I always read that page.

125

1      Q.  Okay.  So the page that you're referring to
2  is not something that you write; is that correct?
3      A.  Yeah, I don't -- I don't necessarily copy
4  everything that's in that page in my notes, yeah.
5      Q.  That is something that the patient fills
6  out, correct?
7      A.  Right, correct.
8      Q.  And you don't have that here in these
9  records?
10     A.  I don't know why.  I don't know when records
11  were asked for, what they choose to send.
12     Q.  Okay.  So for the first time in your
13  notes --
14     A.  Well, I'm trying to think.  Is it the first
15  time?  Because somewhere -- anyway, okay.
16     Q.  Is that correct?
17     A.  Well, I'm -- I've been reading and
18  re-reading and re-reading so often I'm getting kind
19  of like "Now where did I see that last?"  You know,
20  that kind of effect.  But okay if it's -- it's
21  certainly in that way it is, yes.
22     Q.  And you noted for the first time that he had
23  a family history of dementia?
24     A.  Yes.
25     Q.  And then you noted for the first time that

126

1  he had a family history of tremor?
2      A.  Correct.
3      Q.  Other than what you've written in these
4  notes, have you ever created any other writings
5  specifically about Mr. Williford's diagnosis or care?
6      A.  Well, I'm assuming they sent you all the
7  notes, no.
8      Q.  But other than these notes have you written
9  anything else?
10     A.  If I did it's lost with whatever I left
11  at -- I mean, if there's a fifth note somewhere that
12  I don't remember, I don't -- I don't know what to
13  tell you.
14         But, yeah.  I mean, I don't usually go around
15  writing things about patients someplace else.  This
16  was typed into a computer and then it was produced
17  out of that.
18     Q.  So other than the work that you did --
19     A.  I mean, when I'm with a patient I might
20  write instead of type.  I might write what they're
21  telling me.  And then later go to a note from my
22  writing.
23     Q.  Are those written notes retained?
24     A.  Not necessarily, no.
25     Q.  So other than what's retained by USF, do you

127

1  have any written notes?
2      A.  Oh, no.  I don't have anything, no, uh-uh.
3      Q.  Based on review of your notes from
4  Mr. Williford's care is there anything out of the
5  ordinary about Mr. Williford's Parkinson's disease
6  diagnosis?
7      A.  No.
8      Q.  Is there anything out of the ordinary about
9  Mr. Williford's Parkinson's disease symptoms?
10     A.  No.
11     Q.  Is there anything out of the ordinary about
12  Mr. Williford's development over time over the year
13  that you saw him for Parkinson's disease?
14     A.  Not if you consider the whole range of the
15  people with Parkinson's, no, not at all.
16     Q.  And is there anything out of the ordinary
17  about Mr. Williford's prognosis or progression?
18     A.  No.
19     Q.  In this same appointment, so page 51, you
20  noted that "the patient had extensive exposure to
21  paraquat," part of a lawsuit.  Can you describe why
22  you noted that?
23     A.  Probably because he brought it up in that
24  visit.
25     Q.  Do you recall your discussion with him or

128

1  Mrs. Williford about that?
2      A.  I really don't.  I -- but it may be why I
3  went and copied things off that main sheet into the
4  note.
5      Q.  These other things under there, "Raised on
6  farm, drank well water on land sprayed with pesticide
7  paraquat, sleep apnea," were these other things that
8  would have come from that patient questionnaire?
9      A.  Well, if -- yeah, there would be spaces for
10  a patient to reveal any that stuff, of course.
11     Q.  And so --
12     A.  Almost anything on here could have been on
13  that other piece of paper.
14     Q.  So can you explain -- or is it your
15  testimony that Mr. Williford telling you that he was
16  involved in a lawsuit led you to copy those things
17  into your notes?
18     A.  I might have gone and looked at that page on
19  purpose.  I mean, now he's telling me about paraquat
20  and I probably flipped over to the page that he
21  filled out at the beginning to kind of review what he
22  said.  That's possible.
23     Q.  And that would cause you to put those things
24  in his notes?
25     A.  Apparently so.  I mean, I can't recall what

129

1    I was thinking at the time.  I mean, I don't remember
2    my thought processes.  But I mean it makes sense to
3    me.
4        Q.  When you say it makes sense to you, what
5    makes sense to you?
6        A.  Well, I'm just trying -- then I'm thinking,
7    "Okay, so" -- it probably made me think, "Well,
8    why -- maybe this is why he has" -- you know, "is
9    this why he's got Parkinson's?"
10       Q.  Had you previously ever asked him of
11   specific pesticides that he used?
12       A.  No.  Not specific, no.
13       Q.  And once he mentioned that he was involved
14   in a lawsuit regarding paraquat, did you ask him
15   about other pesticides he may have used?
16       A.  No, no.
17       Q.  Did you have discussion with him about this
18   other than him advising you that he was involved in a
19   lawsuit and you writing it down in your notes?
20       A.  I don't remember doing that.  I don't know
21   what I would have said.  Yes, pesticides are known to
22   be associated with Parkinson's disease.
23       I might have said I don't know where this stands
24   in terms of, you know, a court.  I don't -- I don't
25   -- I couldn't -- I wouldn't have anything to offer

130

1    him.
2        Q.  So you testified just now and earlier that
3    pesticides are known to be associated with
4    Parkinson's disease.  Is it your belief that
5    pesticides are known to be associated with
6    Parkinson's disease or cause Parkinson's disease?
7        A.  Well, I think sometimes they cause
8    Parkinson's.  What we don't know -- it's just like I
9    said with the smoking.  There are people who smoke
10   and don't get lung cancer.  There are people who are
11   exposed to things that cause diseases and don't get
12   the disease.
13       So why is that?  Why is it that every single
14   soldier that was there when they dropped that Agent
15   Orange doesn't have Parkinson's today?  But it's very
16   clear that very -- you know, statistically a
17   significant number of people, that's what happens.
18       Q.  So --
19       A.  It's almost anything.  You know, one
20   individual may be more exposed.  You know, it's like
21   if you get an infection, your immune system fights
22   it.  So staphylococcus causes an infection.  It's a
23   direct cause of an infection, but some people, it
24   won't get out of control, other people it will.  If
25   it does, you know it's staph.  You look at it under a

131

1    microscope.  That's staphylococcus, that caused that
2    pneumonia, but other people will be exposed to the
3    same thing and won't get it.
4        So it's multi-factorial.  You don't say "This by
5    itself is the cause."  It's a contributing -- it's
6    more than likely a major contributing factor.
7        Q.  So is it your -- is it your opinion that
8    Mr. Williford's pesticide use was more than likely a
9    contributing factor to his Parkinson's disease?
10       A.  Yes, it is.
11       Q.  Is it your opinion that Mr. Williford's
12   pesticide use was the cause of his Parkinson's
13   disease?
14       A.  I -- I'm sorry, I'm having trouble
15   distinguishing these two questions.
16       Q.  So is it my understanding that your opinion
17   is that his pesticide use was only a contributing
18   factor in his Parkinson's disease?
19           MR. BRAKE:  Let me object because you've
20       been asked that question.  You've already
21       answered it once, but you may answer.
22       A.  I wouldn't minimize it to say only a
23   contributing -- what does that -- what does that
24   mean?
25       Q.  Is it your opinion that there are multiple

132

1    -- or there may be multiple contributing factors --
2        A.  Always.
3        Q.  -- to Mr. Williford's Parkinson's disease?
4        A.  Always, yes.
5        Q.  Is it your opinion that Mr. Williford's
6    paraquat use was a contributing factor to his
7    Parkinson's disease?
8        A.  Yes.
9        Q.  Have you studied the relationship between
10   paraquat and Parkinson's disease specifically?
11       A.  I have tried.  I have looked through data,
12   research studies.  Clearly there are some articles,
13   there's some studies that support it.  And there are
14   people that they don't like the data.
15       And I'm not a basic bench scientist.  I mean, you
16   know, I'm not there taking apart mitochondria and
17   looking at it under a microscope myself.  So there's
18   literature.
19       In fact I saw an NIH report stating that rotenal
20   (sic), r-o-t-e -- it's another pesticide, and
21   paraquat, they did a study that both of them were
22   specific pesticides they felt contributed to
23   Parkinson's.
24       Q.  Which studies have you reviewed?
25       A.  I couldn't possibly answer that question.  I

INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813)259-4800

133

1    mean, over the years, you know, you have some time,
2    you sit there, you do a Google search or Google
3    Scholar, or you go to PubMed and you just read. I
4    get journals and I read.
5        I couldn't sit here and quote. I mean, if I were
6    to write a paper, I would have to go research the
7    information I was writing in the paper and then put
8    it, you know, a long bibliography. And I can't keep
9    all that in my head.
10       Q. So just to be clear. Do you intend to offer
11   an opinion at trial for the plaintiff on whether
12   paraquat played any role in Mr. Williford's --
13       A. My opinion --
14       Q. -- Parkinson's disease?
15       A. -- would be that it did. That would be my
16   opinion.
17       Q. And did you intend to offer that opinion at
18   trial?
19       A. I didn't know I was going to trial. I
20   hadn't thought about it.
21       MR. BRAKE: You pretty much are at trial
22   right now.
23       Q. Do you intend to offer that opinion at
24   trial?
25       A. If I am in --

134

1        MR. BRAKE: Hold on a second.
2        Object to the form of the question.
3        A. If I'm in a trial, all things being the same
4    as they are this minute, that is the opinion I would
5    offer.
6        MS. HARDY: We can take a break.
7        THE VIDEOGRAPHER: We're off the record
8    at 4:29 p.m.
9        (WHEREUPON, a brief recess was taken.)
10       THE VIDEOGRAPHER: This is the beginning
11   of media unit No. 4. We're on the record at
12   4:44 p.m.
13       Q. Dr. Burke, what is the basis for your
14   opinion that paraquat may have played a role in
15   Mr. Williford's Parkinson's disease?
16       A. My training.
17       Q. Your training. Can you explain.
18       A. My training. Well, starting when I was
19   certainly a fellow, but even when I was a resident,
20   you were simply told what things that were associated
21   with certain illnesses, and pesticides were
22   associated with Parkinson's. And then, you know, we
23   heard more about this pesticide, and I mean Agent
24   Orange and other things. But that was one of the
25   causes -- or, you know, cause or associations with

135

1    Parkinson's disease were pesticides.
2        Q. Your training that pesticides are associated
3    with Parkinson's disease is the basis for your
4    opinion that paraquat caused Mr. Williford's
5    Parkinson's disease; is that correct?
6        A. That's part of it, yeah. I mean, the
7    training is re-enforced as you read other pieces of
8    literature and as you find out what has happened to
9    other people, it's reinforced. It's reinforced by,
10   you know, the opinions of a type of -- like basic
11   science experts and research experts. I'm a clinical
12   expert.
13       Q. Did you do any research in preparation for
14   your testimony today?
15       A. Not a lot, no. I really didn't. I Googled
16   a little bit about the MPTP because I know it caused
17   Parkinson's and I was just sort of curious to know a
18   little more about it.
19       I did a quick search, like -- but I didn't -- I
20   spent maybe -- I didn't spend a whole lot of time
21   doing that, no, because I knew it would be just going
22   down a rabbit hole.
23       Q. When did you do this research?
24       A. I don't know. I mean, I would just take a
25   minute when I had a break and Google something. I

136

1    can't -- you know. I mean, it's a matter of minutes.
2        Q. And this was on your home computer?
3        A. No, not necessarily. I mean I take a
4    computer to work. I have breaks at work. I might --
5    I mean, I do this all day. I Google illnesses, I
6    look up causes of things. I would -- I mean, it's
7    kind of a -- really it is, it's sort of freeform, and
8    I knew about this and I thought, "Oh, I wonder
9    about -- you know, maybe I'll check into this and
10   see, yeah.
11       Q. And so this was after you received the
12   subpoena for this deposition?
13       A. Yes.
14       Q. And up until today?
15       A. Uh-huh, correct. But that isn't the first
16   time I've done it. I mean, I've done that over and
17   over again over the years; looked up something
18   related to causes of Parkinson's or things along
19   those lines.
20       Q. Did you Google anything this morning before
21   you came to this deposition?
22       A. I think I did very briefly, but I didn't
23   have much time.
24       Q. And what did you look at very briefly?
25       A. You know, I'm trying to re -- well, partly I

137

1    was trying find the address and I was having trouble
2    with my computer.
3        I think it was just the same thing. I looked
4    up -- I looked at the MPTP again because I was -- by
5    now I was getting curious. Now that's not related --
6    that's not necessarily a pesticide. It was more cur
7    -- because it causes Parkinson's in mice. And then I
8    was curious, and it parallels.
9        See, I do a lot of work now in neurodegenerative
10   diseases, Alzheimer's and there's a great deal of
11   overlap in terms of what causes them. But because of
12   this -- I mean, because I knew that, it sort of
13   piqued my curiosity.
14       And I did another brief, like very broad search.
15   Like "does paraquat cause Parkinson's?" And it was
16   just like all over the place. So I kind of shut it
17   down and it was like there's no time to research
18   that. It's huge, whether pesticides is this, or who
19   says it does this?
20       I mean, a bunch of articles come up, but you have
21   to read them, and then you have to like think about
22   "well, is this statistically consistent? Who's the
23   population that they" --
24       I mean, you have to take time and wade through
25   these things. Just -- there was no time this morning

138

1    to do that.
2        Q.  So you Googled "does paraquat cause
3    Parkinson's disease" this morning?
4        A.  Yes.
5        Q.  And then you didn't read through any
6    articles?
7        A.  I didn't read a single article, no.
8        Q.  You mentioned researching MPTP. What led
9    you to research MPTP in preparation to give your
10   deposition testimony?
11       A.  Because somewhere, and I don't remember
12   when, I just don't, I had read that -- I don't know
13   if it was paraquat, or something about in general,
14   looks like MPTP.
15       So I was thinking. See, MPTP is what is very
16   commonly referred to because it's used to give mice
17   Parkinson's disease. And so those -- that's how they
18   test things for Parkinson's. They give a mouse
19   Parkinson's disease, then they test the medicine on
20   it.
21       So you're always coming across MPTP mice or an
22   MPTP -- you know. And so it's kind of like well,
23   what is exactly, you know, the chemical makeup of
24   this? I already knew that there was some similarity,
25   but I didn't know what it was. I still don't,

139

1    really.
2        Q.  Did Mr. Brake give you any guidance on what
3    to research in preparation for your deposition?
4        A.  Absolutely not. No, he did not.
5        Q.  Did plaintiff give you any guidance on what
6    to research in preparation for your deposition?
7        A.  No. Mr. Williford?
8        Q.  Yes, Mr. Williford or his wife.
9        A.  I haven't spoken to Mr. Williford since I
10   saw him the last visit.
11       I wouldn't need any guidance or anything. I
12   mean, it's just second nature. You know, it's like
13   somebody uses a word you don't know, you go look it
14   up in the dictionary. It's just when you're in
15   medicine, that's what you do.
16       Q.  So just so that I'm clear in your testimony.
17   You can't recall what made you look into MPTP to give
18   your testimony today, but you remembered something
19   about MPTP and paraquat; is that correct?
20       A.  Yeah. I think actually -- because I Googled
21   a little bit when I first got the subpoena, shortly
22   after that. In fact I was really kind of non-plus
23   because -- this is before I talked to him -- because
24   I didn't -- I've never been subpoenaed outside of a
25   medical office in my life. I had somebody come to my

140

1    door, and I was terrified and I have never had that
2    happen.
3        And so I get the subpoena, I don't even -- I
4    don't remember this person. I don't remember
5    anything about it. I was a little relieved because I
6    realize they weren't suing me. And I prob -- and I
7    went and looked stuff up right then, you know.
8        I saw it was a pesticide company. I saw they
9    were suing them. So what do you do? You go look it
10   up.
11       Q.  Did you do any research in PubMed in
12   preparation for your deposition today?
13       A.  I had Googled something that -- a report --
14   no, I don't think I went directly to PubMed. I can't
15   -- I don't remember. I really don't. Because I do
16   -- it -- you know, it's like asking me if I opened
17   the refrigerator twice or three times, it's just
18   second nature.
19       Q.  Other than Googling "does paraquat cause
20   Parkinson's disease" today, what terms or questions
21   have you Googled in preparation for your deposition
22   today?
23       A.  Over the last few weeks?
24       Q.  Yes.
25       A.  MPTP. I think just variations of the same

INTEGRA REPORTING GROUP, LLC
Tampa, FL   (813)259-4800

141

1    thing. And I had only even -- I mean, I didn't have
2    time to spend a lot of time looking into this. I
3    really didn't. I just didn't have time.
4        Q.   About how much time did you spend looking
5    into this?
6        A.   Probably a half an hour altogether. You
7    know, I spent time with the records. I mean, I don't
8    quite know how to answer the questions.
9        Q.   Aside from the time that you spent reviewing
10   your records, about how much time did you spend
11   researching the relationship between paraquat and
12   Parkinson's disease?
13       A.   Specifically paraquat?
14       Q.   Uh-huh.
15       A.   I'm just guessing, half an hour.
16       Q.   So you don't think you've researched
17   specifically whether paraquat causes Parkinson's
18   disease for more than a half hour in preparing for
19   today's deposition?
20       A.   I can't -- I can't -- I don't know. I
21   really don't. I didn't spend the kind of time that I
22   would spend if I was really like getting into a
23   subject. It was fragmented. It might be 5 minutes
24   here, look and see what I got.
25       Q.   So it's your testimony that you did not

142

1    really get into the subject of whether paraquat
2    causes Parkinson's disease before giving your
3    testimony today?
4        A.   No. I wouldn't say that I did. I didn't
5    get a lot of information. I will say that. It was
6    sort of repetitive. A whole bunch of articles come
7    up. I didn't have time to read them.
8        Q.   So you did not do an extensive review of the
9    literature on --
10       A.   I didn't.
11       Q.   -- whether paraquat causes Parkinson's
12   disease in preparing to give your testimony today?
13       A.   I can't say that I did an extensive review
14   of the literature, no.
15       Q.   Did you do a review of more than half an
16   hour?
17       A.   You know, I probably did. I probably did.
18   Because I'm thinking "what did I do this morning?
19   Did I do half an hour, maybe 20 minutes?" So I must
20   have done more, yeah.
21       Q.   But it's your --
22       A.   It's no where like an extensive review. I
23   mean, if I was going to write an article, I wouldn't
24   have even have touched the amount of information that
25   I would need to write an article and have it

143

1    published, for example.
2        Q.   Did you do a review of more than -- I'm
3    trying to narrow it down, Dr. Burke. And I know this
4    seems repetitive, but if you can give me an idea of
5    how much time you spent reviewing the literature --
6        A.   I can't.
7        Q.   -- on whether paraquat causes Parkinson's
8    disease, that would answer my question.
9        A.   Yeah, but I really can't. I can't honestly
10   say. I can't. I can tell you it was not hours,
11   which it would take. I can tell you it was sporadic.
12   I went to a movie last night. I worked, I came home
13   for a short time, I went to a movie, and came home at
14   10:00 and went to bed. Got up this morning, I
15   reviewed the records for the second time this
16   morning. I mean, that's how much time I had. And I
17   was very nervous about this. I wanted to make sure I
18   knew these records. I hadn't had time to read them
19   thoroughly. I did this morning. I got up about 6:00
20   and read them and underlined them and colored them
21   and all of this. That's all I can tell you.
22       Q.   So over the past three weeks in preparation
23   for this deposition most of your preparation involved
24   your reviewing your notes and Dr. Aradi's notes; is
25   that correct?

144

1        A.   I think so. Most. I'm thinking, well, how
2    many? Are you talking hours or minutes or -- when
3    you say "most." I may -- I mean, I didn't go through
4    articles on paraquat and highlight things and
5    underline them. I did here.
6        Q.   And you did not do that with articles --
7        A.   I didn't --
8        Q.   -- on parquat?
9        A.   -- print one article, no.
10       Q.   Did you do any highlighting of articles on
11   your computer?
12       A.   I don't know how to highlight an article on
13   a computer. I know how -- all I can mark it as a
14   favorite.
15       Q.   Did you mark any articles as favorites on
16   your computer?
17       A.   I did not.
18       Q.   Did you save any articles on paraquat on
19   your computer?
20       A.   This morning? No.
21       Q.   Any time.
22       A.   Could I have? I have no idea. I really
23   don't. Because there was -- I think there was one.
24   There was nothing that really gave me a solid enough
25   discourse for me to want to have to hang on to it.

Pages 141 to 144

145

1   You have to really take time and you have to read the
2   articles and you have to read -- I mean, for
3   something like paraquat in particular.  You know, I'm
4   not a toxicologist.
5       Q.  So you can't recall anything that you
6   reviewed that gave you a solid enough discourse that
7   made you want to hang on to it regarding whether
8   paraquat causes Parkinson's disease before giving the
9   opinion today that paraquat caused Mr. Williford's
10  Parkinson's diseases?
11      A.  I think that's a distorted statement.  I
12  would not say -- today did I do that?  Did I -- did
13  it reinforce what I already thought?
14      Q   Not today.  In the past three weeks --
15          MR. BRAKE:  I'm sorry.  Hold on a second.
16  Were you done with your answer?
17          THE WITNESS:  I'm just getting completely
18  overwhelmed.  I'm sorry.  I don't know how to
19  answer you.
20      Q.  So in the past three weeks has there been
21  anything that you've reviewed, any piece of
22  literature, that gave a solid enough discourse
23  regarding paraquat and Parkinson's disease in
24  preparing to give the opinion that you gave here
25  today --

146

1       A.  No.
2       Q.  -- regarding Mr. Williford?
3       A.  No.  And I saw nothing that changed my
4   opinion either, no.
5       Q.  So your opinion regarding Mr. Williford's
6   Parkinson's disease is not based on your review of
7   any specific studies that you can recall; is that
8   correct?
9       A.  I believe I mentioned one thing from the NIH
10  about rotenal -- I can't pronounce it -- and paraquat
11  specifically.  I've already mentioned that.  So I
12  don't know why you say any.  I remember one article
13  that I came across, not today, that was critiquing
14  the literature and saying, well, the literature is
15  flawed in some ways.  So then -- you know, but I
16  didn't take time to go find out, well, how is this
17  literature flawed and what does that mean?  I just
18  didn't.
19      Q.  Okay.  So other than this one thing from the
20  NIH do you have a -- do you recall an article title?
21      A.  I don't.  I really don't.
22      Q.  Do you recall about how long ago it was that
23  you reviewed this article?
24      A.  This morning.  I think that's what I said.
25  No, it didn't occur to me that I needed to go and

147

1   research this.  You know, my understanding is what I
2   thought at the time.  I diagnosed the patient.  And
3   that's over and done with.
4       Q.  At the time that you diagnosed the patient
5   you thought -- did you think that paraquat caused his
6   Parkinson's disease?
7       A.  I thought it was probably associated with
8   it, yes.
9       Q.  Was paraquat discussed at your first or
10  second appointment with Mr. Williford?
11      A.  No.  Not that I remember, no.
12      Q.  Did you diagnose Mr. Williford with
13  Parkinson's disease at your first or second
14  appointment?
15      A.  Well, I equivocated, got a DaTscan.  I mean,
16  Dr. Aradi diagnosed him and he was right.
17      Q.  So at --
18      A.  I agreed with it.
19      Q.  So at your first or second appointment with
20  Mr. Williford where you agreed with the diagnosis of
21  Parkinson's disease, you did not have any specific
22  thoughts related to paraquat; is that correct?
23      A.  No.  It wouldn't have made any difference.
24      Q.  Paraquat had not been discussed at those
25  appointments; is that correct?

148

1       A.  It's not in the records and I don't remember
2   whether or not it was.  It was probably on that first
3   page that he was exposed to pest -- where he answered
4   about well water and everything.
5       I did -- I mean, it was already documented that
6   he had grown up on a farm and had -- he had drank the
7   well water from the farm.  I already knew that.
8       Q.  The one article that you reviewed this
9   morning from the NIH, do you recall, was it a study
10  that was conducted?
11      A.  I probably spent a minute looking at this.
12  I was -- I had to get ready -- I mean, no.  I -- it
13  was a study, yes, as I believe it was.  But I --
14      Q.  Do you recall what was the design of
15  the study?
16      A.  No, I don't.
17      Q.  Do you recall what the treatment group was?
18      A.  They were talking about rotenal and
19  paraquat.
20      Q.  Do you recall the control group?
21      A.  I think they -- they weren't doing a
22  clinical trial.  I think they were looking at trials
23  that had already been done.  So that's -- I mean,
24  there's a difference.  They're not necessarily
25  running the trial.  They're looking at the results of

INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813)259-4800

149

1    the trials and saying, okay, you know, researchers at
2    the university of blah blah did this study.  This is
3    what they got.  That's what they're reporting on.
4        Q.  Were the studies that they were reporting on
5    blinded studies?
6        A.  I don't -- I didn't have time to read all
7    that.  I -- they wouldn't -- you know, in fact they
8    probably were.  They might have said so.  They might
9    have said "oh, we reviewed" -- I -- my opinion is not
10    based one way or another on that article.  That's all
11    can I tell you.
12        Q.  You mentioned --
13        A.  There's probably -- go ahead.
14        Q.  Go ahead.
15        A.  No, that's all right.
16        Q.  You mentioned there was one article from the
17    NIH and then another article critiquing the
18    literature; is that correct?
19        A.  That was -- that was a while ago.  Yeah,
20    that was -- that wasn't this morning.
21        Q.  But was it a while ago after you received
22    the subpoena?
23        A.  Yes, yes.  And I think it was then that --
24    you know, I just thought what makes sense to me?
25    What do I know about pesticides?  What have I been

150

1    taught?  I can't become an expert on pesticides in
2    preparation for this.  I can't do that and I just
3    accepted that.  I'm not a pesticide expert.
4        Q.  Before you concluded that paraquat might
5    have played a role in plaintiff's Parkinson's
6    disease, did you review any peer-reviewed
7    epidemiology studies on paraquat and Parkinson's
8    disease that you can recall?
9        A.  Haven't -- haven't you already asked me
10    this?  I mean, you're just using -- you just keep
11    asking this.  And I don't know how to answer you.
12        Q.  I'm trying to get a clear answer because
13    sometimes you remember things that you didn't say
14    previously.  So I'm --
15        A.  Well, that's true of most people.
16        Q.  Yes.  And I'm just trying to come to a --
17        A.  There isn't a simple answer.  You read off
18    and on sporadically.  I mean, over years I've looked
19    up stuff and read something.  Over years.  Sometimes
20    it's 5 minutes, sometimes it's an hour.  Sometimes
21    it's a clinical trial.
22        You know, we did clinical trials but we didn't
23    do -- I was not involved in any clinical trials of
24    pesticides.  I was -- you learn from other people.
25    You learn who to trust.  You learn who the experts

151

1    are.  And you trust what they say.  You can't be the
2    expert on every piece of everything.
3        Q.  As a neurologist can you say that there's a
4    consensus in the field on where in the body
5    Parkinson's disease begins and how the pathology
6    progresses?
7        A.  Well, actually it's very interesting.
8    There's thought that it begins in the gut.  It
9    doesn't necessarily begin in the brain.
10        Q.  So you are aware that there are theories
11    that Parkinson's disease begins outside of the brain
12    and progresses into the brain; that's correct?
13        A.  Right.  And they're not new.  It's had some
14    rebirth, but that's not new.  It's been thought for a
15    long time that it's part of the nervous system in the
16    gut and it goes up the vagal nerve.  And they talk
17    about all these Brock levels, it comes here and then
18    it comes here and then it comes here.
19        That's why I'm so interested in neurodegenerative
20    diseases because we don't know -- what is the first
21    step?  What happens?  There was -- well, I don't want
22    to digress too much.
23        Q.  Are you aware that most Parkinson's disease
24    cases that occur sporadically and are of an unknown
25    cause?

152

1        A.  Yes.
2        Q.  Would you agree that around 85 to 90 percent
3    of Parkinson's disease cases have no known cause?
4        A.  I would agree that a vast majority of them.
5    I wouldn't like pick a number.  I mean, if you said
6    79 or 82 or 91, it wouldn't -- it would all be -- the
7    vast majority, we can't say what caused them.  We
8    don't know why that person has Parkinson's.  We know
9    there's some people that have genetic -- we know
10    there are genes, but we also know there are people
11    that have Parkinson's, they don't have those genes.
12        Same with exposure to things.  We know that
13    welders get Parkinson's.  I think it's an exposure to
14    manganese.  People took that drug, they got
15    Parkinson's, but those are the minorities.  Most
16    people, we do not know why they have Parkinson's.
17    Just like we don't know why people get Alzheimer's.
18    It's a new frontier, you know, it's the brain.
19        Q.  So just to clarify.  You agree that the vast
20    majority of Parkinson's disease cases have no known
21    cause?
22        MR. BRAKE:  Objection, asked and answer.
23        A.  I agree.
24        Q.  Do you agree that the only scientifically
25    established risk factors for Parkinson's disease are

INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813)259-4800

153

1  family history and age?
2      A.  No.  My understanding is that exposure to
3  manganese as a welder is a known risk factor.
4  Pesticide exposure is a risk factor.  I think there's
5  still debate about whether brain injury -- traumatic
6  brain injury could be a risk factor.  Genetics is
7  certainly a risk factor.
8      Q.  Are those other risk factors that you've
9  mentioned ones that you understand as being
10  scientific-proven risk factors?
11      A.  Proven.  Proven -- there's been statistical
12  correlation for some of those.  I mean, family
13  history, there's a statistical correlation.  I
14  couldn't tell you what the statistics are.  I trust
15  the sources where I got them -- got that notion.
16  There's been a lot -- I know there's been a lot of
17  research, that I could tell, into where the
18  pesticides.
19      There's a lot of research out there.  I mean,
20  nobody could -- I mean, it would take a huge project
21  to really nail all that down.  There's research about
22  tobacco.  You know tobacco is protective against
23  Parkinson's?  Smokers get less Parkinson's.  Who
24  would have thought?  But there's research.  So what
25  is it?  I mean, so maybe someone didn't get

154

1  Parkinson's because they smoked, you know.
2      Yes, there's a lot that we don't know.
3      Q.  So is it your testimony that these other
4  risk factors that you've mentioned correlation
5  between those and Parkinson's disease, these are --
6  there are scientific-proven correlations in all of
7  those risk factors in Parkinson's disease?
8      A.  Well, "proven" isn't the word that's usually
9  used.  There's like statistical correlation or very
10  hard evidence.  But I guess in lay people terms,
11  yeah.  I think it's proven that there's family
12  history.  I mean, genetics, we know there are genes
13  that are statistically highly correlated with the
14  development of Parkinson's.
15      I mean, that's just true with genetics.  There
16  are very few diseases, Huntington's chorea being one
17  of them where if you've got the gene, you know you're
18  going to get the disease.  That's it.  There's lots
19  of other illnesses where we know it can be caused by
20  a gene.  I mean, proven to the extent that you can
21  prove anything like that.
22      Q.  Earlier you testified that you reviewed some
23  literature on MPTP; is that correct?
24      A.  Yeah.  I think it's very interesting.  Well,
25  I'm very interested in what is this -- what is the

155

1  initial chemical/biochemical process that begins
2  these illnesses.  And when you have something, you
3  know it's like, okay, they can take -- they can go
4  into a lab and give a mouse Parkinson's.  So they can
5  take the brain, they can take it apart, they can put
6  it under a microscope and look at it.
7      And some of this interest has developed since I
8  even left there because now I'm very involved with
9  Alzheimer's disease.
10      Q.  Have --
11      A.  And -- well, go ahead.
12      Q.  Have you reviewed Mark Harrison's chapters
13  on neurology?  Are you familiar with --
14      A.  I probably did years and years ago.  I think
15  that's a major textbook.
16      Q.  So you believe that --
17      A.  If you're going to ask me details about some
18  chapter in a neurology textbook years ago, that's
19  impossible.
20      Q.  Are you aware that in Mr. Harrison's
21  textbook he writes that MPTP or MPTP-like compounds
22  have not been linked to sporadic Parkinson's disease?
23      A.  I would have no idea that he said that, no.
24      Q.  So that --
25      A.  I don't know why he would say it.  I mean --

156

1  you know, there's evidence that comes after an old
2  textbook is out.  I have no -- I have no comment to
3  make on that at all.
4      Q.  Would you agree that no environmental factor
5  has yet been proven to be a cause or to contribute to
6  the cause of Parkinson's disease?
7      A.  I -- no, I don't even think that's true.  I
8  mean, maybe it's the wording that something is off.
9  But when they say -- actually, I have said the same
10  thing here.  I've said the same thing.  I said it's
11  not the cause.  That's the point.  It isn't a single
12  cause.  We don't use the word "cause."  We use
13  "strong association."
14      We -- you know to the extent -- you know, if you
15  put two things together and nine out of 10 times one
16  thing causes the next, is that proof of a cause?  You
17  don't know why.  You don't know why there's an
18  association, you just know there is.
19      Q.  So is it now your testimony that you would
20  not be prepared to say that Parkinson -- that
21  paraquat caused Mr. Williford's Parkinson's --
22      MR. BRAKE:  Objection, asked and answered
23  for like -- I don't know -- 12 times.
24      A.  I think we're playing with words.  When you
25  say, "the cause," I always say that's not the word I

Pages 153 to 156

157

1  would use. Strongly associated, thought to possibly
2  be a cause. I mean, we think that in many cases
3  there's more than one variable. That's just a fact.
4  I don't know what you want me to do about it.
5    Q. Dr. Burke, I haven't been saying "the
6  cause." So my question was, would you be prepared to
7  say that paraquat caused Mr. Williford's Parkinson's
8  disease?
9    A. No. I wouldn't use that wording. I would
10  argue with that wording in any case.
11    Q. So you would not be prepared to say that; is
12  that correct?
13    A. I'd say it probably caused it, yes. But it
14  is the cause or a cause -- a cause is vague, but it's
15  -- no one can know -- I mean, that's what you're
16  quoting people who have said -- and I've said it here
17  myself -- nobody knows absolutely.
18    Like the smokers, you take one person. One
19  person with lung cancer that smoked, you can't say
20  that that one person's lung cancer was caused by
21  smoking because you don't know.
22    Does that mean that people should smoke and -- I
23  mean, you can't say that.
24    Q. So, Dr. Burke, I'm trying to get a clear --
25    A. Well, I feel like --

158

1    Q. -- understanding of what your opinion is.
2  Because --
3    A. My opinion is that more than likely that the
4  reason he got Parkinson's is because of the pesticide
5  use.
6    Q. It's more than likely.
7    And is that --
8    A. Or a reason. It is a reason he got it. Is
9  it the only reason? I don't know. And you're going
10  to have to live with that because that's the truth.
11    Q. So your opinion is that in my more than
12  likely a reason -- paraquat is more than likely a
13  reason that Mr. Williford got Parkinson's disease?
14    A. Yes. And it may be the only one, but I
15  don't know that.
16    Q. Dr. Burke, as a physician you understand
17  that correlation or association and causation are two
18  different things, correct?
19    A. Yes.
20    Q. Correlation or association just means that
21  two things can occur together, correct?
22    A. Yes, to some extent. I mean,
23  epidemiological studies use correlation, but if it's
24  very, very highly correlated it begins to be a gray
25  area.

159

1    Q. Causation means that one thing causes the
2  other, correct?
3    A. Okay. If you say so.
4    Q. Is that correct?
5    A. No, I don't think it is correct.
6    Q. So what is causation?
7    A. It is part of what caused something to
8  happen. It can -- something can be caused by two
9  things. Sometimes you have to have two things. So
10  it is not the one thing that caused it.
11    Q. Let's give an example. The --
12    MR. BRAKE: Let me say something first --
13    A. I mean I'm getting --
14    MR. BRAKE: Let me say something first.
15  Let me say this on the record. And I don't
16  very rarely or rarely say this. In my
17  opinion at this point this deposition is
18  becoming abusive.
19    THE WITNESS: I agree.
20    MR. BRAKE: It is becoming harassing.
21  This witness has been asked multiple times
22  her opinion on the association or causation
23  of paraquat and Parkinson's disease. She
24  said 15 times it is more likely than not
25  probably a cause of his Parkinson's disease.

160

1    You're entitled to ask questions but not
2  the same question over and over and over and
3  over again. If it continues I am very
4  inclined to terminate the deposition and ask
5  for a protective order.
6    MS. HARDY: Your colloquy has been made
7  on the record. However, the witness has
8  changed her opinion in the course of this and
9  the words that she uses, they do matter. So
10  when --
11    MR. BRAKE: Well, I'm not here to argue
12  with you. I'm going to tell you what I'm
13  about to do.
14    MS. HARDY: Well certain words were used
15  earlier in the deposition and then they are
16  used differently later in the deposition and
17  I have the right in this deposition to get to
18  an understanding of what this witness is --
19  especially if she's being presented as an
20  expert, what this witness is basing her
21  opinions on.
22    THE WITNESS: I made it very clear when
23  people started using the word "expert." I'm
24  a clinical expert. I am not a -- I am not a
25  scientist, a basic scientist, I am not a

161

1  toxicologist. I am very good at recognizing,
2  diagnosing, and treating Parkinson's. I am
3  an expert. I am much better than most human
4  beings on this earth of seeing, recognizing,
5  diagnosing Parkinson's.
6      MS. HARDY: And I understand --
7      THE WITNESS: That makes me an expert,
8  but that doesn't mean I know everything.
9      MS. HARDY: I'm just trying to get an
10  understanding of what your familiarity is
11  with the topics that we are here to discuss
12  today.
13      THE WITNESS: Okay.
14      MS. HARDY: And the science of those
15  topics. And you, as Mr. Williford's treater,
16  I'm trying to understand what you understand
17  about that science.
18      Because when trial will come as Mr. --
19  you know as we we've discussed today. A
20  trial will come and if you are called to
21  testify at that trial, then I don't -- we --
22  none of us want to be dealing with topics
23  that weren't covered today when that trial
24  comes.
25      THE WITNESS: I understand that.

162

1      MR. BRAKE: Hold on a second. There's no
2  question pending.
3      Q. Dr. Burke, do you agree that there are
4  numerous instances where something can be correlated
5  and not actually have a causation relationship?
6      MR. BRAKE: Objection, asked and answered
7  5 minutes ago.
8      A. I believe I did answer yes before.
9      Q. Can you answer the question?
10      A. Yes.
11      MR. BRAKE: This is an example of what
12  I'm talking about.
13      MS. HARDY: Mr. Brake, I don't have the
14  transcript -- the real time transcript in
15  front of me, but my question earlier was
16  whether she understands the difference
17  between causation and correlation, so, no, it
18  was not asked and answered.
19      MR. BRAKE: Well, I can take notes just
20  as well as you, and if you perhaps do a
21  better job recalling what she says, we
22  wouldn't be here now and I'll leave it at
23  that.
24      MS. HARDY: Let's take a break.
25      THE WITNESS: I would love to.

163

1      THE VIDEOGRAPHER: We're off the video
2  record at 5:24 p.m.
3      (WHEREUPON, a brief recess was taken.)
4      THE VIDEOGRAPHER: On the video record at
5  approximately 5:40 p.m.
6      Q. All right. Dr. Burke, we are hopefully
7  wrapping up soon. I know being deposed is no fun,
8  but we are nearing the end.
9      A. It's okay. You're doing your job.
10      Q. Do you expect that Mr. Williford's condition
11  will be stable on his medication for the foreseeable
12  future?
13      A. No.
14      Q. And can you explain?
15      A. Well, in my experience Parkinson's never
16  stays the same. It progresses.
17      Q. Do you have -- have you seen any -- strike
18  that.
19      Have you seen Mr. Williford not respond
20  positively to his medication in the year that you
21  were treating him?
22      A. Not nec -- no.
23      Q. Just to be clear, have his symptoms
24  responded positively to the medication in the year
25  that you've treated him?

164

1      A. Some have, yes.
2      Q. Can you turn back to Exhibit 2, your last
3  visit with Mr. Williford which starts on page 51?
4      A. Okay.
5      Q. So Mrs. Williford reported some difficulties
6  with indecision and focusing; is that correct?
7      A. That's what she said, uh-huh.
8      Q. Do you recall any discussion of any other
9  cognitive decline?
10      A. In that visit?
11      Q. In that visit, correct.
12      A. Well, I elaborated that he wasn't having
13  trouble making decisions. He was not following up on
14  tasks.
15      Q. Other than that can you recall anything else
16  that was not included here?
17      A. No.
18      Q. And during that appointment you noted that
19  he was awake and alert?
20      A. Yes.
21      Q. Did you see any symptoms of Parkinson's
22  disease-related dementia during that appointment?
23      A. No.
24      Q. Do you recall any symptoms of Parkinson's
25  disease-related dementia in any of his appointments?

Pages 161 to 164

165

1    A.  He wasn't -- the only thing I recall was
2  that he was not aware of the cognitive problems he
3  was having.  Other than that, no.
4    Q.  And did you consider him not being aware of
5  his cognitive problems a symptom related to
6  Parkinson's disease dementia?
7    A.  So cognitive changes are not dementia,
8  including cognitive decline, it's not necessarily
9  dementia.  So, no, you don't have to -- being unaware
10  of something does not mean you have dementia.  Now,
11  being aware of your own cognitive changes does not
12  mean you have dementia.
13    Q.  I understand.  Dr. Burke, my follow-up was
14  because you answered that in relation to my question
15  about whether he had any symptoms of Parkinson's
16  disease-related dementia that you can recall?
17    A.  I was simply -- and I probably should not
18  have said that.  I probably should have simply said
19  no.
20    Q.  As of your last appointment with
21  Mr. Williford was he performing his daily activities
22  by himself?
23    A.  Yes.
24    Q.  As of his last appointment did he describe
25  any difficulty with dressing himself?

166

1    A.  No.
2    Q.  Any difficulty with cooking?
3    A.  No.
4    Q.  Did he describe any difficulty doing his
5  job?
6    A.  I -- my answer is no, but I'm reviewing my
7  notes.  No.
8    Q.  And when you last saw him he was still quite
9  mobile?
10    A.  Yes.
11    Q.  And if Mr. Williford had described any
12  difficulties with his job related to his symptoms,
13  would you have included those in your clinical notes?
14    A.  Probably.
15    Q.  You included a note in here about
16  Mr. Williford skiing; is that correct?
17    A.  Yes.
18    Q.  If Mr. Williford had described difficulties
19  with travel do you believe that you would have
20  included in these notes?
21    A.  Maybe.
22    Q.  You mentioned earlier that Mr. Williford was
23  having some erectile dysfunction.  Was it your
24  understanding that that was caused by one of his
25  other medications?

167

1    A.  Sertraline is that category of medicine that
2  does cause ED.
3    Q.  And so was it your understanding that
4  Mr. Williford's ED was caused by that medication that
5  he was taking sertraline?
6    A.  I knew it could be a factor.  I knew it was
7  something I could control and so I did.
8    Q.  Was it your --
9    A.  I can't tell you it was -- he's an older
10  man, I can't tell you it's the only cause.
11    Q.  Do you know whether --
12    A.  He might have just had ED, you know, for
13  some reason, but why make it worse with that drug.
14    Q.  Do you know whether his ED improved after
15  the drugs were changed?
16    A.  I don't know.  I don't think I saw him much
17  after that.
18    Q.  Can I turn your attention back to your third
19  appointment note, it starts on page 43 and the
20  erectile dysfunction is mentioned on page 44.  Do you
21  see where that's mentioned?
22    A.  On page 44?
23    Q.  Yes.
24    A.  Yes.
25    Q.  So here you discussed the ED.  Did you

168

1  discuss the ED in your note in --
2    A.  Well, it looks like I'm not the -- it's not
3  clear that I was the one from this -- I mean, I would
4  have supported decreasing sertraline.  I can't tell
5  from my notes whether I did it or the psychiatrist
6  did it.
7    Q.  So this plan -- this plan here on page 44 of
8  Exhibit 2, this was written by you; is that correct?
9    A.  It says, "He is working with psych to
10  moderate benzodiazepine use."  Then just semicolon,
11  "decrease sertraline and started buspirone."
12    Q.  Is it your understanding, Dr. Burke, that
13  this note on page 44 of Exhibit 2 was written by you?
14    A.  Yes.
15    Q.  And so he discussed his psychiatrist's
16  change of his medications with you in his appointment
17  with you; is that correct?
18    A.  I can assume that.  It doesn't say that.
19    Q.  But based on these notes, is that what you
20  assume?
21    A.  Well, depending on where the psych was I
22  might have -- I'm just theorizing because you're
23  asking me.  If that was a USF psychologist, I could
24  have read it myself, usually I would -- I might say
25  that, but not necessarily.

Pages 165 to 168

169

1    Q.  To have ended up in these --
2    A.  But probably.
3    Q.  To have ended up in these notes, that was
4  something that you either reviewed from Mr. Williford
5  or you read from Mr. Williford's other doctor's
6  notes; is that right?
7    A.  Yes, yes.
8    Q.  Then turning back to your last appointment
9  on page 51 and 52 with Mr. Williford, you don't
10  mention the ED again here; is that correct?
11    A.  Not directly.  I mentioned the change in
12  medications referencing the psychiatrist.
13    Q.  And there on page 52 you mention that he is
14  continuing those medications, correct?
15    A.  Right.
16    Q.  And you don't mention that he's suffering
17  from ED here in this plan?
18    A.  No, I don't say anything about it.
19    Q.  And you don't recall any discussion of him
20  suffering from ED in that last appointment?
21    A.  No.
22    Q.  Do you know sitting here today whether
23  Mr. Williford's condition has declined since your
24  last appointment with him?
25    A.  No.

170

1    Q.  Do you know sitting here today whether
2  Mr. Williford's condition has improved since your
3  last appointment with him?
4    A.  No, I don't know.
5    Q.  Did you speak to Mr. Brake during any of the
6  breaks today substantively about your testimony?
7    A.  No.
8    Q.  And you mentioned earlier that you had about
9  three conversations with Mr. Brake after you were
10  subpoenaed.  What was the content of those
11  conversations?
12    A.  He asked me what -- I mean, I don't remember
13  exact words so I'm afraid to say anything.  About my
14  treatment.  Whether I saw this patient.  Whether I
15  remembered this patient.  What I said in my notes
16  about the patient.  What would happen here.  That was
17  the gist of it.
18    MS. HARDY:  No further questions.
19    MR. BRAKE:  Dr. Burke, I have two
20  questions for you.
21    THE WITNESS:  Okay.
22        REDIRECT EXAMINATION
23  BY MR. BRAKE:
24    Q.  The -- at your request are we -- we being
25  The Miller Firm -- paying you for the time that you

171

1  spent to review the medical records and to be here at
2  this deposition?
3    A.  Yes.  You asked me to count those hours and
4  let you know what they were.
5    Q.  And do you recall requesting that it would
6  be fair to compensate you of me?
7    A.  Yes.
8    Q.  And I agreed to do so?
9    A.  Correct.
10    Q.  One more question.  Robert A. Hauser, M.D.,
11  M.B.A.  Do you know Robert, Dr. Hauser?
12    A.  Oh, yeah.
13    Q.  And who is Robert Hauser?
14    A.  He's the head of the Movement Disorder
15  Center.
16    Q.  At USF?
17    A.  Yes.
18    Q.  Do you have an opinion about his
19  professional --
20    A.  He's very smart.  And has a major
21  reputation.  Very prolific in terms of publishing.
22    Q.  Is he still at USF?
23    A.  Oh, yeah.
24    MR. BRAKE:  Thank you very much.  I
25  appreciate your time this evening.

172

1    THE WITNESS:  You're welcome.
2    THE VIDEOGRAPHER:  This concludes the
3  videotaped deposition of Dr. Deborah Burke.
4  We're off the video record at 5:57 p.m.
5    THE REPORTER:  Mr. Brake, do you want to
6  order the transcript?
7    MR. BRAKE:  Yes, I am ordering the
8  transcript.
9    THE REPORTER:  Ms. Hardy, do you want to
10  order a copy?
11    MS. HARDY:  Yes, we would like a copy.
12        S T I P U L A T I O N
13    It was stated by the witness and/or
14  counsel that the exercise of reading and
15  signing the transcript would not be waived.
16    (WHEREUPON, the taking of the deposition
17  concluded at 6 p.m.)
18
19
20
21
22
23
24
25

Pages 169 to 172

173

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH
***************************

I, the undersigned notary authority, certify that Deborah Burke, M.D., in the aforesaid proceedings was sworn remotely and was duly sworn under oath.

WITNESS my hand and official seal this 22nd day of December 2022.


_____
JACQUELINE L. BARRON
Notary Public, State of Florida
Comission No. GG 948301
Expires: March 27, 2024

---

175

CORRECTIONS AND AMENDMENTS
DEBORAH BURKE, M.D., DECEMBER 22, 2022
PAGE    LINE

____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____

---

174

CERTIFICATE OF REPORTER

I, Jacqueline L. Barron, Court Reporter, Notary Public for the State of Florida at large, do hereby certify I stenographically reported via remote videoconferencing the proceedings at the time and place so indicated and that my notes were hereinafter reduced to a computer-generated transcript.

I further certify that I am not an employee or relative of any of the parties and am not an employee or relative of either counsel, and further certify that I am not financially interested in the outcome of this litigation.

I hereby affix my signature this 13th day of January 2023, in Tampa, Hillsborough County, Florida.


_____
JACQUELINE L. BARRON
Court Reporter

---

176

I HAVE READ THE FOREGOING TRANSCRIPT OF DEPOSITION OR PROCEEDINGS AND EXCEPT FOR ANY CORRECTIONS AND/OR AMENDMENTS APPENDED HERETO, AND UNDER PENALTY OF PERJURY, I HEREBY SUBSCRIBE TO THE TRANSCRIPT AS AN ACCURATE RECORD OF THE TESTIMONY.




_____
SIGNATURE OF DEBORAH BURKE, M.D.




RETURN TO JACQUELINE L. BARRON, COURT REPORTER
CASE: ALLEN AND LYNDA WILLIFORD, VS.
SYNGENTA CROP PROTECTION, LLC, ET AL.
DATE: DECEMBER 22, 2022
WITNESS: DEBORAH BURKE, M.D.

Pages 173 to 176

177

```
 1        IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL
          CIRCUIT IN AND FOR HILLSBOROUGH COUNTY
 2                  STATE OF FLORIDA
                    CIVIL DIVISION
 3
 4   ALLEN WILLIFORD AND LYNDA WILLIFORD,
 5         Plaintiffs,
 6   vs.           Case No. 21-CA-006219
 7   SYNGENTA CROP PROTECTION, LLC, ET AL.,
 8         Defendants.
     * * * * * * * * * * * * * * * * * * * * * * *
 9   In re:  Deposition of Deborah Burke, M.D.
              Taken December 22, 2022
10
11   January 13, 2023

12   Brian Brake, Esquire
     The Miller Firm, LLC
13   108 Railroad Avenue
     Orange, Virginia 22960
14   bbrake@millerfirmllc.com, jtravers@millerfirmllc.com

15   Dear Mr. Brake:

16       At the conclusion of Dr. Burke's deposition that
     was taken on the 22nd of December, 2022, in the
17   above-styled case has been transcribed.

18       Per your request to read the transcript, please
     forward on to Dr. Burke so that she may have a chance
19   to make any corrections she wishes.  I suggest she
20   would do this within the next 30 days.
         Please forward her signed errata sheet to my
21   office and once it has been received it will be
22   forwarded to all the parties.
23   Thank you,
     Jacqueline L. Barron
24   Court Reporter

25   cc: Seantyel Hardy, Esquire
         John A. Guyton, III, Esquire
```

Page 177